## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br> and <br><br> METALCAM, S.P.A., <br><br> Defendant-Intervenor. | Court No. 21-00073 |

## ORDER

Upon consideration of the Rule 56.2 motion of Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons (collectively, "Plaintiffs"), all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

ORDERED that Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record is granted; and it is further

ORDERED that the final determination of the U.S. Department of Commerce as set forth in *Forged Steel Fluid End Blocks from Italy: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020) is remanded for disposition in a manner consistent with the judgment of this Court.

SO ORDERED.

Date:_____          Signed:_____
    New York, New York                              Stephen Alexander Vaden, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Court No. 21-00073 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| METALCAM, S.P.A., | ) ) | |
| Defendant-Intervenor. | ) ) | |

## PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade (the "Court"), Plaintiffs, Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons, hereby move for judgment on the agency record in the above-referenced action.  For the reasons set forth in the Brief of Plaintiffs in Support of Their Rule 56.2 Motion for Judgment on the Agency Record, Plaintiffs request that this Court hold that the final determination by the U.S. Department of Commerce, as set forth in *Forged Steel Fluid End Blocks from Italy: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020), is unsupported by substantial evidence on the administrative record and otherwise not in accordance with the law, and that the Court therefore remand this final determination to Commerce for disposition in a manner consistent with the judgment of the Court.

Respectfully Submitted,

/s/ Thomas M. Beline

Thomas M. Beline
Jack A. Levy
Myles S. Getlan
Jeffery B. Denning
James E. Ransdell
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W., Ste 400
Washington, D.C. 20006
(202) 567-2316
(202) 567-2301
*tbeline@cassidylevy.com*

*Counsel to Ellwood City Forge Company,*
*Ellwood National Steel Company, Ellwood*
*Quality Steels Company, and A. Finkl &*
*Sons*

Dated:   July 9, 2021

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

|  |  |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br> and <br><br> METALCAM, S.P.A., <br><br> Defendant-Intervenor. | Court No. 21-00073 |

**BRIEF OF PLAINTIFFS, ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS, IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD**

Thomas M. Beline
Jack A. Levy
Myles S. Getlan
Jeffery B. Denning
James E. Ransdell
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W., Ste 400
Washington, D.C. 20006
(202) 567-2316
(202) 567-2301
*tbeline@cassidylevy.com*

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

Dated:  July 9, 2021

**Table of Contents**

Page

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 4

I.    Administrative Determination Under Review ..................................................... 4

II.   Issues Presented ............................................................................................... 4

III.  Statement of Facts ........................................................................................... 6

    A.   Faced with Unfair Trade Competition, Domestic Producers of FEBs Filed an
         Antidumping Petition for Duties on Italian FEBs ................................................ 6

    B.   Because There Is No Italian Home Market for FEBs, Dumping Is Calculated by
         Comparing U.S. Prices to Constructed Normal Value (*i.e.*, Costs) ................ 8

    C.   To Produce Fluid End Blocks, Respondents Use Raw Materials and Equipment
         Shared with Production of Other Forged Products, Making Cost Allocations a
         Fundamental Issue in this Investigation .......................................................... 9

    D.   Commerce's *Preliminary Determination* Ignored Substantive Concerns with
         the Respondents' Reported Data ..................................................................... 10

    E.   Despite Stating an Intent to Verify and Accepting Plaintiffs' Pre-Verification
         Comments, Commerce Failed to Conduct Any Verification of Factual
         Information Submitted by Respondents ........................................................... 11

    F.   Commerce's *Final Determination* Relied Upon Unverified Information and
         Admittedly Failed to Pursue Issues Relevant to the Dumping Margin ........... 12

SUMMARY OF ARGUMENT ........................................................................... 14

ARGUMENT ..................................................................................................... 16

I.    Standard of Review ......................................................................................... 16

II.   Commerce Acted Unlawfully by Failing to Verify Sales and Cost Data Before Such
    Data Were Used in the Dumping Calculation ................................................... 17

    A.   Because Commerce Failed to Conduct a Verification, Commerce's *Final
         Determination* Is Unlawful ............................................................................. 17

    B.   Commerce's Alternative to a Legally Required Verification Is Not Entitled to
         Deference Because Commerce Failed to Follow Procedural Requirements and
         Otherwise Jettisoned Established Practice ...................................................... 19

1.   Commerce Acted Contrary to Law and Its Own Regulations by Failing to
     Conduct a Verification and Failing to Provide a Verification Report ................. 19

2.   Commerce Unreasonably Departed from Past Practice in the
     "Questionnaire in Lieu of Verification;" as a Consequence, its Verification
     Procedures and Results Are Unsupported by Substantial Evidence,
     Rendering them Unlawful ...................................................................................... 27

     a.   Commerce Ignored Major Issues in Metalcam's "Verification"
          Response that Should Have Warranted the Application of
          Adverse Facts Available Under Normal Verification Procedures ........ 28

     b.   Commerce Ignored Lucchini's Concealment of Raw Material
          Scrap Offsets Disclosed for the First Time in the Verification
          Response .................................................................................................. 36

III.   Although Commerce Tried to Avoid Engaging with the Record by Erecting an
       Exhaustion Framework, Plaintiffs Timely Raised the Issues Rendering Commerce's
       *Final Determination* Unsupported by Substantial Evidence ................................. 39

IV.   Commerce Acted Arbitrarily By Not Applying Adverse Facts Available ........................... 41

CONCLUSION .................................................................................................................. 44

## <u>Table of Authorities</u>

Page(s)

<u>Statutes</u>

19 U.S.C. § 1516a(b)(1)(B) ...............................................................16

19 U.S.C. § 1516a(b)(1)(B)(i).............................................................39

19 U.S.C. § 1677b(e) ........................................................................8

19 U.S.C. § 1677e(a)(2)(A) ...............................................................41

19 U.S.C. § 1677e(a)(2)(D) ...............................................................41

19 U.S.C. § 1677e(b)(1) ....................................................................42

19 U.S.C. § 1677f(i)(3) ......................................................................39

19 U.S.C. § 1677f(i)(3)(A) .................................................................15

19 U.S.C. § 1677m(i) ................................................................. *passim*

19 U.S.C. § 3512(d) ..........................................................................20

<u>Regulations</u>

19 C.F.R. § 351.307...............................................................4, 19, 22

19 C.F.R. § 351.307(b)(1)(i) ..............................................................21

19 C.F.R. § 351.307(d) ......................................................................21

19 C.F.R. § 351.307(c) ...........................................................20, 21, 24

19 C.F.R. § 351.307(d) ...............................................................19, 35

19 C.F.R. § 351.309...................................................................5, 15, 41

<u>Court Decisions</u>

*Association of Data Processing Service Organizations, Inc. v. Board of*
*Governors of Federal Reserve System*, 745 F.2d 677 (D.C. Cir. 1984) .......................................17

*Auer v. Robbins*, 519 U.S. 452 (1997) ...........................................................26

*Bomont Indus. v. United States*, 718 F. Supp. 958 (Ct. Int'l Trade 1989) ....................................41

*Bomont Indus. v. United States*, 733 F. Supp. 1507 (Ct. Int'l Trade 1990) ............................28, 35

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ..........................................................36

*Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011) ............................................................26

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)...................................................................................................... *passim*

*China Steel Corp. v. United States*, 306 F. Supp. 2d 1291 (Ct. Int'l Trade 2004) ..................................................................................................40

*Christopher v. SmithKline Beecham*, 567 U.S. 142 (2012) ........................................................26

*Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ..................................................................................39

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ..........................................................16

*Deacero S.A.P.I. de C.V. v. United States*, 353 F. Supp. 3d 1303 (Ct. Int'l Trade 2018) ............................................................................................43

*Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283 (Fed. Cir. 2021) ..............................43

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F. Supp. 2d 1305 (Ct. Int'l Trade 2001) ..........................................................................20

*Guizhou Tyre Co. v. United States*, Consol. Court No. 19-00032, Slip Op. 2021-64 (Ct. Int'l Trade 2021) ..............................................................................36

*In re Gartside*, 203 F.3d 1305 (Fed. Cir. 2000) ...............................................................17, 27

*Ipsco, Inc. v. United States*, 899 F.2d 1192 (Fed. Cir. 1990) ....................................................25

*Micron Tech. v. United States*, 117 F. 3d 1386 (Fed. Cir. 1997) ..............................19, 20, 25, 27

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................................................................................16

*Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696 (Ct. Int'l Trade 2007) ........................21, 29

*New American Keg v. United States*, Slip Op. 21-30 (Ct. Int'l Trade Mar. 23, 2021) ..................................................................................................24, 26

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ....................................40, 42

*Rhone-Poulenc, Inc. v. United States*, 927 F. Supp. 451 (Ct. Int'l Trade 1996) .................................................................................................41

*RHP Bearings v. United States*, 288 F.3d 1334 (Fed. Cir. 2002) ................................... 16-17, 27

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ...........................................26

*Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338 (Ct. Int'l Trade 1999) .................................................................................................20, 25

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ..................................................17

*Smith Corona Corp. v. United States*, 771 F. Supp. 389 (1991) ...................................................24

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) .................................................................................................40

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) ............................................................26

*Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322 (2010) .................................................................................................16

*T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293 (2015) ...................................................16, 27

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) .................................................25

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996) .............................................17

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .....................................................................26

*United States Steel Corp. v. United States*, 179 F. Supp. 3d 1114 (Ct. Int'l Trade 2016) .................................................................................................38

*United States Steel Corp. v. United States*, 219 F. Supp. 3d 1300 (Ct. Int'l Trade 2017) .................................................................................................38

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................16

*Wheatland Tube Corp. v. United States*, 841 F. Supp. 1222 (Ct. Int'l Trade 1993) .................................................................................................20, 25

*Zenith Elecs. Corp. v. United States*, 988 F.2d 1573 (Fed. Cir. 1993) ........................................40

Administrative Determinations

*Brake Rotors From the People's Republic of China: Rescission of Second New Shipper Review and Final Results and Partial Rescission of First Antidumping Duty Administrative Review*, 64 Fed. Reg. 61,581 (Nov. 12, 1999) ............................................................................................................. 22-23

*Carbon and Alloy Steel Wire Rod from the United Kingdom: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 83 Fed. Reg. 13,252 (Mar. 28, 2018) ...................................................................................................... 23

*Carbon and Certain Alloy Steel Wire Rod from Mexico: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015*, 82 Fed. Reg. 23,190 (May 22, 2017) ....................................... 43

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 Fed. Reg. 11,349 (Mar. 17, 2009) ............................................. 38

*Certain Pasta from Italy; Notice of Final Results of the Twelfth Administrative Review*, 75 Fed. Reg. 6,352 (Feb. 9, 2010) ..................................... 42

*Certain Pasta from Turkey; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 78 Fed. Reg. 9,672 (Feb. 11, 2013) ................................ 42

*Certain Tool Chests and Cabinets From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 15,361 (Apr. 10, 2018) ...................................................................... 23

*Common Alloy Aluminum Sheet From the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 86 Fed. Reg. 13,315 (Mar. 8, 2021) .......................................................................................... 35

*Final Determination of Sales at Less Than Fair Value: Certain Activated Carbon from the People's Republic of China*, 72 Fed. Reg. 9,508 (Mar. 2, 2007) ......................................................................................................... 37

*Fine Denier Polyester Staple Fiber From the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 83 Fed. Reg. 660 (Jan. 5, 2018) ....................................................... 42-43

*Forged Steel Fluid End Blocks from Italy: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020) .............................................................................................. *passim*

*Forged Steel Fluid End Blocks From Italy: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 44,500 (Jul 23, 2020) ...................................................8, 10, 11, 12

*Forged Steel Fluid End Blocks From the Federal Republic of Germany and Italy: Amended Final Antidumping Duty Determination for the Federal Republic of Germany and Antidumping Duty Orders*, 86 Fed. Reg. 7,528 (January 29, 2021) .......................................................4, 14

*Forged Steel Fluid End Blocks From the Federal Republic of Germany, India, and Italy: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 2,394 (Jan. 15, 2020) ............................................................6

*Light-Walled Rectangular Pipe and Tube from Mexico; Notice of Amended Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 35,649 (June 24, 2008) ...............................................................42

*Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 16,646 (Apr. 22, 2019) ..................................................................42

*Notice of Final Determination of Sales at Less Than Fair Value, and Negative Determination of Critical Circumstances: Certain Lined Paper Products from India*, 71 Fed. Reg. 45,012 (Aug. 8, 2006) .........................................29

*Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar From Italy*, 67 Fed. Reg. 3,155 (Jan. 23, 2002) .........................................22

*Petroleum Wax Candles From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 68 Fed. Reg. 13,264 (Mar. 19, 2003) ............................................................38

*Polyethylene Terephthalate Resin From Pakistan: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 48,281 (Sep. 24, 2018) .............................23, 32, 42

*Steel Concrete Reinforcing Bar From Mexico: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 Fed. Reg. 54,967 (Sept. 15, 2014) ...................................37

*Welded Stainless Pressure Pipe from Thailand: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 31,093 (May 30, 2014) .........................................40

Other Administrative Materials

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (May 19, 1997) .......................................................................................................................22

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) ............................................................ *passim*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

|  |  |  |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Court No. 21-00073 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| METALCAM, S.P.A., | ) ) | |
| Defendant-Intervenor. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW AND FACTS IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD**

Plaintiffs, Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons, are domestic producers of forged fluid end blocks – a key upstream input for domestic drilling and fracking activity – that petitioned the U.S. Department of Commerce ("Commerce") to impose antidumping duties to offset injurious dumping by forged fluid end block ("FEB") producers from Italy, among others. Battered for years by unfairly traded imports, Plaintiffs filed these cases with the promise that affirmative relief would shore up the domestic industry and allow Plaintiffs to reinvest in their domestic production activities, hire more workers, and solidify America's energy independence throughout the fracking supply chain. But just months after the petitions were filed, the United States largely shut down because of the COVID-19 pandemic. The injury to domestic producers caused by imports was exacerbated when oil prices quickly began trading negative.

Having already grabbed U.S. market access through their unfair trade practices, Italian FEB producers identified the COVID-19 shutdowns of government offices in Washington, D.C. as an opportunity to achieve litigation success.  To avoid a finding of dumping, Italian producers did not increase their prices.  Instead, they developed a strategy to delay and obfuscate Commerce's investigation.  They capitalized on Commerce's generosity to obtain lengthy and indeed extraordinary extensions of time, which allowed them to repeatedly shift their narrative and data in a manner most favorable to their preferred outcome.

But this gambit would only pay off if Commerce did something it had never done before: abrogated its statutory directive to verify factual information before using it in an original investigation.  Incredibly, and citing nothing other than COVID-related travel restrictions, Commerce did not conduct an on-site, or even a virtual, verification.  Nor did Commerce issue any verification report or verification findings.  As a result of Commerce's failure to follow the law, Italian FEB producers escaped the investigation without the proper measure of accountability required under U.S. law.  Metalcam S.p.A. was excluded from the antidumping duty order after Commerce relied on unverified data to find that Metalcam was not dumping. Meanwhile, the dumping margin calculated for Lucchini Mamè Forge S.p.A. was a fraction of what data in the Petition demonstrated it should be.  Given the importance of fair trade to the U.S. economy and the ample factual record showing dumped Italian FEB imports, the only reason the Petition was not a success was because of COVID-19's impact on Commerce's operations.  But such operational challenges do not excuse Commerce from acting in accordance with law.  Plaintiffs' appeal seeks to redress Commerce's failures in this regard.

From a practical perspective, the consequences of a failure to verify data were amplified significantly in this antidumping investigation.  Most antidumping duty investigations involve a

comparison of the U.S. price of the imported product to the domestic "home market" price of the foreign like product.  Under such a price-to-price comparison methodology, dumping exists if the U.S. price is lower than the foreign market prices in the ordinary course of trade.  But because the United States is one of the only markets in the world for Italian FEBs, neither respondent had usable home market FEB sales available for comparison.  As such, Commerce's dumping calculation did not involve Italian home market prices for FEBs.  Instead, Commerce compared U.S. prices to the constructed normal value of FEBs.  As a forging press can produce multiple types of products using the same raw materials (steel ingot) and same shared production equipment (forging and machining), a forger's production costs must be allocated across products in order to derive product-specific costs of production.  Because these foreign producers can easily reduce the costs reported to produce an FEB by allocating costs *away* from FEBs to other forged products, detailed review and testing of a respondent's allocation methodology and associated costs is crucial to ensure a fair comparison between U.S. price and the constructed normal value of FEBs.  Otherwise, foreign producers can readily avoid a finding of dumping by presenting artificially gerrymandered costs for comparison to low U.S. prices.  That is what occurred here, with Commerce's failure to verify allowing Italian forgers to escape scrutiny and consequences.

Plaintiffs appeal Commerce's failure to verify the factual information submitted by respondents and Commerce's reliance on cost of production information that was incorrect and could not be tied to the respondents' books and records.  Plaintiffs hereby request that this Court remand the challenged determination to Commerce with instructions for Commerce to verify factual information as is required by statute and otherwise render findings supported by substantial evidence.

## STATEMENT PURSUANT TO RULE 56.2

### I.    **Administrative Determination Under Review**

The administrative determination under review is Commerce's final determination and

the resulting antidumping duty order in *Forged Steel Fluid End Blocks from Italy: Final*

*Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020) ("Final

Determination") (Appx083315-083318), and accompanying unpublished Issues and Decision

Memorandum ("Final IDM") (Appx083282-083314), and *Forged Steel Fluid End Blocks From*

*the Federal Republic of Germany and Italy: Amended Final Antidumping Duty Determination*

*for the Federal Republic of Germany and Antidumping Duty Orders*, 86 Fed. Reg. 7,528 (Jan.

29, 2021) ("AD Order") (Appx083319-083323).[1]

### II.    **Issues Presented**

A.  Commerce is required by statute to "verify all information relied upon in making

a final determination in an investigation."  19 U.S.C. § 1677m(i).  Insofar as

Commerce admits that it did not conduct a verification did Commerce act

unlawfully? (Argument Section II.A.)

B.  Commerce's discretion in developing its verification procedures is not unlimited.

Commerce must perform an on-site verification and subsequently issue a

verification report.  *See* Statement of Administrative Action Accompanying the

Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) ("SAA") at

868; 19 C.F.R. § 351.307.  When Commerce itself disclaimed any pretense that it

---

[1] In accordance with Section (d) of Joint Appendix Preparation in § 1581(c) Cases Assigned to
Judge Vaden (Rev'd Feb. 17, 2021), this brief cites the Bates numbers corresponding to the
confidential version of the joint appendix but omit "PR" and "CR" references.

conducted a verification or any analogue thereto, and otherwise failed to issue a

verification report, is Commerce's *Final Determination* lawful?  (Argument

Section II.B.1.)

C. Commerce issued "questionnaires in lieu of verification" and in these, instructed

the respondents not to submit new factual information and to otherwise support

what they already reported in prior questionnaire responses.  Did Commerce err

as a matter of law by allowing new factual information in responses to the

questionnaires and otherwise relying on data that did not verify? (Argument

Section II.B.2).

D. When Plaintiffs timely raised issues related to respondents' reconciliations and

costs of production in the case brief pursuant to 19 C.F.R. § 351.309, did

Commerce err as a matter of law by declining to fully investigate the issues

raised?  Did Commerce support its *Final Determination* with substantial evidence

despite admitting that it failed to fully understand the record in response to

Plaintiffs' claims? (Argument Section III).

E. Commerce claims that all of the required factual information exists on the record

to issue a final determination notwithstanding that verification of that information

did not occur.  However, when Commerce admits that key factual gaps exist, did

Commerce support its *Final Determination* with substantial evidence?  Did

Commerce act arbitrarily by taking no action in response to factual gaps caused

by respondents' deficient reporting, despite Commerce applying adverse facts

available in similar circumstances in other proceedings? (Argument Section IV).

III.     **Statement of Facts**

A.     **Faced with Unfair Trade Competition, Domestic Producers of FEBs Filed an Antidumping Petition for Duties on Italian FEBs**

In the face of pernicious unfair trade in imports of FEBs, Plaintiffs, along with the Forging Industry Association and the FEB Fair Trade Coalition, filed a Petition with Commerce on December 19, 2019, alleging that FEBs had been exported from Italy, among other countries, and sold in the United States for less than fair value.  *See Forged Steel Fluid End Blocks From the Federal Republic of Germany, India, and Italy: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 2,394 (Jan. 15, 2020) (Appx080000-080005).  Commerce initiated an investigation of the imports on January 8, 2020.  *See id.*   Commerce selected two mandatory respondents to investigate, Lucchini Mamè Forge S.p.A. ("Lucchini") and Metalcam S.p.A. ("Metalcam").  *See* Commerce Memorandum, "Antidumping Duty Investigation of Forged Steel Fluid End Blocks from Italy: Respondent Selection" (Feb. 4, 2020) at 1 (Appx080006-080011).

On February 6, 2020, Commerce issued its initial antidumping duty questionnaire to both Lucchini and Metalcam.  *See* Commerce Letter to Lucchini (Feb. 6, 2020) (Appx080012-080164); Commerce Letter to Metalcam (Feb. 6, 2020) (Appx080165-080317).  In due course, and after obtaining multiple extensions of time, Lucchini and Metalcam submitted questionnaire responses concerning their production activities in Italy, U.S. sales, and their costs of production to produce the merchandise under consideration ("MUC").  *See* "Lucchini Mamé Forge S.p.A. Section A Questionnaire Response" (Mar. 3, 2020) (Appx080318-081179); "Lucchini Mamé Forge S.p.A. Section E Questionnaire Response" (Mar. 13, 2020) (Appx081838-081872); "Lucchini Mamé Forge S.p.A. Section C Questionnaire Response" (Mar. 16, 2020) (Appx081873-082080); "Lucchini Mamé Forge S.p.A. Section D Questionnaire Response" (Apr. 3, 2020) ("Lucchini DQR") (Appx082215-082376); "Metalcam Section A Questionnaire

Response" (Mar. 5, 2020) (Appx081180-081837); "Metalcam Section C Questionnaire

Response" (Apr. 2, 2020) (Appx082081-082214); "Metalcam Section D Questionnaire

Response" (Apr. 6, 2020) ("Metalcam DQR") (Appx082377-082551).

Plaintiffs identified various deficiencies in both Lucchini's and Metalcam's responses

including, *inter alia*, concerns about Lucchini's reported costs for steel ingots and Metalcam's

failure to report each constituent element of its cost of producing a forged fluid end block.  *See*

"Deficiency Comments on Section A Questionnaire Response of Lucchini" (Apr. 9, 2020)

(Appx082587-082602); "Deficiency Comments on Lucchini Section D Questionnaire Response"

(Apr. 23, 2020) (Appx082603-082635); "Deficiency Comments on Section A Questionnaire

Response of Metalcam" (Apr. 6 2020) (Appx082552-082568); "Request that Metalcam be

Instructed to Immediately Submit its Section D Cost Data in Proper Form and Explain and

Correct Glaring Deficiencies" (Apr. 8, 2020) ("Petitioners' Initial Sec. D Deficiency

Comments") (Appx082569-082576); "Additional Deficiency Comments on Section D

Questionnaire Response of Metalcam" (Apr. 15, 2020) (Appx082603-082635); "Deficiency

Comments on Section C Questionnaire Response of Metalcam S.p.A." (Apr. 20, 2020)

(Appx082636-082658).  Commerce issued multiple rounds of supplemental questionnaires to

both respondents to address these and other deficiencies.  *See* Commerce Letter to Lucchini

(Apr. 9, 2020) (Appx082577-082586); Commerce Letter to Lucchini (Apr. 29, 2020)

(Appx082704-082720); Commerce Letter to Lucchini (May 20, 2020) (Appx082721-082725);

Commerce Letter to Lucchini (Jun. 8, 2020) (Appx082726-082728); Commerce Letter to

Metalcam (Apr. 23, 2020) (Appx082659-082674); Commerce Letter to Metalcam (Apr. 28,

2020) (Appx082696-082703); Commerce Letter to Metalcam (Jun. 17, 2020) (Appx082734-

082739); Commerce Letter to Metalcam (Jun. 17, 2020) (Appx082729-082733).  After being

granted extraordinary extensions of time to respond to these *supplemental* questionnaires –
totaling at least 29 days for Metalcam and at least 40 days for Lucchini – the Italian forgers
responded, in part.

**B.** **Because There Is No Italian Home Market for FEBs, Dumping Is Calculated by Comparing U.S. Prices to Constructed Normal Value (*i.e.*, Costs)**

Forged fluid end blocks are primarily used in the fluid end of hydraulic fracturing pumps
and so the United States is one of the only markets in the world for FEBs. As no Italian FEBs
are sold in the Italian or third-country markets, there are no sales prices for the foreign like
product to use in a price-to-price dumping comparison. *See Forged Steel Fluid End Blocks From
Italy: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of
Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 44,500 (Jul. 23,
2020) ("Preliminary Determination"), and accompanying unpublished Issues and Decision
Memorandum ("Prelim IDM") at 13 (Appx082849). Lacking such home market or third country
sales prices, the statute instructs Commerce to calculate dumping using constructed normal value
under 19 U.S.C. § 1677b(e), which corresponds to a respondent's cost of manufacture plus
elements of selling, general and administrative expenses, and profit. As part of Commerce's
standard cost questionnaire, Commerce requires foreign producers to report each constituent
element of cost and to precisely reconcile costs between the audited financial statements and the
submitted antidumping cost database. *See, e.g.*, Commerce Questionnaire Letter to Lucchini
(Feb. 6, 2020) at Section D (Appx080104-080122); DOC Commerce Questionnaire Letter to
Metalcam (Feb. 6, 2020) at Section D (Appx080257-080275). In this case, the constituent
elements included raw materials, machining costs, and external processing costs. *See* Lucchini
DQR at 9 (Appx082229); Metalcam DQR at 5-6, 13-15, Exhibit D-4 (Appx082389-082390,
Appx082397-082399, Appx082441).

C.    **To Produce Fluid End Blocks, Respondents Use Raw Materials and Equipment Shared with Production of Other Forged Products, Making Cost Allocations a Fundamental Issue in this Investigation**

Generally, forgers produce forged products by using a steel ingot that has been melted and poured to specific chemical properties.  *See* Lucchini DQR at 6-7 (Appx082226-0822271); Metalcam DQR at 4-5, Exhibit D-3 (Appx082388-082389, Appx082437-082439).  Forgers heat this ingot and use a large forging press to form this steel ingot into shape, thereby modifying the physical and chemical properties of the forged steel.  *See* Lucchini DQR at 6-7 (Appx082226-0822271); Metalcam DQR at 4-5, Exhibit D-3 (Appx082388-082389, Appx082437-082439).  From this stage, forgers can machine the forged steel block by reducing the mass of the forged block in a machining process that gives the block its final physical characteristics for sale and further processing in the United States.  Lucchini DQR at 6-7 (Appx082226-0822271); Metalcam DQR at 4-5, Exhibit D-3 (Appx082388-082389, Appx082437-082439).  For FEBs, that may include precision contouring and drilling bore holes for use in the production of a fluid end module.  *See* Lucchini DQR at 6-7 (Appx082226-0822271); Metalcam DQR at 4-5, Exhibit D-3 (Appx082388-082389, Appx082437-082439).  While the precise chemical and physical properties of a forged fluid end block are specific to the customer's drawings, forgers use the same raw materials and equipment for FEBs as they use for other forged products.  "Petitioner's Post-Preliminary Comments" (Aug. 4, 2020) ("Post-Prelim Comments") at ii (Appx082876).  Early in the investigation, Petitioners identified for Commerce the need to obtain every constituent element of FEB production costs so that Commerce could properly identify the total cost of producing FEBs, add this cost to the total cost of producing other forged products, and tie those totals to the financial statements of each respondent company.  *See* Petitioners' Initial Sec. D Deficiency Comments at 3-4 (Appx082571-082573).  Simply stated, we urged Commerce to ensure that the whole equaled the sum of the parts.

9

### D.   Commerce's *Preliminary Determination* Ignored Substantive Concerns with the Respondents' Reported Data

Over Plaintiffs' objections and without addressing any of Plaintiffs' pre-preliminary arguments concerning the veracity of the data supplied by the mandatory respondents, *see* "Petitioner's Pre-Preliminary Comments Concerning Metalcam" (Jul. 2, 2020) (Appx082740-082783), "Petitioner's Pre-Preliminary Comments Concerning Lucchini, (Jul. 2, 2020) (Appx082784-082836), Commerce calculated preliminary estimated weighted-average dumping margins of 4.84 percent and 0.00 percent for Lucchini and Metalcam, respectively.  *Preliminary Determination* at 44,501 (Appx082872).  With respect to Metalcam, Plaintiffs' pre-preliminary comments ranged from identifying errors in Excel spreadsheets accompanying Metalcam's questionnaire responses, to massive cost reducing discrepancies in Metalcam's raw material and processing costs for the same type of FEB, to missing items in Metalcam's ERP system download, to Metalcam's failure to provide a single source document, and asking that Commerce not calculate a dumping margin using such flawed questionnaire responses.  For Lucchini, Plaintiffs highlighted Lucchini's steel ingot purchase costs as severely flawed insofar as the per unit ingot costs varied wildly and had no basis in Lucchini's books and records used in the normal course of business.

Commerce did not address any of the arguments raised in Plaintiffs' pre-preliminary comments, *see generally* Prelim IDM (Appx082837-082854), and so Plaintiffs filed a post-preliminary submission that encouraged Commerce to review the record, issue a post-preliminary determination that did not rely on the respondents' specious cost allocations, or otherwise conduct a full verification of the responses before using such responses in any final determination.  *See* Petitioner's Post-Preliminary Comments (Appx082875-082921).

**E.    Despite Stating an Intent to Verify and Accepting Plaintiffs' Pre-Verification Comments, Commerce Failed to Conduct Any Verification of Factual Information Submitted by Respondents**

In the *Preliminary Determination*, Commerce stated its intent to comply with the antidumping statute: "{a}s provided in section 782(i)(1) of the Act, Commerce intends to verify the information relied upon in making its final determination." Preliminary Determination, 85 Fed. Reg. at 44,502 (Appx082873). On September 2, 2020, Commerce instead issued a "questionnaire in lieu of performing an on-site verification" to both Lucchini and Metalcam. *See* Letter from Commerce to Lucchini (Sep. 2, 2020) ("Lucchini Questionnaire in Lieu of Verification") (Appx082922-082926); Letter from Commerce to Metalcam (Sep. 2, 2020) ("Metalcam Questionnaire in Lieu of Verification") (Appx082927-082931). In issuing the questionnaire, Commerce stated: "The purpose of this questionnaire is to probe information that you have already submitted – not to obtain new information." Lucchini Questionnaire in Lieu of Verification at 1 (Appx082922); Metalcam Questionnaire in Lieu of Verification at 1 (Appx082927). Commerce also notified parties that:

> …after an on-site verification, parties do not have an opportunity to submit factual information rebutting information collected by Commerce at verification. Accordingly, Commerce will not accept factual information from other interested parties to rebut your questionnaire responses. Interested parties should address the information submitted in response to this request, in case and rebuttal briefs.

Lucchini Questionnaire in Lieu of Verification at 2 (Appx082923); Metalcam Questionnaire in Lieu of Verification at 2 (Appx082928). Commerce made no other statement about verification or the reasons for issuing a questionnaire instead of the verification procedures that Plaintiffs suggested using in their post-preliminary comments.

Despite structuring the process related to the questionnaire as an analogue to verification and indicated that "the questions {on this questionnaire} are similar to those that {Commerce}

11

would normally ask during an on-site verification," Lucchini Questionnaire in Lieu of Verification at 1 (Appx082922); Metalcam Questionnaire in Lieu of Verification at 1 (Appx082927), Commerce ultimately acknowledged that the single questionnaire was not a "verification" as contemplated under the statute.  Specifically, in the *Final Determination* Commerce stated that "it was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation as provided for in section 782(i) of the Tariff Act of 1930, as amended {19 U.S.C. § 1677m(i)}."  *Final Determination* at 79,997 (Appx083316).  Commerce did not provide a rationale for its decision not to conduct a verification or explain how its "questionnaire in lieu of verification" complied with the requirements of 19 U.S.C. § 1677m(i), the Statement of Administrative Action, or Commerce's own regulations.  *See id*.  Notably, Commerce also did not issue a verification report, as required under both the SAA and its own regulations.  In the *Final Determination*, Lucchini received a margin of 7.33 percent and Metalcam's margin was found to be *de minimis*.  *Id*.

F.  **Commerce's *Final Determination* Relied Upon Unverified Information and Admittedly Failed to Pursue Issues Relevant to the Dumping Margin**

Based on a review of the factual record developed in Commerce's questionnaires in lieu of verification and a review of Commerce practice, Plaintiffs identified substantive errors in respondents' data, which undermined Commerce's *Preliminary Determination*.  *See* "Petitioners' Case Brief" (Oct. 20, 2020) ("Administrative CB") (Appx083097-083203).  Specifically, Plaintiffs argued that Metalcam's cost data contained undisclosed errors, did not reconcile to the financial statements, contained errors in costs associated with other non-FEB products, and otherwise relied upon unverifiable adjustments in the job order cost build-ups.  With respect to Lucchini, Plaintiffs once again identified major distortions in Lucchini's reported steel ingot costs, but new factual information accepted in the response to the questionnaire in lieu of

verification attributed such distortions to previously undisclosed yield losses.  Given the errors uncovered for the first time in a post-preliminary "verification questionnaire," Plaintiffs argued that Commerce should apply adverse inferences to act consistently with established agency practice for similar errors in other proceedings.

Although Commerce generally agreed that errors existed and reconciliation was not possible from the cost database to Metalcam's costs, *see* Final IDM at 6-9 (Appx083287-083290), and that Lucchini buried yield losses upstream in its reported steel ingot acquisition prices, see *id*. at 25-26 (Appx083306-083307), Commerce declined to apply adverse inferences and in issuing a *Final Determination* by relying on the data as submitted, did so on speculation rather than evidence.  *See id*. at 7 (Appx083288) ("We agree with the petitioners that the cost reconciliation worksheet contained a formula error in one of the reconciling items, where the appropriate amounts from the trial balance for a period outside the POI (*i.e.*, October to December 2019) were not properly summed.  However, after fully examining the record, as noted by Metalcam, we found the same formula error in the corresponding reconciling item where the appropriate amounts from the trial balance for a period within the POI (*i.e.*, October to December 2018) were not properly summed.   Because one of these reconciling items is a subtraction and the other error is an addition, the net result of these two errors continues to show that Metalcam's reported cost file reconciled to its financial statement costs.") (internal citations omitted); *id*. at 8 (Appx083289) ("The product family level standard costs, at the constituent cost level, cannot be reconciled to the trial balance or to the internal operating report as it is a characteristically different report compared to the other two documents from Metalcam's accounting systems."); *id*. ("While we agree with the petitioners that the minor input chart does not tie to the product family costs worksheet or trial balance, we disagree that the minor input

chart is flawed as the information in the chart is merely a portion of the total machining costs in the product family cost worksheet and the trial balance."); *id*. at 9 (Appx083290) ("While we agree with the petitioners that record evidence shows that certain material costs for non-subject merchandise are negative, we note that the anomaly impacts a very small number of job orders and any adjustment will likely result in an increase in the cost of non-subject merchandise, possibly resulting in a reduction to the reported costs of the subject merchandise."); *id*. at 25 (Appx083306) ("…it is appropriate to adjust Lucchini's reported costs to reflect the costs of fluid end blocks which were scrapped due to quality defects…").

Ignoring or minimizing these major issues and relying on incomplete and unverified data, Commerce calculated weighted-average dumping margins of 7.33 percent for Lucchini and *de minimis* for Metalcam. *Final Determination* at 79,997 (Appx083316). Metalcam was excluded entirely from the resulting antidumping duty order, based on unverified and self-serving data. *See* AD Order (Appx083319-083323). The materially injured domestic FEB industry has not received the relief promised by the antidumping statute from dumped FEBs from Italy because Commerce acted unlawfully in conducting this investigation.

This appeal ensued.

## SUMMARY OF ARGUMENT

The major issue in Plaintiffs' appeal presents an issue of law concerning Commerce's failure to verify information relied upon in Commerce's final determination in a less-than-fair-value investigation.

Under *Chevron* step one, Commerce did not have a legal basis to forego conducting a verification of the respondents' data before using those data in the *Final Determination*. The statute is clear; Commerce must conduct a verification. Having failed to conduct a verification, this Court should remand the *Final Determination* to Commerce to conduct a verification in

accordance with the statute's mandate, as supported by the SAA and Commerce's regulations.

Nor has Commerce provided a reasonable basis for this Court to affirm under *Chevron* step two the questionnaire Commerce issued to the respondents "in lieu of verification" because Commerce itself disclaimed any similarity between the questionnaire and a standard verification exercise, Commerce did not create an adequate analogue to the required on-site verification as required by the SAA, and Commerce did not issue a verification report as required by its regulations. Moreover, Commerce accepted new factual information in response to the questionnaire despite warning that it would not do so and in contrast to a standard verification practice. Such procedural missteps rendered Commerce's *Final Determination* arbitrary and unlawful.

Commerce additionally acted contrary to its statutory mandate by failing to address in the *Final Determination* all relevant arguments made by Plaintiffs in the investigation. *See* 19 U.S.C. § 1677f(i)(3)(A). In particular, Commerce failed to address with substantial evidence Plaintiffs' timely-filed arguments that numerous inconsistencies and omissions made the respondent's data unverifiable and irreconcilable. Rather than engage with the record, Commerce relied on unsubstantiated conjecture and a newly-fabricated exhaustion argument that has no basis in the law or Commerce practice. Specifically, Commerce erected a procedural hurdle that Plaintiffs should have raised the issue earlier in the investigation rather than raise it when required under Commerce's regulations. *See* 19 C.F.R. § 351.309. Commerce thereafter failed to fully investigate these issues, rendering its *Final Determination* unsupported by substantial evidence.

Finally, insofar as the types of record inconsistencies that pervaded this investigation and some that came to light for the first time in response to Commerce's questionnaire in lieu of

verification, the statute and established Commerce practice requires Commerce to rely on facts available with an adverse inference.  Commerce did not do so here.  Its reasons for declining to apply adverse inferences were that the record was complete, yet Commerce admits that holes still exist that remain unresolved.  Commerce acted arbitrarily, without substantial evidence, and contrary to law.

## ARGUMENT

### I.   <u>Standard of Review</u>

This court will "hold unlawful any determination, finding, or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

To determine whether Commerce's decision is supported by substantial evidence, the court examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla" and "must take into account whatever in the record fairly detracts from its weight."  *Id*. at 477, 488.  The substantial evidence standard requires Commerce to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322, 1328 (Ct. Int'l Trade 2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, (1983)); *see also T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 301 (2015) ("An agency must articulate a satisfactory explanation for its action to enable substantial-evidence review.").  Such explanation includes, *inter alia*, providing sufficient reasoning for "treating similar situations differently."  *See RHP Bearings v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) ("We therefore concluded that Commerce's actions were

arbitrary, relying on the decision of the District of Columbia Circuit in *Transactive Corp. v. United States*, 319 U.S. App. D.C. 428, 91 F.3d 232, 237 (1996), for the proposition that 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'") (*citing SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001)); *see also In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000) (noting that the "substantial evidence" test is a specific application of the Administrative Procedure Act's "arbitrary, capricious" test that is intended to emphasize that factual support must be found on the record complied by the agency as opposed to elsewhere) (citing *Association of Data Processing Service Organizations, Inc. v. Board of Governors of Federal Reserve System*, 745 F.2d 677, 684 (D.C. Cir. 1984)).

To determine whether Commerce's interpretation of a statue is "in accordance with law," the courts apply the two-step framework laid out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  Under the *Chevron* framework, a reviewing court must first examine "whether Congress has directly spoken to the precise question at issue." *Id*. at 842.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguous expressed intent of Congress." *Id*. at 842-43.  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843.

II. <u>**Commerce Acted Unlawfully by Failing to Verify Sales and Cost Data Before Such Data Were Used in the Dumping Calculation**</u>

A. **Because Commerce Failed to Conduct a Verification, Commerce's *Final Determination* Is Unlawful**

The statute unambiguously requires Commerce to "verify all information relied upon in making a final determination in an investigation," 19 U.S.C. § 1677m(i), but Commerce plainly

admits it did not conduct a verification, *Final Determination* at 79,997 (Appx083316) ("Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation as provided for in section 782(i) or the Tariff Act of 1930, as amended (the Act)."). This, *ipso facto*, renders Commerce's *Final Determination* unlawful under the first prong of *Chevron* scrutiny, which requires Commerce, and this Court, to "give effect to the unambiguous expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

As recounted in the Statement of Facts, in the *Final Determination*, Commerce acknowledged that pursuant to 19 U.S.C. § 1677m(i) Congress unambiguously "provided for" (*i.e.*, intended) Commerce to conduct an "on-site verification of the information relied upon in making its final determination." *Final Determination* at 79,997 (Appx083316). As "the intent of Congress {was} clear" to Commerce, under the first step of *Chevron* that should have been "the end of the matter." *Chevron*, 467 U.S. at 842. However, rather than finding a way to comply with its statutory obligations, Commerce instead chose to rely on unverified information submitted by Lucchini and Metalcam in making its final determinations, essentially treating Congress's clear statutory verification mandate as an optional undertaking subject to Commerce's discretion. Such an interpretation is not entitled to deference, *Chevron*, 467 U.S. at 842-43, and this Court should accordingly remand the *Final Determination* to Commerce to conduct a verification as plainly required under the statute. If remanded on this basis, the Court need not reach the specifics of Commerce's *non-verification* actions, *i.e.*, Commerce's questionnaires "in lieu of" verification, *see* Section III.E, *supra*, because a "verif{ication}" is what the statute, the SAA, and Commerce's regulations require, 19 U.S.C. § 1677m(i).

**B.     Commerce's Alternative to a Legally Required Verification Is Not Entitled to Deference Because Commerce Failed to Follow Procedural Requirements and Otherwise Jettisoned Established Practice**

Assuming *arguendo* that the statute's plain language does not itself establish the necessity of a remand order for Commerce to verify the data relied upon (though it does), when considering Commerce's compliance with this statutory mandate to verify factual information, the Court of Appeals for the Federal Circuit directs a reviewing court to examine the lawfulness of both (a) Commerce's chosen verification methodology and (b) the results derived from that methodology. *Micron Tech. v. United States*, 117 F. 3d 1386, 1394 (Fed. Cir. 1997).

Here, neither Commerce's methodology nor its results pass muster under the law. *First*, both the SAA and Commerce's regulations make clear that such verification must be on-site and a report must be generated for comment by interested parties prior to Commerce's final determination. *See* SAA at 868; 19 C.F.R. § 351.307. The procedures employed by Commerce did not satisfy either requirement. *Second*, even to the extent Commerce's decision to ignore the law and its own regulations were somehow a reaction to the challenge of the global coronavirus pandemic, Commerce's procedures were nonetheless unlawful because they were arbitrary and an unlawful departure from past practice.

**1.     Commerce Acted Contrary to Law and Its Own Regulations by Failing to Conduct a Verification and Failing to Provide a Verification Report**

As further explained herein, the statute unambiguously requires that Commerce conduct a verification in investigations. 19 U.S.C. § 1677m(i). The SAA and Commerce's regulations require that Commerce observe certain procedures attendant to a verification, *see* SAA at 868; 19 C.F.R. § 351.307(d) ("The Secretary will notify the government of the affected country employees of the Department will visit with the persons listed below in order to verify the accuracy and completeness of submitted factual information."), and furthermore require the

issuance of a verification report prior to promulgation of a final determination, SAA at 868; 19

C.F.R. § 351.307(c) ("The Secretary will report the methods, procedures, and results of a

verification under this section prior to making a final determination in an investigation….").

Aside from these unconditional requirements, the statute does not articulate the precise

requirements for what constitutes a lawful verification.  Thus, when conducting verification,

Commerce generally has the latitude to "derive {its} verification procedures *ad hoc*" and the

court reviews these procedures for abuse of discretion.[2]  *Micron Tech. v. United States*, 117 F. 3d

at 1395-96.  However, this discretion is not absolute.  *See generally Rubberflex Sdn. Bhd. v.

United States*, 59 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 1999) ("In spite of, or perhaps because

of, the wide latitude given Commerce in conducting reviews and verifications, however, 'the

Court must be ever vigilant of abuse of discretion by the agency.'") (quoting *Wheatland Tube

Corp. v. United States*, 841 F. Supp. 1222, 1227 (Ct. Int'l Trade 1993)).  As made clear by the

Supreme Court, an agency's interpretation of an ambiguous statute is only entitled to deference

where it is reasonable and "based on a permissible construction of the statute."  *Chevron*, 467

U.S. at 842-43; *see also Micron Tech*, 117 F.3d at 1397 (noting that Commerce's verification

process must "comport{} with a permissible interpretation of the statutory requirement").  Here

this was not the case.

---

[2] However, as the Trade Court has clarified, in this context the "abuse of discretion" standard is
"not {} a discrete or more stringent standard," but rather "another guise of the statutorily-
mandated substantial evidence/in-accordance-with-law test."  *Fujian Mach. & Equip. Imp. &
Exp. Corp. v. United States*, 178 F. Supp. 2d 1305, 1314 (Ct. Int'l Trade 2001).  In other words,
in evaluating Commerce's chosen verification methodology for abuse of discretion, the court
ensures Commerce's methodology is both: (a) not arbitrary and capricious (*i.e.*, that its decision-
making is supported by substantial evidence) and (b) a reasonable effectuation of Congress's
statutory purpose (i.e., that it is "in accordance with law").  *Id*. at 1313-14.

While the statute does not explicitly delineate what a "verification" entails, the accompanying SAA provides direction.  *See generally* 19 U.S.C. § 3512(d) (requiring that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of…{the} Act in any judicial proceeding in which a question arises concerning such interpretation or application.").  In particular, the SAA stipulates that "Commerce will verify information in a foreign country" after obtaining the consent of the respondent and notifying the foreign government concerned.  SAA at 868.  In compliance with this mandate, Commerce's regulations make clear that Commerce "will verify factual information upon which {it} relies in a final determination in a{n}…antidumping investigation," and, as part of this verification, "will notify the government of the affected country that employees of the Department will visit the persons listed below {i.e. the relevant foreign producers, exporters, importers, affiliates and/or unaffiliated purchasers submitting factual information in the proceeding} in order to verify the accuracy and completeness of submitted factual information." 19 C.F.R. §§ 351.307(b)(1)(i), (d); *see also Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696, 1704 (2007) (noting that the court, like Commerce, "interprets {the term 'verification'} to mean 'on-site' verification").

In addition to clarifying the necessity of "on-site" verification, the SAA further specifies that Commerce must "report the methods, procedures, and results of the verification prior to making its final determination in an investigation." SAA at 868.  As with the "on site" requirement, this mandate was similarly incorporated into Commerce's regulations, which state that Commerce "will report the methods, procedures, and results of a verification under this section prior to making a final determination in an investigation or issuing final results in a review." 19 C.F.R. § 351.307(c).

21

Although possible impediments to these requirements — such as armed conflict, political instability, administrative resource constraints, and domestic or international health crises — were readily foreseeable, neither the statute nor the SAA provide an exception to these mandates, even for extenuating circumstances. *See generally* 19 U.S.C. § 1677m(i); SAA at 868. Commerce's regulations similarly do not contemplate any circumstances where a verification and/or the release of a verification report are not required. *See generally* 19 C.F.R. § 351.307. Indeed, the Preamble to Commerce's regulations make clear that the verification report constitutes a critical piece of "evidence on the record that the Department must consider in making its final determination." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,337 (May 19, 1997). This is why Commerce has, in the past, found a way to conduct verification even under exceptional circumstances. *See, e.g.*, *Polyethylene Terephthalate Resin From Pakistan: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 48,281 (Sep. 24, 2018) ("*PET from Pakistan*") (conducting a verification using "standard verification procedures, including an examination of relevant accounting and production records, and original source documents" with representatives of Pakistani company in Washington D.C. when Commerce determined that travel in Pakistan was not possible due to a State Department travel advisory); *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar From Italy*, 67 Fed. Reg. 3155 (Jan. 23, 2002) (tolling the final determination deadline in this and companion investigations of SSB from Germany, France, the United Kingdom, and Korea in order to conduct a modified verification that "met the {verification} standard" in the wake of "security concerns and logistical difficulties brought about by the events of September 11 {2001}"); *Brake Rotors From the People's Republic of China: Rescission of Second New Shipper Review and Final Results and Partial Rescission of First Antidumping Duty*

*Administrative Review*, 64 Fed. Reg. 61,581 (Nov. 12, 1999) (conducting an off-site verification at a Beijing hotel rather than on-site verification at the respondent's production facilities due to security concerns associated with travel in China following a NATO bombing incident in Belgrade, Yugoslavia).  Further, where Commerce could not verify, it has applied adverse facts available, *see*, *e.g*., *Carbon and Alloy Steel Wire Rod from the United Kingdom: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 83 Fed. Reg. 13,252 (Mar. 28, 2018); *Certain Tool Chests and Cabinets From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 15,361 (Apr. 10, 2018).

Notably, Commerce did not even attempt to justify its procedures in this investigation as a stand-in for the type of procedures required under law.  *See Final Determination* at 79,997 (Appx083316) ("Commerce was unable to conduct onsite verification of the information relied upon in making its final determination in this investigation as provided for in section 782(i) of the Tariff Act of 1930, as amended (the Act).").  Commerce states that it instead "took additional steps in lieu of on-site verification and requested additional documentation and information."  *Id*. However, at no point did Commerce explain how these "additional steps" constituted a lawful substitute for an on-site verification.  Nor did it, for that matter, explain why alternative mechanisms of the type previously employed or that more closely approximated on-site verification were not possible.  Indeed, Commerce actually acknowledged flaws in using yet another questionnaire "in lieu of verification," noting that the questionnaire it issued represented only "a subset of what is typically requested in a verification outline," did not involve the types of "impromptu questions that Commerce verifiers ask during the course of verification," and, unlike a true on site verification, "pertain{ed} {only} to information {the respondent} already

provided on the record." *See* Letter from Commerce to Lucchini (Sep. 9, 2020) (Appx083325-083326); Letter from Commerce to Metalcam (Sep. 9, 2020) (Appx083323-083324). Contrary to the requirements of the SAA and Commerce's own regulations, Commerce also did not issue a verification report outlining its verification procedures and findings, *see* SAA at 868; 19 C.F.R. § 351.307(c), and offered no explanation for this failure. In fact, the questionnaires Commerce issued "in lieu of verification" were no more than another supplemental questionnaire—except that Plaintiffs were stripped of the regulatory right to submit clarifying or rebuttal information under 19 C.F.R. § 351.301(c)(1)(v). *See* Lucchini Questionnaire in Lieu of Verification at 2 (Appx082923); Metalcam Questionnaire in Lieu of Verification at 2 (Appx082928).

Verification is a "critical aspect of Commerce's antidumping investigation." *New American Keg v. United States*, Ct. No. 20-00008 Slip Op. 21-30 at *6 (Ct. Int'l Trade Mar. 23, 2021) ("*American Keg*"). Commerce's decision to rely on the unverified factual submissions of Lucchini and Metalcam in the *Final Determination* thus clearly breached Commerce's "statutory obligation to properly verify those facts which it finds dispositive." *See Smith Corona Corp. v. United States*, 771 F. Supp. 389, 399 (Ct. Int'l Trade 1991). Further, while the ongoing coronavirus pandemic may warrant some flexibility—within the confines of the law—it does not provide Commerce *carte blanche* to act arbitrarily and ignore the law completely. For example, Commerce could have arranged a virtual "on site" verification visit with Lucchini and Metalcam, given Commerce's extensive use of videoconferencing during the pandemic. Indeed, Commerce held the hearing via videoconference. *See* Final IDM at 2 (Appx083283); *see also* Transcript of Public Hearing (Nov. 13, 2020) at 1 (Appx083204). Such an approach would have allowed Commerce to at least approximate verification by interviewing company officials, observing the operation of the sales and financial systems of Lucchini and Metalcam to better understand the

24

process they used to report data to Commerce and to instruct company officials to conduct particularized probes of those systems, issuing follow-up requests for information with strict (typically overnight) response deadlines, and other additional verification exercises routinely used to assess the credibility of a respondent's submitted data.

As noted above, Commerce abuses its administrative discretion where, as here, its verification procedures "contravene{} statutory objectives." *Ipsco, Inc. v. United States*, 899 F.2d 1192, 1195 (Fed. Cir. 1990); *see also Wheatland Tube*, 841 F. Supp. at 1227 ("This Court has noted that it will not allow the agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute."); *Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 1999) ("{W}hile Commerce generally has discretion to schedule a review and allocate resources to a review as it sees fit, it must do so within the confines of its statutory mandates.  When its actions compromise the accuracy of dumping margins, then it has abused its discretion.").  Commerce itself disavowed any notion that its questionnaire in lieu of verification was intended to approximate verification. Thus, Commerce abused its administrative discretion when it developed a procedural framework that otherwise contravened the statute's objectives.

Commerce's administrative discretion is additionally curtailed where, as here, Commerce has "restricted itself by clarifying the verification requirement" in its regulations.  *Micron Tech*. 117 F. 3d at 1396.  In such instances, the proper role of the court "is to determine…if Commerce fulfilled its own self-imposed obligations."  *Id*. at 1396; *see generally Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) (citations omitted) ("Commerce, like other agencies, must follow its own regulations.").  A reviewing court will generally view an agency's interpretation of its own regulation as controlling unless plainly erroneous or inconsistent with

the regulation. *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)); *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances"). An agency's interpretation will not be considered controlling when "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Christopher v. SmithKline Beecham*, 567 U.S. 142, 143-44 (2012) (quoting *Auer*, 519 U.S. at 462 and citing *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 209 (2011)). "This might occur when the agency's interpretation conflicts with a prior interpretation. . . ." *Id.* (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)). Commerce's failure to apply its regulation and conduct a meaningful verification and in turn issue a verification report is unreasonable in this investigation because Commerce had ample tools at its disposal to approximate an on-site verification and it had time to issue a verification report.

In sum, Commerce needed to do more to comply with the law, including the mandates of the SAA and its own regulations. Despite the availability of alternative techniques that would more closely approximate the mandated onsite verification, Commerce relied on a mere supplemental questionnaire, in response to which it accepted new information from the Italian forgers and the domestic industry was prohibited from submitting rebuttal factual information. This is inadequate under the law. *Cf. American Keg*, Slip Op. 21-30 at *41 (remanding to Commerce after concluding that "Commerce unreasonably failed to verify those corrections {submitted by the respondent after the preliminary determination} and thereby abused its discretion"). It is, furthermore unlawful for Commerce to have never issued a verification report of any kind. At an absolute minimum, this deprived the parties of a full explanation of (1) the

reasons Commerce was unable to conduct a verification, (2) why Commerce believed the alternate procedures it undertook were adequate, and (3) Commerce's own findings based on the information derived from Lucchini's and Metalcam's questionnaire responses.  Because Commerce ignored a statutory mandate and its regulations, its *Final Determination* is not entitled to deference and this Court should therefore remand the determination to Commerce so that it may verify the information submitted by Lucchini and Metalcam.

**2.    Commerce Unreasonably Departed from Past Practice in the "Questionnaire in Lieu of Verification;" as a Consequence, its Verification Procedures and Results Are Unsupported by Substantial Evidence, Rendering them Unlawful**

Although Commerce explicitly disclaimed that its questionnaire was an effective stand-in for verification, Commerce nevertheless included instructions in its questionnaire to mimic certain pre-existing verification procedures: (a) "probe information that you have already submitted," (b) "not to obtain new information," (c) "revisions of previously requested information{} may be rejected," and (d) "Commerce will not accept factual information from other interested parties to rebut your questionnaire responses."  *See* Lucchini Questionnaire in Lieu of Verification at 1-2 (Appx082922-082923); Metalcam Questionnaire in Lieu of Verification at 1-2 (Appx082927-082928).  Under the legal framework set forth in *Micron Tech*., 117 F. 3d. at 1397, the court determines "whether the verification results themselves are supported by substantial evidence."  Such review necessarily entails an examination of whether Commerce provided a satisfactory explanation for its decision making, including, *inter alia*, whether it provided a sufficient rationale for treating similar situations differently.  *See T-Mobile*, 574 U.S. at 301; *In re Gartside*, 203 F.3d at 1315; *RHP Bearings*, 288 F.3d at 1347.  In other words, even if this Court were somehow to determine that Commerce's "verification procedures"—that is, the issuance of an additional supplemental questionnaire—complied with Commerce's statutory duty under 19 U.S.C. § 1677m(i), as further explicated by the SAA and

27

Commerce's own regulations, this Court must then examine whether the conclusions Commerce reached after applying those procedures, and the explanations thereof, were reasonable. Here, this was not the case.

As this Court has previously explained, "verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." *Bomont Industries v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990). In its "questionnaire{s} in lieu of on-site verification," Commerce thus asked both Lucchini and Metalcam to provide information validating previously reported cost and sales information. *See* Lucchini Questionnaire in Lieu of Verification at Enclosure (Appx082924-082926), Metalcam Questionnaire in Lieu of Verification at Enclosure (Appx082929-082931). However, as Plaintiffs explained at length in their administrative case brief, both Metalcam and Lucchini failed to provide requested information in the form and manner requested by Commerce. *See* Administrative CB at 8-59 (Appx083118-083169).

> a. *Commerce Ignored Major Issues in Metalcam's "Verification" Response that Should Have Warranted the Application of Adverse Facts Available Under Normal Verification Procedures*

Commerce did not address the gravamen of Plaintiffs' concerns with respect to Metalcam's data as a whole. Early in this investigation, Plaintiffs identified a risk that the Italian respondents could allocate away the costs associated with producing FEBs to other forged products, thereby depressing normal value and masking their dumping. *See, e.g.,* Petitioners' Initial Sec. D Deficiency Comments at 3-4 (Appx082571-082572). This is why Plaintiffs repeatedly stressed the need for Commerce to obtain all the constituent elements of cost (*e.g.,* raw materials, internal machining, external machining). From the beginning, Metalcam attempted to hide the constituent elements of cost. *See e.g.,* Post-Prelim Comments at 12-14 (Appx082891-082893). Plaintiffs' post-preliminary comments identified the massive distortions

apparent in comparing the raw material costs of the same FEBs.  *Id*. at 6-12 (Appx082885-082891).

Commerce's "verification questionnaire" intended to have Metalcam support its reported costs for raw materials, internal machining, and external machining, but the data in the antidumping cost database could not be reconciled to Metalcam's audited financial statements. Specifically, as recounted in Commerce's *Final Determination*, the worksheet used to develop the cost database "cannot be reconciled to the trial balance {(the trial balance being what is audited)}."  Final IDM at 8 (Appx083289).  As Commerce has previously noted, "{a}udited financial statements undergo detailed testing by independent auditors and serve as a reliable benchmark for financial statement users."  *Notice of Final Determination of Sales at Less Than Fair Value, and Negative Determination of Critical Circumstances: Certain Lined Paper Products from India*, 71 Fed. Reg. 45,012 (Aug. 8, 2006), and accompanying IDM ("*Paper Products from India* IDM") at Comment 14.  A reconciliation of Metalcam's antidumping cost database to its audited financial statements is thus critical because it "assures {Commerce} that the respondent has accounted for all costs before allocating those costs to individual products." *Myland Indus.* 31 C.I.T. at 1703 (quoting *Paper Products from India* IDM at Comment 14).

Often, as in this case, there are several steps in the "chain" between the antidumping costs and the financial statements, as respondents may prepare one or more intermediary reports to narrow company-wide audited costs into product-specific costs as required by the antidumping questionnaire.  A failure to "tie" or "reconcile" such reported product-specific costs to a GAAP-compliant, audited financial statement strongly indicates that costs relevant to the product at issue in the antidumping investigation may have been improperly omitted.  Here, Metalcam's GAAP-compliant financial statements are broken into more granular detail in its trial balance

and the so-called "internal operating report."  However, Metalcam's antidumping costs are

derived, not from the foregoing documents, but rather from so-called "product family standard

costs" prepared, not in accordance with Italian GAAP,[3] but for purposes of these proceedings.

The basic problem is that these two groups of documents – on the one hand, Metalcam's

antidumping costs and "product family standard costs" and on the other, Metalcam's audited

financial statements, trial balance, and "internal operating report" – do not reconcile.  Thus, there

exists a break in the chain.

Plaintiffs detailed these concerns over 14 pages of the case brief.  Commerce responded

with two contradictory propositions (bolded for ease):

> **The petitioners allege that costs as reported in Metalcam's trial balance, the
> Conto Economico (internal operating report) and the product family level
> standard costs do not reconcile.  We disagree.**  In our review of the trial balance
> and the internal operating report for the POI, we find that they are in agreement.
> While the trial balance and internal operating report may not reconcile to the
> product family level standard costs by constituent cost elements (e.g., steel ingot
> cost, external machining costs), they do reconcile in total (after applying the
> calculated cost variance).  **The product family level standard costs, at the
> constituent cost level, cannot be reconciled to the trial balance or to the
> internal operating report as it is a characteristically different report compared
> to the other two documents from Metalcam's accounting systems.**

Final IDM at 8 (Appx083289).  Commerce disagreed with Plaintiffs' argument in summary

fashion, but a few sentences later, recognized that the argument that the documents do not

reconcile had validity (*i.e.*, the cost database (product family level standard costs) cannot be

reconciled to the trial balance).

---

[3] Reference here to Italian GAAP is important insofar as Commerce stated in its Final IDM:
"Commerce will normally calculate costs based on the records of the producer of the
merchandise, if such records are kept in accordance with the generally accepted accounting
principles (GAAP) of the exporting country and reasonably reflect the costs associated with the
production and sale of the merchandise."  Final IDM at 7 (Appx083288).  But Commerce
ignores that the product family worksheet is not a GAAP-audited financial record.

Commerce further highlighted its own analytical error by acknowledging that the product family level standard cost worksheet "provides breakdown of the constituent cost elements (*e.g.*, steel ingot, external machining costs) as recorded in the job orders" but that "the constituent cost elements in the product family level standard costs for, *e.g.*, Steel Ingot, External Machining, etc., cannot be compared to the raw materials and external services costs in the trial balance or internal operating report which records costs on the basis of the nature of expenses." *Id*. Stated differently, insofar as Metalcam's cost database is generated from the product family standard costs, and these product family standard costs do not tie in to Metalcam's audited trial balance, Commerce allowed for the cost database to have <u>no tie in</u> to Metalcam's audited trial balance. *See* Metalcam DQR (at 18, 27, Exhibit D-17 (Appx082402, Appx082411, Appx082512-082517). As Commerce correctly observed but did not fully grasp the implications of, verification demonstrated that the product family cost buildup "cannot be reconciled" to the internal management report or the trial balance, which flows into the audited financial statements. This means that there is ***no document*** that ties the reported costs used in the dumping calculation to Metalcam's audited financial statements. Therefore, there was no basis to find that Metalcam did not allocate costs away from FEBs to other forged products or otherwise underreport its costs of production.

Plaintiffs identified other errors that undermined Metalcam's reporting, and despite agreeing that such errors existed, Commerce did not meaningfully address or remedy these errors. *First*, Commerce agreed with Plaintiffs that "the cost reconciliation worksheet {in Metalcam's supplemental Section D questionnaire response} contained a formula error in one of the reconciling items" and Commerce "found the same formula error in the corresponding reconciling item." Final IDM at 7 (Appx083288). These errors are only discernible from a

review of the source documentation provided in Metalcam's response to Commerce's questionnaire in lieu of verification, which Commerce instructed should not contain new factual information but instead should support information already submitted.  Administrative CB at 8-11 (Appx083118-083121).  Specifically, Commerce required Metalcam to submit a full cost reconciliation early in the proceeding.  But because the newly submitted source documents do not support Metalcam's prior questionnaire responses, this item failed to verify and should have been subject to an adverse finding.  *See*, *e.g.*, *PET from Pakistan*, and accompanying IDM at 4-6 (explaining that a reconciliation is fundamental, and without a valid reconciliation, adverse facts available apply).  Commerce found that although two errors exist, "the net result of these two errors continues to show that Metalcam's reported cost file reconciled to its financial statement costs" because one error was a subtraction and the other an addition.  Final IDM at 7 (Appx083288).  But the reconciliation covered four quarters over a two-year period and was unverifiable based on source documents.

*Second*, Commerce agreed with Plaintiffs that Metalcam's "minor input chart {used in reporting its antidumping costs} does not tie to the product family costs worksheet or trial balance."  Final IDM at 8 (Appx083289).  Commerce nevertheless diminished the significance of the discrepancy by claiming that the information presented in the chart "is merely a portion of the total machining costs in the product family cost worksheet and the trial balance" and that non-subject merchandise costs and other services were omitted.  *Id*.  But this was the point all along — without a complete picture of total costs, costs may be allocated away from FEBs to other products.  This risk was highlighted when Plaintiffs identified for Commerce a significant difference in cost associated with machining in Metalcam's trial balance than what was reported in the product family cost worksheet, with the latter being used to report costs for purposes of the

dumping calculation. *See* Administrative CB at 15-19, 21-23 (Appx083125-083129, Appx083131-083133). Insofar as this element of cost was tied to specific products (*i.e.*, FEBs), the larger amount in the trial balance should have been included in the cost database, but it was not.

*Third*, Commerce "agree{d} with the petitioners that record evidence shows that certain material costs for non-subject merchandise are negative." Final IDM at 9 (Appx083290). Commerce dismissed this concern as being limited to "a very small number of job orders" and speculated, without any basis in the record, that "any adjustment will likely result in an increase in the cost of non-subject merchandise, possibly resulting in the reduction to the reported costs of the subject merchandise." *Id*. But again, Commerce missed the point. If Metalcam holds the product family cost worksheet as the lodestar of its cost database, the product family cost worksheet needs to be correct and verifiable. Negative values for raw material costs demonstrably prove that it is not verifiable. No one acquires raw materials for free, let alone at negative cost.

*Fourth*, Commerce completely sidestepped Plaintiffs' concerns regarding Metalcam's aberrant steel ingot costs across different FEBs that had similar chemical and physical properties. In particular, Plaintiffs cited to new record evidence available for the first time in response to Commerce's questionnaire in lieu of verification to show that Metalcam incurred costs to melt and pour, cast, and machine the steel ingot, but never included those direct costs in the total cost buildup. *See* Administrative CB at 29-32 (Appx083139-083142). Plaintiffs explained that Metalcam's job-order costing omitted these costs from the cost database and instead treated these costs as semi-finished inventory waiting for an FEB order. *Id*.; *see also* Final IDM at 9 (Appx083290). This resulted in a distortion where similar ingots for similar FEBs were given

vastly different costs.  Commerce ignored these distortions by allowing the costs of ingots that were produced, but not used during the period of investigation, to be buried in the company's overall cost of manufacture (thus allocating them away from subject FEBs).  *See* Final IDM at 9 (Appx083290).

*Fifth*, Commerce recognized that Metalcam manually moved certain revenue items in its books and records, which was not disclosed until Metalcam's response to Commerce's questionnaire in lieu of verification.  *Id*. at 10-11 (Appx083291- 083292).  Commerce dismissed the problem by claiming that "none of the {items} in question related to sales of {FEBs}," "the total value is insignificant," other accounts verified successfully, and this "was the first instance provided to Metalcam to reconcile" these accounts.  *Id*. at 11 (Appx083292).  But regardless of magnitude, these types of belated disclosures and failures to verify without new factual information have been the basis for Commerce to apply adverse inferences (or, at minimum, investigate).  Indeed, Commerce's initial and supplemental questionnaires required a full reconciliation, *see* Commerce Letter to Metalcam (Feb. 6, 2020) at D11-D13 (Appx080267- 080269); Commerce Letter to Metalcam (Apr. 28, 2020) at 6 (Appx082701); Commerce Letter to Metalcam (Jun. 17, 2020) at 4 (Appx082732), and so this was not the first such opportunity for this information to be disclosed.

The arbitrariness of Commerce's treatment of Plaintiffs' arguments is evident from a contemporaneous decision in another investigation in which Commerce found similar failures in response to a "questionnaire in lieu of verification" to be grounds for applying facts otherwise available with an adverse inference ("AFA").  In the countervailing duty investigation on aluminum sheet from Turkey, Commerce concluded that use of AFA was warranted "because the company failed to provide requested information in the form and manner requested by

Commerce," including a failure "to provide many of the screen shots from its accounting ledgers in its in lieu of on-site verification response that Commerce requested in order to examine the completeness and accuracy of reported information." *See Common Alloy Aluminum Sheet From the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 86 Fed. Reg. 13,315 (Mar. 8, 2021), and accompanying IDM at 6. For example, Commerce explained that in its questionnaire in lieu of verification, it requested that the respondent reconcile its sales to its audited financial statement and provide screen shots to support all reconciled amounts. *Id*. However, while Commerce acknowledged that "Teknik provided worksheets in an attempt to reconcile the sales information as requested by Commerce" it found that "the worksheets {did} not contain screen shots for all of the accounting adjustments that are included in the spreadsheets, and the worksheets refer to other worksheets that reference account ledgers but {did} not contain screen shots of the actual account ledgers." *Id*. Commerce also asked the respondent to provide screen shots of the accounts in which it recorded benefits it received from various Turkish government programs. *Id*. at 7. However, the respondent again provided a worksheet that lacked "screen shots from the actual account ledger that contains the underlying information." *Id*.

In the case at bar, Commerce failed to reasonably explain how the aforementioned inconsistencies in Metalcam's submissions, including screen shots from Metalcam's source accounting program that undermined previously reported data, did not impugn the validity of the Metalcam's *reporting in toto*. *See* 19 C.F.R. § 351.307(d) (making clear that the purpose of verification is to "verify the accuracy and completeness of {previously} submitted factual information"); *see also Bomont Industries*, 733 F.Supp. at 1508 ("{V}erification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness.").

Commerce also failed to explain why it was appropriate to accept the various "explanations" entirely new to Metalcam's response to the questionnaire in lieu of verification and which therefore could not be independently validated.  *See Guizhou Tyre Co. v. United States*, Consol. Court No. 19-00032, Slip Op. 2021-64 (Ct. Int'l Trade May 19, 2021) at 56-57 (affirming Commerce's rejection of information provided at verification as having been "precluded…from fully investigating and verifying," and noting that "verification is not a forum for respondents to provide or for Commerce to accept or collect new factual information") (citing *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1349 (Ct. Int'l Trade 2015)).  Commerce's apparently far more lenient approach here demonstrates that its post-preliminary questionnaire was not a reasonable stand-in for the verification contemplated by statute and regulations, and in any event, was arbitrary in its application.

> b. *Commerce Ignored Lucchini's Concealment of Raw Material Scrap Offsets Disclosed for the First Time in the Verification Response*

Lucchini's response to the "questionnaire in lieu of verification" disclosed for the first time that Lucchini buried yield losses within its "purchased price" for steel ingot and in so doing, prevented Commerce from examining the reasonableness of these yield losses.  Administrative CB at 48 (Appx083158).  Specifically, and although requested in previous questionnaires, Lucchini failed to explain the existence of major discrepancies in its reported data concerning purchased steel ingots.  *See* "Lucchini Mamé Forge S.p.A Post-Preliminary Questionnaire" (Sep. 11, 2020) at 8 (Appx082946).  These discrepancies evidenced that Lucchini was suppressing its reported steel ingot costs, thereby decreasing total FEB costs and, in turn, its dumping margin.

In the verification response, Lucchini admitted that the observed differences between acquisition costs for steel ingots and what it reported to Commerce has to do with yield losses that it effectively buried within a "net" steel ingot cost in the cost database, despite Commerce's

questionnaire requiring yield losses to be reported separate from raw material costs.  In a massive

departure from past practice, Commerce excused Lucchini's failure to timely report the

information by claiming, without a scintilla of support in the record, that Lucchini's scrap offset

is limited to scrap cut away during the production process and that items scrapped for quality

reasons are not factored into the submitted per-unit costs.  Final IDM at 25 (Appx083306).

Essentially, Commerce excused Lucchini's failing to disclose this information because the

impact was purportedly "limited."  It was "limited" because Commerce only conducted a

targeted question to this issue.  A proper verification would likely have uncovered a trove of

other instances where such yield losses were buried in net steel ingot costs.  Commerce failed to

investigate and failed to address the fact that Lucchini was required by the standard cost

questionnaire to disclose such information much earlier in the proceeding and to do so by

reporting yield losses separate from raw material costs, but did not do so.

To the extent Commerce contends that the questionnaire in lieu of verification was in fact

a verification, Commerce's approach to Lucchini's flagrant disregard for Commerce's

instructions contravenes its practice, demonstrating its arbitrariness in this case.  For example, in

*Steel Concrete Reinforcing Bar From Mexico: Final Determination of Sales at Less Than Fair

Value and Final Affirmative Determination of Critical Circumstances*, 79 Fed. Reg. 54,967

(Sept. 15, 2014), and accompanying IDM at Comment 8, Commerce refused to accept new

information at verification concerning indirect selling expenses, saying "{v}erification is not

meant to be an opportunity for respondents to present new blocks of data, whole cloth."

Similarly, in *Final Determination of Sales at Less Than Fair Value: Certain Activated Carbon

from the People's Republic of China*, 72 Fed. Reg. 9,508 (Mar. 2, 2007), and accompanying IDM

at Comment 27, Commerce refused to accept a worksheet that claimed to demonstrate actual

consumption based on daily production records, because doing so would have placed on the record "a significant amount of non-minor new information that had not previously been disclosed."  Additionally, in *Petroleum Wax Candles From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 68 Fed. Reg. 13,264 (Mar. 19, 2003), and accompanying IDM at Comment 3, Commerce refused to accept new production data presented at verification, noting that the data concerned a large percentage of total production and "both the Department and petitioner should have had the opportunity to examine the large production quantity involved in the new order before verification."  Likewise, in *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 Fed. Reg. 11,349 (Mar. 17, 2009), Commerce applied adverse inferences when it "discovered at verification, for the first time, that {the respondent} used diesel fuel as an energy input in the production of subject merchandise." These are just a few proceedings in which Commerce applied adverse inferences to respondents that withheld information in the same manner as Lucchini did.  Commerce's decision here is the outlier—and its reason for accepting Lucchini's reporting is not supported on the factual record.

The Court of International Trade has held that Commerce is not permitted to "merely accept{} {respondent}'s reported yield losses without comparing costs" across products.  *United States Steel Corp. v. United States*, 179 F. Supp. 3d 1114, 1132-35 (Ct. Int'l Trade 2016) (remanding Commerce's determination for failure to compare yield loss allocations across "different physical characteristics or stages of production").  The Court has also affirmed the application of adverse inferences for such failings.  *United States Steel Corp. v. United States*, 219 F. Supp. 3d 1300, 1320-21 (Ct. Int'l Trade 2017).  By failing to provide this information in a

timely manner, Lucchini deprived Commerce of this required assessment, which heretofore had

warranted the application of adverse inferences under Commerce's established practice.

*    *    *    *    *

Commerce's failure to conduct a meaningful verification under the admittedly unusual

circumstances of this investigation finds no statutory support and renders the *Final*

*Determination* unlawful.  Commerce's failure to conduct an analogue to on-site verification and

issue a verification report is also contrary to law.  Finally, and in the alternative, insofar as

Commerce's "questionnaire in lieu of verification" can be a stand-in to verification, Commerce's

failure to treat responses as in other cases when errors were uncovered at verification renders the

*Final Determination* arbitrary, unreasonable, and unsupported by substantial evidence.

### III.    Although Commerce Tried to Avoid Engaging with the Record by Erecting an Exhaustion Framework, Plaintiffs Timely Raised the Issues Rendering Commerce's *Final Determination* Unsupported by Substantial Evidence

In supporting its decisions with substantial evidence, as required by 19 U.S.C. §

1516a(b)(1)(B)(i), Commerce is obligated to address the relevant arguments of the parties.  *See*

19 U.S.C. § 1677f(i)(3); *Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340,

1351 (Ct. Int'l Trade 2020) ("Commerce is obligated to respond to those arguments made by

interested parties that bear on issues material to Commerce's determination.").  Faced with

allegations that Metalcam failed Commerce's unlawful verification process, *see* Section II.B.2.a,

*supra*, Commerce erected an exhaustion framework that is not found in the law or Commerce

practice.  Specifically, when presented with claims that Metalcam's (a) minor input chart failed

to reconcile to reported costs and (b) direct material costs for other forged products contain

negative, rather than positive, values, Commerce appeared to fault Plaintiffs for raising these

issues for the first time in the case brief.  *See* Final IDM at 8 (Appx083289) ("**The petitioners**

**assert, for the first time**, that Metalcam's minor input chart for rough machining is flawed as

39

the costs for rough machining reported in the minor input chart does not reconcile to the external machining costs in the product family costs worksheet, internal operating report and the trial balance.") and *id*. at 9 (Appx083290) ("**In its case brief, the petitioners, for the first time in the proceeding**, point to what appears to be an anomaly in the material costs for certain non-subject products (*i.e.*, the material costs in the worksheet are negative….Further the anomaly here **was not raised before the briefing stage**, although it has been on the record for months prior to the preliminary determination.") (emphasis supplied).  But in erecting these barriers to fully investigating these issues and reckoning with them, Commerce ignores applicable law.

*First*, it is well-settled that the burden of creating an accurate record lies with the party submitting information.  *See Ta Chen Stainless Steel Pipe, Inc. v. United States.*, 298 F.3d 1330, 1336 (Fed. Cir. 2002); *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993).  *See also China Steel Corp. v. United States*, 306 F. Supp. 2d 1291, 1306 (Ct. Int'l Trade 2004); *Welded Stainless Pressure Pipe from Thailand: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 31,093 (May 30, 2014) and accompanying Issues and Decision Memorandum at V.  This means that respondent interested parties can be faulted for making errors, including those associated with transposition or the like, since "{t}he statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003); *see also id*. at 1382 (noting that the statutory "best of its ability" standard requires the respondent to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries" and "does not condone inattentiveness, carelessness, or inadequate record keeping.")

*Second*, interested parties are not required to raise these issues earlier in the proceeding to preserve them for agency disposition.  Rather, 19 C.F.R. § 351.309 is the operable regulation and requires that the case brief "present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."  This is precisely what Plaintiffs did.  Plaintiffs cited these errors alongside other errors to demonstrate the unreasonableness of using Metalcam's data in calculating a dumping margin.  Even though Commerce agreed with Plaintiffs that these issues existed and were borne out in the data, Commerce appears to excuse itself from analyzing them simply because, in Commerce's view, they were presented too late for full inquiry and thus its speculation that the errors were minimal would suffice.  But Commerce needs to rely on evidence it has collected and not mere speculation or conjecture.  *See generally Rhone-Poulenc, Inc. v. United States*, 927 F. Supp. 451, 456 (Ct. Int'l Trade 1996) ("{C}ommerce's failure to perform an independent investigation of the facts related to this issue falls short of its statutory duty to investigate antidumping cases and assign fair antidumping margins") (citing *Bomont Indus. v. United States*, 718 F. Supp. 958, 964 (Ct. Int'l Trade 1989)).  In any event, as recounted in the Statement of Facts, Plaintiffs engaged early and often with the record by identifying major discrepancies with the submitted data, but such a large number of errors existed that they continued to exist from the beginning to the middle to the end of the investigation.  By failing to engage with the record in erecting false procedural barriers, Commerce's *Final Determination* is unsupported by substantial evidence.

## IV.    Commerce Acted Arbitrarily By Not Applying Adverse Facts Available

Under the statute, Commerce is required to use facts otherwise available where, *inter alia*, a respondent withholds requested information or provides information, but the information cannot be verified.  19 U.S.C. §§ 1677e(a)(2)(A) and (D).  The statute further permits Commerce

to "use an inference that is adverse to the interests of that party in selecting from the facts otherwise available" where Commerce determines that the party has "failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b)(1).  As noted, *supra*, the "best of ability" standard does not examine motivation or intent; instead "{c}ompliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel*, 337 F.3d. at 1382-83.

Pursuant to the statutory framework and case law, Commerce's established practice is to apply adverse facts available where a respondent: (a) fails to provide complete and accurate cost and sales reconciliations demonstrating that the cumulated values from submitted databases reconcile to the respondent's books and records and source accounting information; or (b) fails to fully document and explain the values reported in reconciliations submitted to Commerce.  *See, e.g., PET from Pakistan*, and accompanying IDM at Comment 6; *Light-Walled Rectangular Pipe and Tube From Mexico*, 84 Fed. Reg. 16,646 (Apr. 22, 2019) and accompanying IDM at Comment 9 (citing *Certain Pasta from Turkey; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 78 Fed. Reg. 9,672 (Feb. 11, 2013) and accompanying IDM at Comment 5; *Certain Pasta from Italy; Notice of Final Results of the Twelfth Administrative Review*, 75 Fed. Reg. 6,352 (Feb. 9, 2010), and accompanying IDM at Comment 11; *Light-Walled Rectangular Pipe and Tube from Mexico; Notice of Amended Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 35,649 (June 24, 2008) and accompanying IDM at Comment 8; *Fine Denier Polyester Staple Fiber From the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and*

*Extension of Provisional Measures*, 83 Fed. Reg. 660 (Jan. 5, 2018), and accompanying

Preliminary Decision Memorandum at 20)).

      Additionally, Commerce has found, and the courts have upheld, that significant and

unsubstantiated changes to a dataset without contemporaneous explanation significantly impedes

a proceeding.  In *Carbon and Certain Alloy Steel Wire Rod from Mexico*, 82 Fed. Reg. 23,190

(May 22, 2017) and accompanying IDM at 7 (final admin. review)*,* the respondent, Deacero,

submitted a revised section D database containing changes "so significant that it constitutes an

entirely new section D dataset."  Deacero attempted to explain its changes subsequent to their

submission, however, Commerce found its explanation insufficient because it had not been

"previously attested to in either its initial or first supplemental questionnaire response."  *Id*.  The

CIT, in sustaining Commerce's decision to apply total AFA to calculate Deacero's final dumping

margin stated, "Commerce has the discretion to accept, reject, or disregard corrective

information.  Given the lack of explanation and evidence provided by Deacero, it was reasonable

for Commerce to determine that Deacero's responses were incomplete and unreliable, disregard

the corrected information, and rely on total facts otherwise available."  *Deacero S.A.P.I. de C.V.

v. United States*, 353 F. Supp. 3d 1303, 1309-1310 (Ct. Int'l Trade 2018), *aff'd*, 996 F.3d 1283

(Fed. Cir. 2021) ("Contrary to its arguments here, Deacero's 'significant failing' was not that it

submitted corrected information; rather, it was that Deacero failed to timely notify Commerce of

the nature and import of those corrections, and failed to adequately explain the corrections when

given the opportunity to do so.").

      Here, insofar as Commerce issued a questionnaire that instructed respondents not to

submit new data and instead support previously submitted data, Lucchini's and Metalcam's

responses should not have been relied upon when such responses untimely corrected errors in

earlier submissions and failed to explain why the information was not provided previously.   As such, given the lack of reliable data submitted in conformity with the time, form, and manner requested by Commerce, Commerce should have applied facts otherwise available with an adverse inference, as it has in similar situations, and indeed situations where the failing was much less severe than in this case.

**CONCLUSION**

Plaintiffs engaged early and often with Commerce to ensure the development of a complete administrative record so to guard against the Italian FEB producers being able to allocate away costs from subject FEBs, thereby masking the extent of their dumping.  In spite of Plaintiffs' oft-repeated concerns, Commerce unlawfully failed to conduct a verification as required under the statute.  Commerce further failed to support its conclusions with substantial evidence because it did not meaningfully engage with the record to demonstrate that the costs it was relying upon were accurate and correct.  Accordingly, this Court should remand the determination to Commerce with instructions that Commerce verify the responses of Lucchini and Metalcam and thereby properly address the factual issues raised during the proceeding.

Respectfully submitted,

/s/ Thomas M. Beline        _
Thomas M. Beline
Jack A. Levy
Myles S. Getlan
Jeffery B. Denning
James E. Ransdell
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300
(202) 567-2301
tbeline@cassidylevy.com

*Counsel to Ellwood City Forge Company, Ellwood*
*National Steel Company, Ellwood Quality Steels*
*Company, and A. Finkl & Sons*

## <u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 12,993 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.


By:     <u>/s/ Thomas M. Beline</u>
        Thomas M. Beline