**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, <br><br>                 Plaintiffs, <br><br>       v. <br><br> UNITED STATES, <br><br>                 Defendant, <br><br>        and <br><br> METALCAM, S.P.A., <br><br>                 Defendant-Intervenor. | Court No. 21-00073 |

**ORDER**

Upon consideration of the Rule 56.2 motion of Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons (collectively, "Plaintiffs"), all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

**ORDERED** that the Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record is denied.

**SO ORDERED**.

Dated: _____          Signed: _____

      New York, New York                    Stephen Alexander Vaden, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> METALCAM, S.P.A., <br><br> Defendant-Intervenor. | Court No. 21-00073 |

## RESPONSE BRIEF OF DEFENDANT-INTERVENOR IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Douglas J. Heffner
Richard P. Ferrin (lead)
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803
*Counsel for Metalcam S.p.A.*

Dated: October 8, 2021

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2.................................................................1

   I.   Administrative Determination Under Review ..................................................1

   II.   Issues Presented and Reasons for Affirming Commerce's Determination .....................1

ARGUMENT ..................................................................................................2

   I.   Standard of Review ................................................................................2

   II.   Commerce's Procedures and Determinations during the Course of This Investigation Were Within its Discretion and Thus in Accordance with Law. ...............................................4

      A.   Commerce's Granting of Deadline Extensions Were Reasonable and in Accordance with Law. ..................................................................................................4

      B.   Commerce's In Lieu of Verification Questionnaire Was an Appropriate Substitute for an On-Site Verification and Thus in Accordance With Law. ................................................6

   III.   Commerce's In Lieu of Verification Questionnaire Elicited Fulsome Source Data from Metalcam and Provided Sufficient Verification to Support Commerce's Final Determination as Supported by Substantial Evidence.................................................................7

      A.   Commerce Reasonably Concluded That Metalcam's Cost Reporting Accurately Ties to its Financial Records Kept in Accordance with Italian GAAP.........................................8

      B.   The Information Provided by Metalcam in Response to its Verification Questionnaires Provides Substantial Evidence in Support of Commerce's Negative Determination with Respect to Metalcam. ..................................................................................13

      C.   Commerce Explained Its Final Determination Sufficiently to Meet Substantial Evidence Requirements. .......................................................................................20

CONCLUSION................................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States*, 13 F.3d 398 (Fed. Cir. 1994) ...........................................................................................3

*Bowman Trans. v. Arkansas-Best Freight Sys.*, 419 U.S. 281 (1974).............................….....3

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ..............2

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ........................................................3

*Consolo v. Fed. Mar. Com'n*, 383 U.S. 607 (1966)...................................................4, 9

*DuPont Teijin Films USA v. United States*, 407 F.3d 1211 (Fed. Cir. 2005)................................3

*Hercules, Inc. v. United States*, 11 CIT 710, 673 F. Supp. 454 (1987) ......................................22

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997)...................................passim

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)..........................................3

*Rubberflex Sdn. Bhd. v. United States*, 23 CIT 461 (1999).........................................................4

*Securities Exchange Comm. v. Chenery Corp.*, 318 U.S. 80 (1943) ............................................8

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) ........................................................4

*United States Steel Corp. v. United States*, 37 CIT 1799, 953 F. Supp. 2d 1332 (2013)...............4

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951).............................................................3

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519 (1978)...........6

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)...........................................................................................................6

19 U.S.C. §1677e(a).....................................................................................................................18

**Regulations**

19 C.F.R. § 351.302(b)...............................................................................................................5, 9

**Administrative Determinations**

*Certain Hot-Rolled Steel Flat Products from Australia:  Preliminary Results of Antidumping Duty Administrative Review and Intent to Rescind Review, in Part, 2018-2019*, 86 Fed. Reg. 10,923 (February 23, 2021) ................................................................................................9

*Common Alloy Aluminum Sheet from the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 86 Fed. Reg. 13,315 (Mar. 8, 2021) ......................................................................................24

*Forged Steel Fluid End Blocks from Italy: Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020) .............................................................................passim

*Forged Steel Fluid End Blocks from the Federal Republic of Germany and Italy: Amended Final Antidumping Duty Determination for the Federal Republic of Germany and Antidumping Duty Orders*, 86 Fed. Reg. 7,528 (Jan.29, 2021) ............................................................................5

*Notice of Final Determination of Sales at Less than Fair Value, and Negative Determination of Critical Circumstances:  Certain Lined Paper Products from India*, 71 Fed. Reg. 45,012 (Aug. 8, 2006)........................................................................................................................14

## STATEMENT PURSUANT TO RULE 56.2

Defendant-Intervenor, Metalcam, S.p.A., ("Metalcam") hereby responds in opposition to the Motion for Judgment on the Agency Record and the Memorandum of Law and Fact in Support thereof filed by Plaintiffs, Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons.

### I.        Administrative Determination Under Review

Plaintiffs contest certain aspects of the final determination by the Department of Commerce ("Commerce") and the resulting antidumping duty Order in *Forged Steel Fluid End Blocks from Italy: Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020) ("Final Determination") (Appx083315-083318), and accompanying unpublished Issues and Decision Memorandum ("Final IDM") (Appx083282-083314), and *Forged Steel Fluid End Blocks from the Federal Republic of Germany and Italy: Amended Final Antidumping Duty Determination for the Federal Republic of Germany and Antidumping Duty Orders*, 86 Fed. Reg. 7,528 (Jan.29, 2021) ("AD Order") (Appx083319-083323).

### II.       Issues Presented and Reasons for Affirming Commerce's Determination

**1. Whether Commerce's determinations to grant Metalcam extensions to respond to Commerce's questionnaires during the course of this investigation was within its discretion, and thus in accordance with law.**

Under 19 C.F.R. § 351.302(b), Commerce "may, for good cause, extend any time limit established by this part." Commerce's decision to grant Metalcam extensions to respond to the agency's questionnaires in light of operational challenges resulting from the COVID-19 pandemic amounted to good cause, and thus was within Commerce's discretion and in accordance with law.

**2. Whether Commerce's determination to issue an in lieu of verification questionnaire, rather than conduct an on-site verification abused its discretion.**

Commerce acted within its discretion to issue respondents in lieu of verification questionnaires as an approximation of the verification experience, and its decision to do so was in accordance with law.

**3. Whether Commerce's determination, made in reliance on Metalcam's responses and data, is supported by substantial evidence.**

Metalcam provided thorough, fulsome responses that were verified by Commerce's in lieu of verification questionnaire. Commerce thoroughly explained the basis for its fact finding, and a reasonable mind could find the evidence in this case adequate to support its final determination and thus its determination is supported by substantial evidence.

## ARGUMENT

### I.    Standard of Review

Section 516A of the Tariff Act of 1930, as amended, instructs this Court to hold unlawful any final determination of Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). To determine whether Commerce's final determination is "in accordance with law," the Court undertakes the two-step analysis prescribed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." *Id.* at 842. If, after employing the first prong of *Chevron*, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether the agency's construction of the statute is permissible. Essentially, this is an inquiry into the reasonableness of the agency's interpretation. *See Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States*, 13 F.3d 398, 402 (Fed. Cir. 1994).

In order to review agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable give the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Com'n*, 383 U.S. 607, 620 (1966). Even if a "record may not present a paragon of clarity," the Court will uphold a decision as supported by substantial evidence as long as "'the agency's path may reasonably be discerned.'" *Micron Tech., Inc.*, 117 F.3d. 1386, 1400 (Fed. Cir. 1997) (quoting *Bowman Trans. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

The Court of Appeals for the Federal Circuit has established that "Commerce is entitled to broad discretion regarding the manner in which it develops the record in an antidumping investigation." *Stupp Corp. v. United States*, 5 F.4th 1341, 1350 (Fed. Cir. 2021). "Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc." *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997). This Court has explained that "Commerce has not defined the requirements or procedures associated with verification in any formal way." *Rubberflex Sdn. Bhd. v. United States*, 23 CIT 461, 467 (1999). In fact, even in situations where Commerce has been unable to complete a verification, or

3

conduct any particular verification task, such as a "completeness test," this Court has refused to second-guess Commerce and has sustained its findings.  *See United States Steel Corp. v. United States*, 37 CIT 1799, 1819, 953 F. Supp. 2d 1332, 1348 (2013) (sustaining Commerce decision to revoke order with respect to a foreign producer despite uncompleted verification and lack of completeness test).  As a result, the courts "review verification procedures employed by Commerce in an investigation for abuse of discretion rather than against previously-set standards."  *Micron Tech., Inc.*, 117 F.3d. at 1396.

II.     **Commerce's Procedures and Determinations during the Course of This Investigation Were Within its Discretion and Thus in Accordance with Law.**

A.     **Commerce's Granting of Deadline Extensions Were Reasonable and in Accordance with Law.**

The Plaintiffs allege that the Italian producers subject to the underlying investigation, including Metalcam, "developed a strategy to delay and obfuscate Commerce's investigation" by making extension requests as allowed under Commerce's regulations for the submission of data and responses. *See* Plaintiffs' Brief at 2.  The Court should reject out of hand Plaintiffs' gratuitous and unsubstantiated assertions of bad faith.  Yes, Metalcam made extension requests during the course of this investigation, but to characterize them as a calculated tactic to achieve a "preferred outcome" is an outlandish mischaracterization of the record.

While we are now somewhat adjusted to changes in the workplace as a result of the pandemic, the state of the world in February and March 2020 was dramatically different.  The global pandemic understandably hindered Italian producers' ability to prepare responses, as explained in Metalcam's March 11, 2020 extension request:

> As noted in many news reports, the COVID-19 virus has spread rapidly within Lombardy and is disrupting business activities.  Initially, the Government of Italy ("GOI") ordered restrictions on movement within several cities and provinces.  On March 7, the GOI ordered a quarantine of Lombardy region and 14 nearby provinces outside of Lombardy, in an attempt to halt the spread of

4

> COVID-19. On March 9, the GOI extended the quarantine nationwide. Under the terms of the nationwide quarantine, the GOI has ordered people to stay home and seek permission for official travel. The quarantine has seriously disrupted Metalcam's ability to complete work on the Department's questionnaire.

Metalcam's March 11, 2020 Extension Request at 2 (Appx083328). Commerce itself was hindered by the resulting shift in workplace dynamics, tolling deadlines in administrative reviews by a cumulative 110 days, directly citing "operational adjustments due to COVID-19" as the reason for such tolling. *See, e.g., Certain Hot-Rolled Steel Flat Products from Australia: Preliminary Results of Antidumping Duty Administrative Review and Intent to Rescind Review, in Part, 2018-2019*, 86 Fed. Reg. 10,923 (February 23, 2021), and accompanying IDM at 2. As such, to suggest that Metalcam took advantage of the COVID-19 pandemic to request unnecessary extensions, when the Company, Commerce and the world were in the throes of the pandemic, is not only gratuitous, but beyond the bounds of zealous advocacy.

Furthermore, it was well within Commerce's discretion to grant Metalcam's extension requests. Under 19 C.F.R. § 351.302(b), Commerce "may, for good cause, extend any time limit established by this part." The United States Supreme Court has clarified that, "absent constitutional constraints or extremely compelling circumstances[,] the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) (internal quotation marks and citation omitted). Plaintiffs do not—and cannot—allege that Commerce somehow abused its discretion in granting Metalcam's extension requests. Instead, Plaintiffs appear simply to have decried Commerce's lawful and understandable decisions to grant extension requests in this investigation as a means to malign Metalcam. Commerce's determination to grant extensions to Metalcam was supported by substantial evidence and reasonable.

**B.**    **Commerce's In Lieu of Verification Questionnaire Was an Appropriate Substitute for an On-Site Verification and Thus in Accordance With Law.**

To start, Metalcam agrees with and incorporates by reference the arguments set forth in the government's brief with respect to the validity of Commerce's verification procedures and lawfulness of its Final Determination.  Metalcam affirms that the "in lieu of verification" questionnaire approximated the experience of an on-site verification as Commerce intended by issuing the following statement:

> We are issuing this questionnaire in lieu of performing an on-site verification. The purpose of this questionnaire is to probe information that you have already submitted – not to obtain new information. Accordingly, the questions are similar to those that the Department of Commerce (Commerce) would normally ask during an on-site verification.

Letter from Commerce to Metalcam (Sep. 2, 2020) at 1 ("In Lieu of Verification Questionnaire") (Appx 082927). In fact, Commerce's in lieu of verification questionnaire, segmented by cost and sales information, totaled more than 19 discrete questions including subparts related to verifying Metalcam's cost and sales response. *Id.*  Importantly, and as detailed below, Plaintiffs' post preliminary comments directly informed Commerce's In lieu of verification questionnaire.  *See generally* Petitioners' Post-Preliminary Comments (Aug. 4, 2020) ("Post-Prelim Comments") (Appx082875-082921).  In response, Metalcam provided the agency with 530 pages of explanations and source documentation. *See generally* Metalcam's In Lieu of Verification Cost Questionnaire Response (Sep. 11, 2020) ("In Lieu of Verification Cost QR") (Appx0833331-083493); Metalcam's In Lieu of Verification Sales Questionnaire Response (Sep. 11, 2020)  ("In Lieu of Verification Sales QR") (Appx083494-083860).

In *Micron Tech., Inc.*, the Federal Circuit has held that "Congress has implicitly delegated to Commerce the latitude to derive verification procedures *ad hoc*." *Micron Tech., Inc.*, 117 F.3d at 1396.  Because "the action rests upon an administrative determination — an

exercise of judgment in an area which Congress has entrusted to the agency — of course it must not be set aside because [the Court] might have made a different determination were [the Court] empowered to do so." *Id.* (citing *Securities Exchange Comm. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).  Therefore, the Court should find that Commerce acted within its discretion to issue respondents in lieu of verification questionnaires as an approximation of the verification experience.

III.     **Commerce's In Lieu of Verification Questionnaire Elicited Fulsome Source Data from Metalcam and Provided Sufficient Verification to Support Commerce's Final Determination as Supported by Substantial Evidence.**

Commerce's in lieu of verification questionnaire directly incorporated the Plaintiffs' post preliminary comments and suggested verification questions, but now as in the course of the investigation, the Plaintiffs attempt to shift the goal posts.  Despite the extensive record, Plaintiffs claim that Commerce should not have accepted Metalcam's fulsome responses and that its decision to do so amounted to lack of substantial evidence in support of Commerce's final determination.  Specifically, the Plaintiffs allege that Metalcam's cost verification questionnaire response did not as a whole support Metalcam's cost reporting, and thus failed the substantial evidence test.  *See* Plaintiffs' Brief at 28-31.  The Plaintiffs further attempt to discredit Metalcam's cost and sales verification responses as a whole with misleading claims that the pieces of supporting source documentation Metalcam included in its responses constitute new factual information, or otherwise undermine the record.  *Id.* at 31-34.  However, as Commerce's Final IDM makes clear, Metalcam's verification questionnaire responses satisfied Commerce's goal of verifying existing information on the record with additional source information.  At most, Plaintiffs' complaints amount to an attempt to re-weigh the evidence, but "the possibility of drawing two inconsistent conclusions from the evidence" does not prevent Commerce's findings from being supported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. at 620.

**A.    Commerce Reasonably Concluded That Metalcam's Cost Reporting Accurately Ties to its Financial Records Kept in Accordance with Italian GAAP.**

The Plaintiffs' requested that Commerce verify Metalcam's cost reconciliation by gathering source accounting information for the period of investigation total cost of sales, total costs of good manufactured, and cost of sales for FEBs.  *See* Post-Prelim Comments at 33-35 (Appx082912-082914).  The Plaintiffs also requested that Commerce verify Metalcam's product family costs worksheet by requiring Metalcam to reconcile this worksheet to its cost reconciliation with supporting source accounting documents, and to further reproduce its allocation of variance, total costs by product family, job order costs for open die forging, and open die forged products balance with source documentation. *Id.*  In the in lieu of verification questionnaire issued to Metalcam, Commerce requested the information as specified by the Plaintiffs.  *See In Lieu of Verification Questionnaire* at 1-3 (Appx082929-082931).  In its response at pages 2 to 6 and Exhibits CVE-2 through CVE-4, Metalcam provided all of the requested information.  *See generally* Metalcam's In Lieu of Verification Cost Questionnaire Response (Appx0833331-083493).  In its case brief, Plaintiffs' nonetheless complained that Metalcam's costs were unverifiable.  Plaintiffs' Administrative Case Brief (October 20, 2020) at 7 to 23 ("Plaintiffs' Administrative CB") (Appx083117-083133). Metalcam thoroughly rebutted Plaintiffs' claims in its response brief.  *See generally* Metalcam's Administrative Rebuttal Brief (Nov. 2, 2020) ("Metalcam's Administrative RB") (Appx083860-083902).  Commerce agreed with Metalcam in its Final IDM finding the following:

> Metalcam's reported costs are reasonable, product-specific, rely on their normal books and records, and reconcile to Metalcam's audited financial statements, which are prepared in accordance with Italian GAAP. Metalcam responded to all of our requests for information in a timely manner and participated fully in this proceeding. Metalcam did not withhold information that we requested or in any way impeded this investigation. Accordingly, we used the complete, accurate, and verifiable cost data on the record in

determining Metalcam's weighted-average dumping margin for purposes of the final determination.

Final IDM at 9 (Appx083290).

The Plaintiffs now claim that Commerce did not apply the proper standard when evaluating Metalcam's cost reconciliation because Metalcam's underlying accounting records were not kept in accordance with Italian GAAP. Metalcam has consistently demonstrated that its ERP system is kept in accordance with Italian GAAP, and furthermore, forms the *basis* for Metalcam's trial balance, audited financial statements, Conto Economico (internal operating report), and standard cost methodology. *See, e.g.,* Metalcam's Section D Questionnaire Response (Apr. 6, 2020) at 10 (Appx082394). Thus, the Plaintiffs' claims that Metalcam's reported costs are not *based* on the principals of Italian GAAP misstates the record. *See* Plaintiffs' Brief at 30. The Plaintiffs appear to conflate Commerce's actual expectation that costs should be *based* on accounting records kept in accordance with the country of export's GAAP, with a stricter requirement made of whole cloth that CONNUM specific cost worksheets *must themselves* be a GAAP-audited financial record. *Id.* at n. 3 ("Commerce ignores that the product family worksheet is not a GAAP-audited financial record."). Commerce does not require that respondents must magically produce GAAP-audited worksheets categorized by CONNUMs (which are not generated in the normal course of business), only that the underlying accounting records supporting those worksheets be kept in accordance with GAAP. Relying on this misstatement of what Commerce typically expects to verify the accuracy of costs, the Plaintiffs go on to distort the record with respect to the completeness of Metalcam's cost reconciliation.

Metalcam's summaries of its cost reporting in its cost verification questionnaire response make clear that the Plaintiffs' allegations are unfounded. Metalcam explained that its ERP

system does not have a built-in output for the listing of all job orders and related information. Metalcam's In Lieu of Verification QR at 4 (Appx083340). Nonetheless, the data for each individual job order exists within the ERP system – the costo commessa report. *Id.* at 5 (Appx083341). As such, in order to derive the total standard cost of job orders by product family, Metalcam created a query that extracted data from its ERP system to "generate{ } a list of all job orders for all products produced during the POI including the information associated with the job order, *e.g.,* product family and the total standard costs." *Id.* at 4 (Appx083340). The totals by product family were then determined by summing the constituent cost elements of each product family. *Id.* at 5 (Appx083341). These standard costs along with variance information from the *Conto Economico* report (Metalcam's internal operating report) form the basis for Metalcam's cost reporting.[1] *Id.*

Thus, Metalcam never asserted that the product family costs worksheet is itself a GAAP-audited financial record. Futhermore, Commerce's standard practice does not require it to be. Rather, the product family costs worksheet represents costs *based on* the records of the producer of the merchandise, here its ERP system, which is kept in accordance with Italian GAAP, and reconciles to Metalcam's audited financial statements. As the Plaintiffs quote in part in their opening brief, where "amounts reported reconcile to a respondent's audited financial statement{ }, 'it assures {Commerce} that the respondent has accounted for all costs before allocating those costs to individual products.'" Plaintiffs' Brief at 29 (quoting *Notice of Final Determination of Sales at Less than Fair Value, and Negative Determination of Critical Circumstances: Certain Lined Paper Products from India*, 71 Fed. Reg. 45,012 (Aug. 8, 2006), accompanying IDM ("*Paper Products from India* IDM") at Comment 14). As such, by

---

[1] Here, too, the Plaintiffs misstate the record by claiming that Metalcam's cost reporting is not derived from the *Conto Economico* report. Plaintiffs' Brief at 30.

Plaintiffs' own understanding of Commerce's standard, Commerce can in fact reasonably rely on Metalcam's reporting because the reconciliation "ensure{s} that the *aggregate amount* of the reported costs capture all costs incurred by the respondent." *Paper Products from India* IDM at Comment 14 (emphasis added).

Furthermore, Commerce's position, which is that Metalcam's trial balance, its Conto Economico (internal operating report) and its product family level standard costs reconcile in total, does not contradict the statement that the "product family level standard costs, *at the constituent cost level*, cannot be reconciled to the trial balance or to the internal operating report." Final IDM at 8 (Appx083289) (emphasis added). Rather, it is the only logical interpretation of these three documents. The Federal Circuit has considered a similar statement by Commerce in *Micron Tech., Inc.*:

> {W}ith respect to Commerce's statement that it was not able to trace costs to company source documents, the government correctly points out that the statement was not meant to describe a failure of verification, but, rather, related to the fact that HEI's normal cost accounting system prepared unit cost information on a semi-annual basis, while its cost response reported information on a monthly basis. To prepare cost submissions, HEI was required to draft worksheets detailing the company's allocation of costs. The statement at issue simply reflects that fact.

117 F.3d at 1399. Here, too, there is not a failure of verification, merely a statement of fact regarding the nature of the product family standard cost worksheet. *See* Final IDM at 8 (Appx083289). As Metalcam explained throughout its responses before Commerce, and the agency recognized, these three documents – the *Conto Economico*, the trial balance and the product family standard cost worksheet -- present the same aggregate information -- split in different ways. *Id.*

Commerce explained its understanding of the inherent differences in Metalcam's documentation, stating in its Final IDM that the "product family level standard costs [are] a

11

characteristically different report compared to the other two documents from Metalcam's accounting systems." Final IDM at 8 (Appx 083289).  For this reason, the totals of the reports reconcile, but the exact numbers found at certain parts, *e.g.,* at the constituent cost level, are not delineated in each report.  Commerce further explained that the nature of Metalcam's accounting system led to this difference:

> Metalcam's process cost system will accumulate the costs of the fluid end blocks up to the point where multiple fluid end blocks are combined and this reflects the total costs up to that point in the "Steel Ingot" field. The Steel Ingot field in the product family cost worksheet, therefore, not only includes the cost of materials (ingot) but also includes some processing costs like forging, heat treatment and external machining. Therefore, the constituent cost elements in the product family level standard costs for, *e.g.*, Steel Ingot, External Machining, *etc.*, cannot be compared to the raw materials and external services costs in the trial balance or internal operating report which records costs on the basis of the nature of expenses. *However, in total, the costs recorded in Metalcam's trial balance, internal operating report, and product family level standard costs, adjusted by the variance, reconcile.*

Final IDM at 8 (Appx 083289) (emphasis added) (footnotes omitted).  When considering this issue in *Micron Tech., Inc.*, the Federal Circuit found that the appearance of a discrepancy only existed because the cost of production figures in two different sources did not represent the same data. 117 F.3d at 1400.  The Court linked the appearance of a difference directly to the fact that the manner in which the respondent in that instance kept its books and records in the normal course of business and is different than the manner in which it was required to report costs for purposes of Commerce's investigation. *Id.*  However, as the Federal Circuit was ultimately able to be reconcile the documents with additional steps, the Federal Circuit found that the respondent's allocation of costs were supported by substantial evidence. *Id.*

In conclusion, while discrete elements of the product family level standard costs do not tie directly to Metalcam's trial balance and internal operating report, the total figures by product family are based on Metalcam's ERP system and reconcile to the trial balance and internal

operating report.  For this reason, Plaintiffs' allegation that Metalcam may have allocated costs

away from FEBs to other forged products is wrong on its face.  Metalcam could not have

allocated costs away from FEBs if the total costs for the product families reconcile.  Thus, as in

*Micron Tech., Inc.*, Plaintiffs' argument also fails when the facts are properly applied.

Commerce's findings in this regard, therefore, easily meet the test for substantial evidence.

> **B.     The Information Provided by Metalcam in Response to its
>           Verification Questionnaires Provides Substantial Evidence in Support
>           of Commerce's Negative Determination with Respect to Metalcam.**

> **1.     Commerce verified Metalcam's cost reconciliation.**

The Plaintiffs first point to a minor clerical error to claim that Metalcam's cost

reconciliation did not verify.  *See* Plaintiffs' Brief at 31-32.  Metalcam clarified this so-called

discrepancy in its administrative rebuttal brief explaining this was merely an arithmetic mistake

made when summing general ledger account subtotals across quarters in its verification

questionnaire response. Metalcam Administrative RB at 4 (Appx083869).  The amounts

reflected in Metalcam's trial balance tie to its financial statements. *Id.* at 5 (Appx083869) (citing

Metalcam's Second Supplemental Section D Questionnaire Response (June 29, 2020) at Exhibit

SD-35-B).  The petitioner presents no substantiated allegations against the validity of the

underlying data.  *ee* Plaintiffs' Brief at 31-32.  The Plaintiffs claim that "these errors are only

discernible from a review of the source documentation," but this claim is patently false – had

Commerce or the Plaintiffs actually added the figures purported to equal the costs of sales for the

relevant quarters, the clerical error would have been evident. *See id.*  Commerce agreed with

Metalcam that this minor clerical error was inconsequential in its Final IDM, stating:

> We agree with the petitioners that the cost reconciliation worksheet contained a
> formula error in one of the reconciling items, where the appropriate amounts
> from the trial balance for a period outside the POI (*i.e.*, October to December
> 2019) were not properly summed. However, after fully examining the record,
> as noted by Metalcam, we found the same formula error in the corresponding

> reconciling item where the appropriate amounts from the trial balance for a period within the POI (*i.e.*, October to December 2018) were not properly summed. Because one of these reconciling items is a subtraction and the other error is an addition, the net result of these two errors continues to show that Metalcam's reported cost file reconciled to its financial statement costs.

Final IDM at 7 (Appx083288). Thus, Commerce's decision that Metalcam's reported costs file reconciled to its financial statement was supported by substantial evidence.

Furthermore, contrary to Plaintiffs' claim, *see* Plaintiffs' Brief at 32, Metalcam did not present new factual information when providing the source documentation identifying the clerical error in its earlier formula, as again the errors were the result of an arithmetic mistake. As such, Plaintiffs' call for an adverse finding directly contradicts the statute which specifies that Commerce should only rely on "facts otherwise available" on the record if "necessary" information is missing. 19 U.S.C. §1677e(a). Here, Commerce has all the information necessary to determine that Metalcam did not underreport its costs. Thus, there is no basis to apply facts otherwise available, let alone with an adverse inference on this claim. Consequently, Commerce's final determination is in accordance with law.

### 2.    Commerce verified Metalcam's minor input chart.

With respect to Metalcam's minor input chart, the Plaintiffs continue to cherry pick the record and malign any facts not in their favor as "discrepancies." Plaintiffs' Brief at 32. The Plaintiffs' claim that the chart is flawed because it does not directly reconcile to the product family cost worksheet or the trial balance with respect to external machining costs. *Id.* As Commerce pointed out in its Final IDM, Plaintiffs first raised this apparent "discrepancy" in their case brief, and as such, Commerce did not specifically ask about Metalcam's minor input chart in its in lieu of verification questionnaire. *See* Final IDM at 8 (Appx 083289). Nonetheless, as Metalcam explained in its administrative rebuttal brief, no such discrepancy existed, but rather Plaintiffs merely misunderstood the record. Metalcam Administrative RB at 12 (Appx083877).

Commerce agreed with Metalcam, correctly explaining in its Final IDM, that this chart was not intended to directly reconcile as it presents a subset of information:

> While we agree with the petitioners that the minor input chart does not tie to the product family costs worksheet or trial balance, we disagree that the minor input chart is flawed as the information in the chart is merely a portion of the total machining costs in the product family cost worksheet and the trial balance. Specifically, the reported rough machining costs in the minor input chart is a subset of the total external services cost in the trial balance, it does not include the costs of machining services performed on the non-subject merchandise and finish machining services for the subject merchandise, it only includes rough machining costs for fluid end blocks.

*See* Final IDM at 8 (Appx 083289).

Commerce's explanation shows a thorough consideration of the issue in light of the administrative record. *Id.*  During the course of the investigation, Metalcam demonstrated how to tie the total external machining costs from the trial balance to the *Conto Economico in toto*. *See* Metalcam Administrative RB at 16(Appx083881).  Metalcam also provided specific examples tying the amount for external processing in the *Conto Economico* to general ledger accounts. *See* Cost Verification Response at Exhibit CVE-4 (Appx083363-083407).  Once again, the scenario here is analogous to that of *Micron Tech., Inc.* where the Federal Circuit found that no discrepancy exists between documents when taking into consideration their inherent differences such as "the fact that certain figures are not broken down." 117 F.3d at 1400.  Thus, the Plaintiffs' allegation – that Commerce made its determination without a full picture of the costs – is unfounded.  Commerce's determination is this regard are supported by substantial evidence.

### 3. Commerce verified Metalcam's product family cost worksheet.

The Plaintiffs next attempt to discredit Metalcam's product family cost worksheet by pointing to an isolated anomaly, negative raw material costs related to non-subject merchandise. Plaintiffs' Brief at 33.  Here, too, plaintiffs first raised this issue in their case brief, and as such, did not request Commerce verify this issue. *See* Final IDM at 9 (Appx083290).  Nonetheless, in

response to the Plaintiffs' initial allegation, Metalcam explained that this issue was in fact immaterial in its administrative rebuttal brief. Metalcam Administrative RB at 19-20 (Appx083884-083885). Therein, Metalcam explained that this discrepancy is minor and unrelated to Metalcam's costs for subject merchandise which fully reconcile to the *Conto Economico* and trial balance (including variance). *Id.* Despite having raised this concern late in the investigation, Commerce thoroughly reviewed Plaintiffs' allegation, but found in favor of Metalcam stating:

> While we agree with the petitioners that record evidence shows that certain material costs for non-subject merchandise are negative, we note that the anomaly impacts a very small number of job orders and any adjustment will likely result in an increase in the cost of non-subject merchandise, possibly resulting in a reduction to the reported costs of the subject merchandise. This assertion is made because earlier in the proceeding we noted a negative value for internal machining costs for subject merchandise and we asked Metalcam for an explanation. Metalcam explained that there was an error in the data query that was used in generating the reported data. Metalcam submitted a revised cost file after correcting the faulty query that resulted in an increase to the cost of subject merchandise. Further, the anomaly here was not raised until the briefing stage, although it has been on the record for months prior to the preliminary determination. Therefore, because the anomaly is insignificant with respect to the total job orders reported, is related only to non-subject merchandise, and record evidence does not show that this anomaly affects the reported cost of subject merchandise, we find no adjustment to Metalcam's reported cost is warranted.

Final IDM at 9 (Appx083290) (internal citations omitted). Further, Commerce acted within its discretion to determine that no adjustment was necessary on the basis of facts available as Metalcam was not asked to address this issue during the course of the investigation. *Id.*

### 4.   Commerce verified Metalcam's steel ingot costs.

In their post preliminary comments, Plaintiffs requested that Commerce verify source accounting information with respect to its steel ingot costs, including at the melting, pouring, and casting stage; with respect to the type of steel; and for multiple CONNUMS. Post-Prelim

Comments at 35 (Appx082914).  Commerce requested that very same information from Commerce in its in lieu of verification questionnaire, which Metalcam responded to at pages 6 to 13 and Exhibits CVE-5 through CVE-9 of its response. *See* Metalcam's Cost Verification Questionnaire Response at 6-13; Exhibits CVE-5 to CVE-9 (Appx083342-083349; Appx083408-083493).  Despite Metalcam's thorough response, the Plaintiffs continue to allege that Metalcam lowered its actual POI costs for forged ingots that are held in semi-finished inventory waiting for an FEB order. *See* Plaintiffs' Brief at 34.  In its administrative rebuttal brief, Metalcam thoroughly refuted the Plaintiffs' interpretation of Metalcam's verification response with respect to steel ingot costs. *See* Metalcam's Administrative RB at 20-23 (Appx083885-083888).  Metalcam's response was not new evidence; rather, as in the normal course of verification, Metalcam appropriately provided the source documents requested by Commerce. *Id.* Thus, Metalcam provided the appropriate information that allowed Commerce to verify Metalcam's costs, which was the fundamental purpose of Commerce's in lieu of verification questionnaire.  Further, the Plaintiffs misinterpret the substance of Metalcam's response.  *See* Plaintiffs' Brief at 34.  As Metalcam explained in its administrative rebuttal brief, an ingot produced for FEBs can only be used in the production of FEBs, therefore it is impossible for Metalcam to allocate any costs from FEBs to non-subject merchandise. Metalcam's Administrative RB at 20 (Appx083885).  Furthermore, Commerce did not "sidestep" this concern, and indeed addressed it thoroughly, as follows:

> Record evidence does not support a claim that there is an understatement of the reported costs due to ingot costs being held in semi-finished inventory. A review of the cost of sales in the trial balance for the POI shows that the inventory changes in the value of semi-finished goods are appropriately included in the cost of sales, and likewise appropriately included in the reported cost of manufacture as demonstrated in the overall cost reconciliation.

Final IDM at 9 (Appx083290).  Thus, Commerce's determination in this regard is supported by substantial evidence.

### 5.   Commerce verified Metalcam's sales reconciliation.

In their Post-Prelim Comments, Plaintiffs instructed Commerce to verify Metalcam's sales reconciliation by providing source documentation to support each step of the reconciliation. Post-Prelim Comments at 36 (Appx082915).  Commerce's question was actually more detailed than Plaintiffs' original request, asking that Metalcam provide screen shots from its financial accounting system for 16 general ledger accounts for the 4th quarter of 2018 and 1st -3rd quarters of 2019. In Lieu of Verification Questionnaire at 1 (Appx082929).  At Exhibit VE-1, Metalcam provided the requested source documentation. Metalcam's In Lieu of Verification Sales QR at Exhibit VE-1 (Appx083563-083600).  Nonetheless, Plaintiffs complained in their case brief that Metalcam's screenshots did not tie to its sales reconciliation and somehow undermined the record as new factual information. Plaintiffs' Administrative CB at 36 (Appx083146).  Metalcam rebutted this complaint in its response brief.  Metalcam's Administrative Rebuttal Brief at 24-29. (Appx083889-083894).  Not only did Metalcam's response tie to its sales reconciliation, but again, as in the normal course of verification, the documents provided were support for Metalcam's existing sales reconciliation, and not new factual information. *Id.*

Commerce considered and agreed with Metalcam on both points.  In its Final IDM, Commerce discussed at length the validity of Metalcam's sales reconciliation:

> With regard to the petitioners' argument concerning Metalcam's sales reconciliation, we find that there is no basis in the petitioners' arguments for us to conclude that Metalcam's sales reconciliation failed to tie to the questionnaire's requested source accounting documents.

Final IDM at 9 (Appx083290).  Not only did Commerce find no basis in the Plaintiffs' argument

that Metalcam's sales reconciliation did not tie, but Commerce found that in making such

allegations, the Plaintiffs' "ignore{d} other portions of Commerce's inquiries concerning

Metalcam's reported reconciliation of U.S. sales." *Id.* at 11 (Appx083292).  Commerce went on

to list the relevant portions of Metalcam's response:

> Specifically, Commerce also requested that Metalcam: (1) provide POI general
> ledger detail for "Foreign Sales Revenues" general ledger account, identifying
> therein all POI U.S. sales of fluid end blocks; (2) reconcile the total value of
> POI U.S. sales of fluid end blocks in this detail to the total value of reported
> U.S. sales (as shown in Metalcam's reconciliation); (3) demonstrate how
> Metalcam queried its accounting system to extract (*i.e.*, ERP download) all
> sales of all products made in all countries, invoiced during the POI, and how
> the results of the query support the quantity and value thereof, as reflected in
> Metalcam's reconciliation; and (4) demonstrate, using ERP download (also
> previously provided in the record), how the quantity and value for various
> categories of sales shown in steps of Metalcam's reconciliation of U.S. sales
> are supported. Metalcam provided information in response to all items
> Commerce requested, with no discrepancies.

*Id.*(internal citations omitted).  Moreover, Commerce called the Plaintiffs' argument that

Metalcam's Verification Response contained new factual information "misleading" because the

details presented with Metalcam's Verification Response were not "substantive," and further

were only drawn out as a result of "Commerce's inquiry, in its tailored design."  *Id.*

Yet, the Plaintiffs continue to confuse the record claiming that by failing to present that

certain revenue items were moved for interim quarterly trial balance preparation purposes,

Metalcam failed to appropriately disclose its reconciliation methodology. Plaintiffs' Brief at 34.

Here, too, Plaintiffs' claim is specious.  As Commerce appropriately found, "Metalcam's

reconciliation of reported U.S. sales commenced with reconciling the total revenue in audited

2018 fiscal year income statement to the POI total value in the trial balance {which was not

affected by these movement}, and then directly to the quantity and value (all sales, all markets)

in the ERP download." Final IDM at 11 (Appx083292).  Therefore, the Verification

Questionnaire was the first instance in which Metalcam was required to reconcile the individual

general ledger accounts at issue on a quarterly basis. *Id.*  Consequently, Commerce's

determination in this regard is supported by substantial evidence.  At most, Plaintiffs' allegation

amounts to a request to reweigh the evidence.

### C.   Commerce Explained Its Final Determination Sufficiently to Meet Substantial Evidence Requirements.

Plaintiffs' claim that Commerce's determination suffered from "arbitrariness" is

meritless.  Plaintiffs' assert that Commerce should have applied adverse facts available for

failure to provide certain "screen shots," allegedly unlike Commerce's reaction to a respondent's

failure to provide certain screen shots in an "in lieu of verification" questionnaire in a

countervailing duty investigation on aluminum sheet from Turkey. Plaintiffs' Brief at 35 (citing

*Common Alloy Aluminum Sheet from the Republic of Turkey: Final Affirmative Countervailing*

*Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 86

Fed. Reg. 13,315 (Mar. 8, 2021), and accompanying IDM at 6).  Yet, in the very next paragraph

of Plaintiffs' brief, Plaintiffs recognize that Metalcam *did* provide screen shots from its source

accounting program. Plaintiffs' Brief at 35.  The cases are clearly not analogous, and thus

Plaintiffs' assertion of "arbitrariness" fails.

Plaintiffs' complaints in this regard ignore the thorough explanations provided by

Commerce in its final determination.  Commerce addressed each of the Plaintiffs arguments in

turn – finding that the information provided in response to the questionnaire in lieu of

verification was not new information and did indeed validate Metalcam's prior responses. Final

IDM at 9-11 (Appx083292-083290). Applying the appropriate substantial evidence standard, the

Court must "look instead to whether a reasonable mind might accept the relevant evidence in the

record as adequate to support the results of Commerce's verification," here, largely explained in the Final IDM rather than a separate verification report. *See Micron Tech., Inc.*, 117 F.3d at 1397 (citing *Hercules, Inc. v. United States*, 11 CIT 710, 726, 673 F. Supp. 454, 469 (1987) ("When Commerce applies a reasonable standard to verify materials submitted and the verification is supported by such relevant evidence as a reasonable mind might accept, the Court will not impose its own standard, superceding that of Commerce.")(internal citations omitted)). Commerce's thorough explanations are more than sufficient for this Court to conclude that its reasoning is reasonably discernible, and that Commerce's conclusions are supported by substantial evidence.

## CONCLUSION

For the reasons stated above, the Court should (1) hold that Commerce's decision to issue an in lieu of verification questionnaire is within its broad discretionary authority to determine the manner in which it conducts antidumping investigations; and (2) hold that Commerce's determination was in accordance with law.

Respectfully submitted,

/s/Douglas J. Heffner
Douglas J. Heffner
Richard P. Ferrin

*Counsel to Metalcam S.p.A.*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATIONS**

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's Standard Chambers Procedures, the undersigned certifies that Defendant-Intervenor's Response Brief complies with the word count limitations set forth in paragraph 2(B)(l). Exclusive of the exempted portions, as provided in paragraph 2(B)(l ), this brief includes 6,523 words. In preparing this certificate, the undersigned has relied upon the word count feature of the word-processing system used to prepare the submission.

Respectfully submitted,

/s/Douglas J. Heffner
Douglas J. Heffner
Richard P. Ferrin

*Counsel to Metalcam S.p.A.*

October 8, 2021