## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE CO., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | Court No. 21-00073 |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| METALCAM, S.P.A., ) | |
| ) | |
| Defendant-Intervenor. ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

PATRICIA M. MCCARTHY
Assistant Director

OF COUNSEL

HENDRICKS VALENZUELA
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement & Compliance
1401 Constitution Ave., NW
Washington, D.C. 20230

SARAH E. KRAMER
Trial Attorney
Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 353-0537
Email: sarah.e.kramer@usdoj.gov

October 8, 2021

*Attorneys for Defendant*

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ...............................................2

    I.    Administrative Determination Under Review ........................................2

    II.    Statement of the Issues ...............................................................2

STATEMENT OF FACTS ...................................................................2

SUMMARY OF ARGUMENT ..............................................................7

ARGUMENT ..................................................................................7

    I.    Applicable Law ........................................................................7

        A.    Standard Of Review ............................................................7

        B.    Legal Framework for Exhaustion of Administrative Remedies ..............10

    II.    Ellwood's Challenge Of The Verification Procedures Is Waived Due To Its Failure To Exhaust Its Administrative Remedies Before Commerce ..................11

        A.    Ellwood Did Not Challenge Verification Procedures Before Commerce ...............................................................12

        B.    No Exception To The Exhaustion Requirement Applies .........................15

    III.    Commerce's Verification Procedures Used Here Were Consistent With Statute And Necessary Due to the Exigencies Of The COVID-19 Pandemic ............... 17

    IV.    Commerce's Final Determination Is Supported By Substantial Evidence And In Accordance With Law ................................................................23

        A.    Commerce Addressed Material Arguments Raised During The Investigation In Making Its Final Determination ....................................23

            1.    Commerce's Use Of Metalcam's Costs Data Was Reasonable.... 25

            2.    Commerce's Use Of Metalcam's Sales Data Was Reasonable ....30

            3.    Commerce Addressed Ellwood's Arguments Regarding Lucchini's Verification Response .................................................34

        B.    Commerce's Decision To Not Apply Adverse Facts Available Was Supported By Substantial Evidence And In Accordance With Law ........37

CONCLUSION ..................................................................................................................41

## **TABLE OF AUTHORITIES**

**CASES**                                                                                      **PAGE(S)**

*ABB, Inc. v. United States,*
    920 F.3d 811 (Fed. Cir. 2019)..........................................................................10

*Albemarle Corp. v. United States,*
    821 F.3d 1345 (Fed. Cir. 2016)........................................................................35

*Am. Alloys v. United States,*
    30 F.3d 1496 (Fed. Cir. 1994) .........................................................................20

*Altx, Inc. v. United States,*
    370 F.3d 1108 (Fed. Cir. 2004).........................................................................9

*Appvion, Inc. v. United States,*
    100 F. Supp.3d 1374 (Ct. Int'l Trade 2015) ...................................................38

*Boomerang Tube LLC v. United States,*
    856 F.3d 908 (Fed. Cir. 2017)..........................................................................10

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962)...........................................................................................9

*Cerro Flow Prod., LLC v. United States,*
    2014 WL 3539386 (Ct. Int'l Trade 2014).......................................................38

*Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.,*
    467 U.S. 837 (1984)...........................................................................................8

*Clearon Corp. v. United States,*
    800 F. Supp. 2d 1355 (Ct. Int'l Trade 2011) ..................................................11

*Consol. Bearings Co.,*
    25 C.I.T. 546 (2001) ........................................................................................16

*Consol. Edison Co. of N.Y. v. NLRB,*
    305 U.S. 197 (1938)....................................................................................10, 37

*Consol. Fibers, Inc. v. United States,*
    535 F. Supp. 2d 1345 (Ct. Int'l Trade 2008) ...................................................9

*Consol. Bearings Co. v. United States,*
    348 F.3d 997 (Fed. Cir. 2003).............................................................12, 16, 17

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966)..................................................................................10, 40

*Corus Staal BV v. United States,*
    502 F.3d 1370 (Fed. Cir. 2007)...............................................10, 11, 14, 17

*CS Wind Vietnam Co. v. United States,*
    832 F.3d 1367 (Fed. Cir. 2016)...........................................................................9

*Daewoo Elec. Co. v. Int'l Union,*
    6 F.3d 1511 (Fed. Cir. 1993)...............................................................................35

*Davis v. Wakelee,*
    15 S. Ct. 555 (1895)...............................................................................................14

*Deacero S.A.P.I. de C.V. v. United States,*
    353 F. Supp. 3d 1303 (Ct. Int'l Trade 2018) ...................................40

*Dillinger France S.A. v. United States,*
    350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ..........................38, 39

*Dongtai Peak Honey Indus. v. United States,*
    777 F.3d 1343 (Fed. Cir. 2015)............................................................................9

*Dorbest Ltd. v. United States,*
    604 F.3d 1363 (Fed. Cir. 2010)..........................................................................10

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, United States,*
    25 C.I.T. 1150 (2001) ...........................................................................................20

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996)........................................................................7, 9

*Fuwei Films (Shandong) Co. v. United States,*
    791 F. Supp. 2d 1381 (Ct. Int'l Trade 2011) ...................................17

*Goodluck India Ltd., v. United States,*
    2021 U.S. App. LEXIS 26187 (Fed. Cir. Aug. 31, 2021) ................19

*Itochu Bldg. Prods. v. United States,*
    733 F.3d 1140 (Fed. Cir. 2013)..........................................................................11

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015)............................................................................8

*Jiaxing Bro. Fastener Co. v. United States,*
    822 F.3d 1289 (Fed. Cir. 2016)........................................................34, 40

*Koyo Seiko Co., Ltd. v. United States,*
    36 F.3d 1565 (Fed. Cir. 1994)................................................................8

*Kyocera Solar, Inc. v. United States Int'l Trade Comm'n,*
    844 F.3d 1334 (Fed. Cir. 2016)..............................................................8

*LG Chem, Ltd. v. United States,*
    2021 WL 3578970 (Ct. Int'l Trade Aug. 13, 2021)........................................35

*Luoyang Bearing Factory v. United States,*
    240 F. Supp. 2d 1268 (Ct. Int'l Trade 2002) ..................................................12

*Maverick Tube Corp. v. United States,*
    857 F.3d 1353 (Fed. Cir. 2017)........................................................10, 37

*McCarthy v. Madigan,*
    503 U.S. 140 (1992)............................................................................11

*Micron Tech., Inc. v. United States,*
    117 F.3d 1386 (Fed. Cir. 1997)..............................................................20

*Mittal Steel Point Lisas Ltd. v. United States,*
    548 F.3d 1375 (Fed. Cir. 2008)........................................................10, 17

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)..............................................................................9

*N. Am. Rubber Thread Co., Inc. v. United States,*
    593 F.3d 1346 (Fed. Cir. 2015)..............................................................14

*Nan Ya Plastics Corp., Ltd. v. United States,*
    810 F.3d 1333 (Fed. Cir. 2016)..............................................................35

*Nippon Steel Corp. v. United States.,*
    458 F. 3d 1345 (Fed. Cir. 2006)..............................................................9

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003)........................................................38, 39

*Nucor Corp. v. United States,*
    286 F. Supp. 3d 1364 (Ct. Int'l Trade 2018) ......................................11, 13, 40

*PAM S.p.A. v. United States*,
    463 F.3d 1345 (Fed. Cir. 2006)..................................................................9, 22

*PAM, S.p.A v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009)..................................................................38

*Philipp Bros. v. United States*,
    10 C.I.T. 76 (1986) ..................................................................................11

*Pohang Iron & Steel Co. v. United States*,
    23 C.I.T. 778 (Ct. Int'l Trade 1992) .........................................................11

*Prime Time Commerce LLC v. United States*,
    495 F. Supp. 3d 1308 (Ct. Int'l Trade 2021) .............................................10

*PSC VSMPO–Avisma Corp. v. United States*,
    688 F.3d 751 (Fed. Cir. 2012)..........................................................8, 35, 37

*Rubberflex Sdn. Bhd. V. United States*,
    59 F. Supp. 2d 1338 (Ct. Int'l Trade 1999) ...............................................16

*Samsung Electronics Co. Ltd., v. United States*,
    72 F. Supp. 3d 1359 (Ct. Int'l Trade 2015) ...............................................14

*Sandvik Steel Co. v. United States*,
    164 F.3d 596, 600 (Fed. Cir. 1998)...........................................................11

*SNR Roulements v. United States*,
    402 F.3d 1358 (Fed. Cir. 2005)..................................................................35

*Stanley Works (Langfang) Fastening Sys. Co., Ltd. V. United States*,
    279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ......................................9, 11, 16

*Ta Chen Stainless Steel Pipe, Ltd. v. United States*,
    342 F. Supp. 2d 1191 (Ct. Int'l Trade 2004) .............................................11

*Timex V.I., Inc. v. United States*,
    157 F.3d 879 (Fed. Cir. 1998)....................................................................8

*Torrington Co. v. United States*,
    68 F.3d 1347 (Fed. Cir. 1995)....................................................................20

*Torrington Co. v. United States*,
    82 F.3d 1039 (Fed. Cir. 1996)....................................................................8

*U.S. Steel Grp. v. United States*,
  96 F.3d 1352 (Fed. Cir. 1996)............................................................8

*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952)............................................................................10

*Uttam Galva Steels Ltd., v. United States*,
  997 F.3d 1192 (Fed. Cir. 2021)........................................................24

*Viet I–Mei Frozen Foods Co. v. United States*,
  839 F.3d 1099 (Fed. Cir. 2016)...................................................10, 40

*Zhongce Rubber Group Co. Ltd., v. United States*,
  352 F.Supp.3d 1276 (Ct. Int'l Trade 2018) .....................................16

## STATUTES

19 U.S.C. § 1677................................................................... passim

28 U.S.C. § 2637(d) ...........................................................10, 12, 17

## REGULATIONS

19 C.F.R. § 351.307 ...............................................................19, 22

19 C.F.R. § 351.309 ..........................................................10, 14, 17

19 C.F.R. § 351.310 .................................................................5, 12

## OTHER AUTHORITIES

*Brake Rotors From the People's Republic of China*,
  64 Fed. Reg. 61,581 (Dep't of Commerce Nov. 12, 1999)................20

*Polyethylene Terephthalate Resin From Pakistan*,
  83 Fed. Reg. 48,281 (Dep't of Commerce Sep. 24, 2018) ...............20

*Common Alloy Aluminum Sheet from the Republic of Turkey*,
  86 Fed. Reg. 13,315 (Dep't of Commerce Mar. 8, 2021) .................34

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

_____

|  |  |  |
|---|---|---|
| ELLWOOD CITY FORGE CO., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | Court No. 21-00073 |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| METALCAM, S.P.A., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
_____

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response in opposition to the Rule 56.2 Motion for Judgment on the Agency Record (Ellwood Br.), July 9, 2021, ECF No. 21, filed by the plaintiffs, Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons (collectively, Ellwood), challenging certain aspects of the Department of Commerce's final determination in the antidumping duty investigation of forged steel fluid end blocks from Italy.  Specifically, Ellwood suggests that Commerce's use of off-site verification procedures necessitated by the COVID-19 pandemic renders Commerce's final determination unlawful and that Commerce failed to sufficiently verify information relied upon in reaching its final determination.  As we demonstrate below, Commerce's final determination is supported by substantial evidence and the COVID-safe

verification procedures it used are in accordance with the law.  Therefore, we respectfully request that the Court deny Ellwood's motion and sustain Commerce's final determination.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

**I.      <u>Administrative Determination Under Review</u>**

The administrative determination under review is the final determination in the antidumping duty investigation of fluid end blocks from Italy.  *See Forged Steel Fluid End Blocks From Italy*, 85 Fed. Reg. 79,996 (Dep't of Commerce Dec. 11, 2020) (Final Determination), Appx083315-083318[1] and accompanying Issues and Decision Memorandum (IDM), Appx083282-083314.  The period of investigation is October 1, 2018 through September 30, 2019.  Final Determination, Appx083315.

**II.     <u>Statement of the Issues</u>**

1.      Whether Ellwood failed to exhaust its administrative remedies regarding challenges against Commerce's verification procedures made pursuant to 19 U.S.C. § 1677m(i).

2.      Whether Commerce's final determination and reliance on Italian producers' reported costs is supported by substantial evidence and in accordance with law.

3.      Whether Commerce's determination not to apply facts available with an adverse inference is supported by substantial evidence and in accordance with law.

<u>**STATEMENT OF FACTS**</u>

On December 19, 2019, Commerce received an antidumping duty petition concerning imports of fluid end blocks from Italy filed by the FEB Fair Trade Coalition, Ellwood Group, and A. Finkl & Sons (collectively, the petitioners) and Commerce initiated its antidumping investigation on January 8, 2020.  *Forged Steel Fluid End Blocks From the Federal Republic of*

---

[1] "Appx_" refers to the page of the joint appendix.

*Germany, India, and Italy*, 85 Fed. Reg. 2,394 (Dep't of Commerce Jan. 15, 2020) (initiation

notice), Appx080000.  Commerce subsequently selected Lucchini Mamè Forge S.p.A.

(Lucchini) and Metalcam S.p.A. (Metalcam) as mandatory respondents in this investigation.  *See*

*Forged Steel Fluid End Blocks From Italy*, 85 Fed. Reg. 44,500 (Dep't of Commerce July 23,

2020) (Preliminary Determination) and accompanying Preliminary Decision Memorandum

(PDM), Appx082838.

On February 6, 2020, Commerce issued its questionnaire to both mandatory respondents.

PDM at Appx082839; *see also* Commerce's Letter to Lucchini (Feb. 6, 2020), Appx001012-

001013; Commerce's Letter to Metalcam (Feb. 6, 2020), Appx001165-001166.  In March and

April 2020, Commerce received timely questionnaire responses from Lucchini and Metalcam.

PDM at Appx082839 (summarizing timeline of questionnaire responses received).  From April

through June 2020, Commerce issued multiple supplemental questionnaires to Lucchini and

Metalcam.  *See* PDM at Appx082840 (discussing questionnaires issued between April and June

2020).  Commerce subsequently received timely responses from respondents.  *Id.*  On March 23,

2020, Commerce requested interested parties submit constructed value profit and selling

expenses comments and information.  *Id.*  Because neither Lucchini nor Metalcam had a viable

home market or third-country market for subject merchandise, Commerce based normal value on

constructed value, in accordance with 19 U.S.C. § 1677b(a)(4).  *Id.* at Appx082852.  On April

20, 2020, the petitioners, Lucchini, and Metalcam submitted comments and new factual

information related to the determination for constructed value profit and selling expenses for

consideration in the calculation of constructed value as the basis for normal value for Lucchini

and Metalcam.  PDM at Appx082840.  On May 11, 2020, the petitioners, Lucchini, and

Metalcam submitted rebuttal comments and factual information to rebut, clarify, or correct information concerning the submitted constructed value profit and selling expenses. *Id.*

On July 2, 2020, petitioners submitted comments with respect to Metalcam and Lucchini for consideration in the preliminary determination. PDM at Appx082841; *see generally* Petitioner's Pre-Preliminary Comments Concerning Metalcam (July 2, 2020), Appx082740-082783; Petitioner's Pre-Preliminary Comments Concerning Lucchini (July 2, 2020), Appx082784-082836. On July 9, 2020, Metalcam replied to petitioners' comments. *See* PDM at PDM at Appx082841; *see generally* Response to Petitioner's July 2, 2020 Pre-Preliminary Comments (July 9, 2020), Appx084180-084241; Metalcam's Factual Information and Response to Petitioners' July 2, 2020 Comments on CV Profit and Selling Expenses (July 9, 2020), Appx003319-003325. Likewise, Lucchini also replied to the petitioners' comments. *See generally* Initial Rebuttals to Petitioner's Pre-Preliminary Comments (July 10, 2020), Appx003326-003334; Rebuttals to Petitioner's Pre-Preliminary Comments (July 13, 2020), Appx084242-084262.

On July 16, 2020, Commerce issued its preliminary determination in which it explained its methodology and calculated preliminary dumping margins for Lucchini and Metalcam of 4.84 percent and 0.00 percent, respectively. PDM at Appx082846-082854; Preliminary Determination, Appx002977. Commerce explained it had calculated the respective cost of materials and fabrication, general and administrative, and financial expenses, based on information submitted by Metalcam and Lucchini in their original and supplemental questionnaire responses, except in instances where Commerce determined that the information was not valued correctly. PDM at Appx082852. In particular, Commerce adjusted Lucchini's reported transfer prices for ingots that it purchased from affiliated parties to reflect market prices

pursuant to 19 U.S.C. § 1677b(f)(3).  *Id.*  Following the preliminary determination, petitioners

submitted multiple post-preliminary comments, IDM at Appx083283, to which Metalcam and

Lucchini submitted respective replies, *id.*  On August 24, 2020, pursuant to 19 C.F.R.

§ 351.310(c), interested parties requested that Commerce hold a public hearing.  *Id.*; *see*

*generally* Public Hearing Transcript (Nov. 13, 2020), Appx083204-083281.

      Because, as petitioners later acknowledged, the global COVID-19 pandemic had made

conducting on-site verification impossible, on September 2, 2020, Commerce issued

questionnaires requesting additional information from Metalcam and Lucchini in lieu of

performing on-site verification pursuant to 19 U.S.C. § 1677m(i).  IDM at Appx083283; *see*

*generally* Commerce Letter to Metalcam (Sept. 2, 2020), Appx082927-082931; Commerce

Letter to Lucchini (Sept. 2, 2020), Appx082922-082926 (collectively, Verification

Questionnaires).  On September 11, 2020, Commerce received responses to its Verification

Questionnaires from both Lucchini and Metalcam.  IDM at Appx083283; *see generally*

Lucchini's Response to Verification Questionnaire (Sept. 11, 2020), Appx082932-083096;

Metalcam's Response to Verification Questionnaire (Sept. 11, 2020), Appx083327-084018.

      On October 2, 2020, Commerce invited parties to comment on the preliminary

determination and the responses to Commerce's verification questionnaires.  IDM at

Appx083283.  On October 20, 2020, Commerce received case briefs from petitioners and

Metalcam.  *Id.*  On November 2, 2020, Commerce received rebuttal briefs from Metalcam and

Lucchini, and on November 10, 2020, received rebuttal brief from the petitioners.  *Id.*  On

November 13, 2020, Commerce held a virtual public hearing.  *Id.*; *see generally* Public Hearing

Transcript, Appx083204-083281.  Relevant here, petitioners did not object to Commerce's use of

the Verification Questionnaires to conduct verification in lieu of on-site verification, in either

their case brief or at the public hearing. *See generally* Petitioners' Case Brief (Oct. 20, 2020), Appx083097-083203; Public Hearing Transcript, Appx083204-083281. Rather, petitioners *lauded* Commerce's use of the Verification Questionnaires at that time: "Here, in-person verification was impossible given the COVID-19 global pandemic, but Commerce developed an alternative tool of a verification questionnaire to obtain the type of information it would during an on-site verification. We are grateful for Commerce's Verification Questionnaires." Petitioners' Case Brief at Appx083195; *see also* Public Hearing Transcript, Appx003231 (stating that "Commerce {took} the extraordinary step in these times of the coronavirus to issue a verification questionnaire. We're glad you did.").

In its final determination, Commerce made certain changes to the margin calculations for Lucchini to adjust costs to reflect the cost of scrapped fluid end blocks and apply the applicable commission rate to corresponding U.S. sales. IDM at Appx083283. For Metalcam, Commerce determined that its reported costs are reasonable, product-specific, rely on its normal books and records, and reconcile with its audited financial statements, which are prepared in accordance with Italian generally accepted accounting practices. IDM at Appx083290. As such, Commerce calculated a final dumping margin for Lucchini of 7.33 percent, and zero percent for Metalcam. *See* Final Determination at Appx083316. Following an affirmative determination of injury by the U.S. International Trade Commission, Commerce published an antidumping duty order on imports of fluid end blocks from Italy on January 29, 2021. *See Forged Steel Fluid End Blocks From the Federal Republic of Germany and Italy*, 86 Fed. Reg. 7,528 (Dep't of Commerce Jan. 29, 2021) (Antidumpting Duty Orders).

## SUMMARY OF ARGUMENT

Commerce's final determination is supported by substantial evidence and in accordance with law, and Ellwood's arguments do not demonstrate otherwise.  As an initial matter, throughout the investigation, Ellwood agreed with Commerce's verification methodology and did not challenge the use of verification questionnaires until now.  Thus, Ellwood did not exhaust its administrative remedies regarding its challenge to the validity of Commerce's verification process, and the Court should consider these arguments waived.  Regardless, Commerce verified the information relied upon in making its final determination using verification questionnaires, in a manner consistent with the statute and with how Commerce has adapted its verification procedures to past crises.  Commerce relied on verifiable data and information provided by the respondents throughout the investigation such that resort to facts available with an adverse inference was not warranted.  Moreover, contrary to Ellwood's assertions, Commerce clearly explained the record basis for relying on the provided information and how that record information supported its determination.  Therefore, Commerce's determination was supported by substantial evidence and in accordance with law.

## ARGUMENT

### I.   Applicable Law

#### A.   Standard Of Review

In reviewing Commerce's antidumping or countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  In reviewing whether Commerce's actions are in

accordance with law, the Court relies upon the two-step test articulated by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). In the first step, the Court determines "whether Congress has directly spoken to the precise question at issue" and clearly expressed its purpose and intent in the governing statute. *See id.* at 842-43. In considering whether Congress has spoken to the precise question at issue, the Court may consider the statute's structure and legislative history. *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998).

If the statute is silent or ambiguous regarding the relevant issue, the traditional second prong of the *Chevron* analysis requires courts to "defer to the agency's interpretation of its own statute as long as that interpretation is reasonable." *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994); *see Kyocera Solar, Inc. v. United States Int'l Trade Comm'n*, 844 F.3d 1334 (Fed. Cir. 2016) (same); *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996) ("Any reasonable construction of the statute is a permissible construction."). "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction." *Chevron*, 467 U.S. at 843 n.11.

Commerce is afforded an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory test." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id.* "Antidumping . . . duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts," *PSC VSMPO–Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012), and so courts afford Commerce significant deference

in those determinations, *id.*; *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996); *see also Stanley Works (Langfang) Fastening Sys. Co., Ltd. V. United States*, 279 F. Supp. 3d 1172, 1185 (Ct. Int'l Trade 2017). Still, Commerce "must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983); *see also CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) ("The requirement of explanation presumes the expertise and experience of the agency and still demands an adequate explanation in the particular matter." (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-68 (1962)).

Additionally, this Court reviews Commerce's conduct of its administrative proceedings for abuse of discretion. *See Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1350 (Fed. Cir. 2015). This Court "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} factfindings and its ultimate action." *Consol. Fibers, Inc. v. United States*, 535 F. Supp. 2d 1345, 1354 (Ct. Int'l Trade 2008). The Court of Appeals for the Federal Circuit has also recognized that it is within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. *PAM S.p.A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006).

A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F. 3d 1345, 1352 (Fed. Cir. 2006) (citation omitted). Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004). "A finding is supported by substantial evidence if a reasonable mind might accept

the evidence as sufficient to support the finding." *Maverick Tube Corp. v. United States*, 857

F.3d 1353, 1359 (Fed. Cir. 2017) (citing *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229

(1938)).  Moreover, "{a}n agency finding may still be supported by substantial evidence even if

two inconsistent conclusions can be drawn from the evidence." *Viet I–Mei Frozen Foods Co. v.

United States*, 839 F.3d 1099, 1106 (Fed. Cir. 2016) (citing *Consolo v. Fed. Mar. Comm'n*, 383

U.S. 607, 620 (1966)).

### B.       Legal Framework for Exhaustion of Administrative Remedies

Congress has mandated that "the Court of International Trade shall, where appropriate,

require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  This statute "indicates

a congressional intent that, absent a strong contrary reason, the court should insist that parties

exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v.

United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502

F.3d 1370, 1379 (Fed. Cir. 2007)).  As such, Courts require parties to exhaust administrative

remedies before the agency by raising all issues in their initial case briefs before Commerce. *See

Prime Time Commerce LLC v. United States*, 495 F. Supp. 3d 1308, 1313-14 (Ct. Int'l Trade

2021) (citing *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (internal

citation omitted); *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383 (Fed. Cir.

2008); *ABB, Inc. v. United States*, 920 F.3d 811, 818 (Fed. Cir. 2019)).  Commerce's regulations

also address the requirement that parties submit a case brief that contains all the arguments that

the submitters view to be relevant to the final determination. *See* 19 C.F.R. § 351.309(c)(2).

"Simple fairness to those who are engaged in the tasks of administration, and to litigants,

requires as a general rule that courts should not topple over administrative decisions unless the

administrative body not only has erred but has erred against objection made at the time

appropriate under its practice." *Mittal Steel*, 548 F.3d at 1383–84 (quoting *United States v. L.A.

*Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)).  "Exhaustion serves two main purposes: 'to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors,' and to 'promot{e} judicial efficiency by enabling an agency to correct its own errors so as to moot judicial controversies.'" *Stanley Works*, 279 F. Supp. 3d at 1189 (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998)); *see also Corus Staal*, 502 F.3d at 1379-80 (citing *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)); *Clearon Corp. v. United States*, 800 F. Supp. 2d 1355, 1362 (Ct. Int'l Trade 2011).  As such, the Court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Corus Staal*, 502 F.3d at 1379; *accord Clearon Corp.*, 800 F. Supp. 2d at 1362 (Ct. Int'l Trade 2011); *see also Nucor Corp. v. United States*, 286 F. Supp. 3d 1364, 1377 (Ct. Int'l Trade 2018), *aff'd*, 927 F.3d 1243 (Fed. Cir. 2019); *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 342 F. Supp. 2d 1191, 1205 (Ct. Int'l Trade 2004); *Pohang Iron & Steel Co. v. United States*, 23 C.I.T. 778, 792 (Ct. Int'l Trade 1992).

Exceptions to the exhaustion requirement are limited, such as when it would have clearly been "futile" or the issue for the Court is a "pure question of law" that can be addressed without further factual development or further agency exercise of discretion.  *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013).[2]

## II.     Ellwood's Challenge Of The Verification Procedures Is Waived Due To Its Failure To Exhaust Its Administrative Remedies Before Commerce

Ellwood failed to exhaust its administrative remedies because it did not raise any of the arguments it now makes regarding Commerce's verification procedures to the agency in its case

---

[2]  Other exceptions include cases in which the plaintiff did not have timely access to the confidential record, *Philipp Bros. v. United States*, 10 C.I.T. 76, 78 (1986); no administrative

brief.  To the contrary: in the proceedings before Commerce, Ellwood explicitly expressed *approval* of the verification procedures it now challenges in this Court.  Furthermore, no exception to the exhaustion requirement applies to Ellwood's claims.  As such, consistent with 28 U.S.C. § 2637(d), the Court should dismiss Ellwood's challenge to Commerce's verification.

### A.    Ellwood Did Not Challenge Verification Procedures Before Commerce

Ellwood failed to exhaust its administrative remedies before Commerce with respect to its arguments challenging Commerce's verification procedures.  As discussed above, Commerce issued verification questionnaires in lieu of conducting on-site verification.  These questionnaires explained that the questions in each questionnaire "are similar to those that . . . Commerce would normally ask during an on-site verification" and that the questionnaires fulfill the function of on-site verification.  Commerce Letter to Metalcam, Appx082927; Commerce Letter to Lucchini, Appx082922.

During the investigation, Ellwood did not argue that Commerce's verification questionnaires were insufficient to meet Commerce's requirement to conduct a statutory verification of the information or that such questionnaires were not verification.  *See generally* Petitioner Case Brief, Appx083097-083203.  Ellwood had opportunities to raise its newly found grievances regarding how Commerce conducted verification either in case briefs, and having raised the argument in its case brief at the public hearing, both of which occurred after Commerce issued its verification questionnaires.  19 C.F.R. § 351.310.

---

procedures existed to exhaust, *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1004 (Fed. Cir. 2003); or when a new interpretation from an intervening judicial decision would impact the agency's action.  *See Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1297 n.26 (Ct. Int'l Trade 2002).  These exceptions are not relevant to this case.  Ellwood had timely access to the confidential record and has not claimed that it did not.  There is also no claim or evidence of an intervening judicial decision that would have affected how Commerce conducted verification.

However, Ellwood did just the opposite: on multiple occasions *after* Commerce had issued the verification questionnaires and had explained its use of off-site verification methods, Ellwood lauded Commerce's verification procedures: "Here, in-person verification was impossible given the COVD-19 global pandemic, but Commerce developed an alternative tool of a verification questionnaire to obtain the type of information it would during an on-site verification.  We are grateful for Commerce's Verification Questionnaires."  Petitioners' Case Brief at Appx083195; *see also* Public Hearing Transcript, Appx003231 (stating that "Commerce {took} the extraordinary step in these times of the coronavirus to issue a verification questionnaire. We're glad you did.").  Ellwood could have suggested alternative methods for off-site verification then, but does so for the first time before this Court.  *See* Ellwood Br. at 24 ("For example, Commerce could have arranged a virtual 'on site' verification visit with Lucchini and Metalcam, given Commerce's extensive use of videoconferencing during the pandemic.").

Ellwood now argues that "Commerce did not even attempt to justify its procedures in this investigation" or how Commerce's actions "constituted a lawful substitute for an on-site verification."  Ellwood Br. at 23.  As noted above, however, Commerce had no reason to provide such a justification because Ellwood had warmly embraced the procedures.  Even assuming that Ellwood had been more neutral in its reaction to the procedures, it still failed to provide Commerce with an opportunity to address its current concerns at the administrative level because Ellwood did not raise them.  Similarly, Ellwood never raised any argument regarding the need for a separate verification report during the course of the investigation, and Commerce was likewise denied the opportunity to address these concerns at the administrative level.  This is the exact situation the administrative exhaustion doctrine was intended to prevent.  *See Nucor Corp.*, 286 F. Supp. 3d at 1377 (explaining that "absent exceptional circumstances . . . it would be

inconsistent with the purposes of the exhaustion doctrine to require Commerce to explain a challenge . . . that was not raised at the administrative level") (internal citations omitted).  More fundamentally, as discussed below, Commerce explained its adoption of the questionnaire verification procedure, and the off-site verification method used here is in accordance with law and consistent with Commerce's past practice of adjusting its verification procedures in light of crisis situations.

A separate but related basis for denying Ellwood's claims is that Ellwood's failure to raise these issues in its administrative case brief violated 19 C.F.R. § 351.309, which requires parties to submit case briefs containing all the arguments the submitter views relevant to the final determination.  The Courts have recognized a violation of section 351.309 as a separate basis for denying a plaintiff's motion.  *See Corus Staal*, 502 F.3d at 1379 (explaining that in the context of 19 C.F.R. § 351.309 the exhaustion requirement "is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review"); *Samsung Electronics Co. Ltd., v. United States*, 72 F. Supp. 3d 1359, 1371 (Ct. Int'l Trade 2015) ("A violation of Commerce's regulation, therefore, supplies an independent ground for determining that an argument has not been exhausted.").  As Ellwood's administrative case brief does not reflect any of its new allegations regarding verification procedures, the Court should not consider them.

Finally, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position."  *Davis v. Wakelee*, 15 S. Ct. 555, 558 (1895); *see also Trustees in Bankr. of N. Am. Rubber Thread Co., Inc. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2015) ("{J}udicial estoppel applies just as much when one of the tribunals is an administrative agency

as it does when both tribunals are courts.").  Put another way, just because Ellwood does not like

the ultimate outcome of Commerce's investigation does not mean it can assume, before this

Court, the opposite position of that presented to the agency.

### B.      No Exception To The Exhaustion Requirement Applies

Moreover, Ellwood had an administrative remedy available and multiple opportunities to

raise any and all arguments against Commerce's verification, so there is no evidence that it

would have been "futile" to do so, there was no delay in access to the confidential record,

Ellwood does not point to any intervening judicial decision that would affect Commerce's

decision, and the issues raised do not present a "pure question of law." As such, the exhaustion

requirement applies to Ellwood's arguments challenging Commerce's verification.

Ellwood had opportunities to contest Commerce's verification procedures during the

administrative proceeding.  Commerce invited interested parties to submit administrative case

and rebuttal briefs to address the responses submitted to the verification questionnaires.  *See*

Commerce Letter to Metalcam, Appx082928; Commerce Letter to Lucchini, Appx082923.

Ellwood took full advantage of these opportunities to express that it *supported* how Commerce

conducted its verification of the mandatory respondents' information.  Petitioners' Case Brief at

Appx083195; Public Hearing Transcript, Appx003231.  Indeed, Ellwood's administrative briefs

contained substantial comments addressing the information submitted in response to the

verification questionnaires, but said nothing about how the procedures to gather such information

were insufficient.  *See generally* Petitioners' Case Brief at Appx083097-083203; Petitioners'

Rebuttal Brief (Nov. 10, 2021), Appx003453-003484.  Moreover, these opportunities were not

"futile": as indicated by the record, Commerce took additional steps during these unprecedented

pandemic times to conduct verification.  *See* Petitioners' Case Brief at Appx083195.  Commerce

addressed the concerns Ellwood, and others, raised during the investigation with regard to

verification.  In fact, Ellwood ensured its concern, that some form of verification took place during the investigation, reached Congress.  *See* Attachment to Ex Parte Memo, Letter from Rep. Mike Kelly (Sept. 24, 2020), Appx003450-003452 (pointing to "serious concerns that the foreign producers will go unverified"); *compare* Letter from Rep. Mike Kelly (Dec. 3, 2020), Appx003485 (citing to discussions with petitioners regarding "respondents' verification questionnaire responses" and noting that "{s}ince our conversation, I was pleased to learn that Commerce has adapted to the current environment by issuing 'verification questionnaires' to be used 'in lieu of on-site verification.'").  Ellwood was certainly able to contest or raise arguments regarding the adequacy of the verification questionnaires to Commerce, and nothing in the record suggests these efforts would have been futile.  *See Rubberflex Sdn. Bhd. V. United States*, 59 F. Supp. 2d 1338, 1345 (Ct. Int'l Trade 1999) (limiting the Court's review only to the allegations regarding verification asserted in Rubberflex's administrative case brief).

The pure question of law exception also does not apply here.  The pure question of law exception applies when (1) plaintiff raises a new argument; (2) this argument is of a purely legal nature; (3) the inquiry requires neither further agency involvement nor additional fact finding or opening up the record; and (4) the inquiry neither creates undue delay nor causes expenditure of scarce party time and resources.  *Zhongce Rubber Group Co. Ltd., v. United States*, 352 F. Supp. 3d 1276, 1279-80 (Ct. Int'l Trade 2018) (citing *Consol. Bearings Co.*, 25 C.I.T. 546, 553-554 (2001)).  "Statutory construction alone is not sufficient to resolve this case." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003). "Rather, the question is whether the methodology is justifiable, and to resolve that issue, a factual record needs to be developed." *Stanley Works*, 279 F. Supp. 3d at 1190 (citing *Consol Bearings*, 348 F.3d at 1003 (determining that the pure legal question exception could not apply when the court would have to assess

Commerce's justifications for its practice)); *Mittal Steel*, 548 F.3d at 1384 (finding the pure

question of law exception not applicable when argument relies on unique facts of the case);

*Fuwei Films (Shandong) Co. v. United States*, 791 F. Supp. 2d 1381, 1384–85 (Ct. Int'l Trade

2011) (concluding that the pure legal question exception could not apply when the statute at

issue did not speak to the required methodology and Commerce's interpretation was needed to

fill the statutory gap)).  Whether Commerce appropriately adapted its verification procedures

involves the exercise of Commerce's discretion and application of its special expertise to account

for the specific circumstances created by the pandemic.  *See Corus Staal*, 502 F.3d at 1380;

*Consol. Bearings Co.*, 348 F.3d at 1004.  Such analysis would require a factual record of

Commerce's past practice and an assessment of Commerce's justifications for any departure

from that past practice on an issue for which this Court has granted Commerce considerable

latitude in developing, and thus the pure question of law exception does not apply.

 This Court should find that challenges to the verification newly raised in Ellwood's

motion do not qualify for any of the limited exceptions to the exhaustion doctrine.  Hence,

because Ellwood failed to exhaust its administrative remedies and to raise its challenges to

verification procedure in its case brief, the Court should accordingly dismiss Ellwood's

challenge on this matter.  28 U.S.C. § 2637(d); 19 C.F.R. § 351.309.

**III.** **Commerce's Verification Procedures Used Here Were Consistent With Statute And Necessary Due To the Exigencies Of The COVID-19 Pandemic**

 Even were the Court to find that Ellwood had exhausted its administrative remedies or an

exception to exhaustion applies, Ellwood fails to show how Commerce's verification procedure

was contrary to law or an abuse of Commerce's discretion in light of the global pandemic.

Ellwood argues that the statute and applicable regulations require Commerce to always conduct

on-site verification, without any exception for extenuating circumstances "such as armed

conflict, political instability, administrative resource constraints, and domestic or international health crises."  Ellwood Br. at 34.  In support of this contention, Ellwood misconstrues Commerce's final determination to claim that "Commerce plainly admits it did not conduct a verification."  *Id.* at 17-18 (quoting *Final Determination* at Appx083316).

As an initial matter, although Ellwood correctly notes that Commerce acknowledged that it did not conduct an *on-site* verification, Commerce did conduct an *off-site* verification using questionnaires.  On September 2, 2020, Commerce issued questionnaires requesting additional information from Metalcam and Lucchini explicitly in lieu of performing on-site verifications. IDM at Appx083283.  A plain reading of these questionnaires, and how Commerce used Lucchini's and Metalcam's responses to them in its final determination, clearly indicates that Commerce used these questionnaires for verification: "We are issuing this questionnaire in lieu of performing an on-site verification.  The purpose of this questionnaire is to probe information that you have already submitted – not to obtain new information.  Accordingly, the questions are similar to those that the Department of Commerce (Commerce) would normally ask during an on-site verification."  Lucchini Verification Questionnaire at Appx082922; Metalcam Verification Questionnaire at Appx082927.  Commerce further explained that "{n}ormally, after an on-site verification, parties do not have an opportunity to submit factual information rebutting information collected by Commerce at verification.  Accordingly, Commerce will not accept factual information from other interested parties to rebut your questionnaire responses." Lucchini Verification Questionnaire at Appx082923; Metalcam Verification Questionnaire at Appx082928; *see also* Lucchini Verification Questionnaire at Appx082922-082923 (discussing how, under Commerce's regulations, unsolicited new factual information cannot be submitted during verification and how "responses indicating that information previously submitted cannot

be verified – may result in the application of partial or total facts available"); Metalcam

Verification Questionnaire at Appx082927-082928 (same).  Clearly, Commerce intended to, and

did, conduct verification through these questionnaires, and hewed as closely to its on-site

verification procedures as feasible.

More fundamentally, contrary to Ellwood's assertions, Ellwood Br. at 34, the plain

language of the statute does not require Commerce to conduct on-site verifications despite

extenuating circumstances.  In fact, 19 U.S.C. § 1677m(i) does not include any *on-site*

requirements: it only requires, in relevant part, that "{t}he administering authority shall verify all

information relied upon in making— (1) a final determination in an investigation, (2) a

revocation under section 1675(d) of this title, and (3) a final determination in a review under

section 1675(a) of this title."  Commerce's methodology was consistent with 19 U.S.C.

§ 1677m(i)'s requirement that "{t}he administering authority shall verify all information relied

upon in making — (1) a final determination in an investigation."  Nor do Commerce's

regulations require on-site verification.  19 C.F.R. § 351.307.[3]

The statute gives Commerce wide latitude in its verification procedures; therefore,

Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad

hoc.  *Goodluck India Ltd., v. United States*, 2021 U.S. App. LEXIS 26187, at *13-16 (Fed. Cir.

---

[3] 19 C.F.R. 351.307 entitled "Verification of Information" provides that
 (b) In general.

(1) Subject to paragraph (b)(4) of this section, the Secretary will verify factual information upon which the Secretary relies in:

(i) A final determination in a continuation of a previously suspended countervailing duty investigation (section 704(g) of the Act), countervailing duty investigation, continuation of a previously suspended antidumping investigation (section 705(a) of the Act), or antidumping investigation; . . .

Aug. 31, 2021); *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997); *Am. Alloys v. United States*, 30 F.3d 1496, 1475 (Fed. Cir. 1994); *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 C.I.T. 1150, 1157 (2001).

Commerce's use of detailed questionnaires, in light of the exigencies and restrictions caused by the global COVID-19 pandemic, complied with the statutory mandate to verify information. The Statement of Administrative Action (SAA) referencing both investigations and administrative reviews states that "{a}s under existing practice, *where practicable*, verification will be conducted after receipt of all questionnaire responses." *See* SAA, H.R. Doc. No. 103-316, at 868 (1994) (emphasis added). Here, after the receipt of all questionnaire responses, Commerce conducted verification by issuing verification questionnaires. IDM at Appx083283.

Additionally, alternatives to on-site verification by Commerce have been recognized as a lawful "compromise" when on-site verification requested during an administrative review was not conducted, in part, because of the outbreak of the Persian Gulf War and the attendant risk to international travel. *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995). Notably, Ellwood recognizes instances where Commerce was unable to conduct on-site verification and as such adopted procedures in lieu of an on-site verification in both investigations and administrative reviews. *See* Ellwood Br. at 22-23 (citing *Polyethylene Terephthalate Resin From Pakistan*, 83 Fed. Reg. 48,281 (Dep't of Commerce Sep. 24, 2018) (explaining that as provided in section {§1677m(i)} verification was conducted in Washington D.C. when travel in Pakistan was not possible); *Brake Rotors From the People's Republic of China*, 64 Fed. Reg. 61,581, 61,587 (Dep't of Commerce Nov. 12, 1999) (conducting off-site verification at a hotel due to security concerns at production facilities and further explaining that Commerce has the discretion to elect to verify off-site). Indeed, Ellwood even suggests an

alternate, entirely off-site verification procedure of its own devising would be proper under the circumstances.  *See* Ellwood Br. at 34 (suggesting that videoconferencing would be a viable substitute to on-site verification).

Hence, Ellwood's arguments that Commerce's inability to conduct on-site verification means that required verification was not conducted should be rejected.  The extensive responses from mandatory respondents to Commerce's verification questionnaires, *see generally* Metalcam Response to Verification Questionnaire, Appx083327-084018; Lucchini Response to Verification Questionnaire, Appx082932-083096, support Commerce's development and use of an alternative means of verification during which it obtained the type of information it would during an on-site verification, and neither the statute nor Commerce's regulations require verification to occur on-site.

Moreover, Ellwood's current argument before the Court contrasts with Ellwood's record statements during the investigation.  Specifically, Ellwood acknowledged that "in-person verification was impossible given the COVD-19 global pandemic."  Petitioners' Case Brief at Appx083195.  Ellwood recognized and applauded Commerce for issuing the verification questionnaires and consistently referred to that exercise as verification. *Id*.; Public Hearing Transcript, Appx003231.  Throughout its administrative case brief, Ellwood frequently referred to verification including discussing the "verification questionnaires," "Commerce's remote verification," "verification exercise," information "disclosed until verification" and "verification exhibits."  *See generally* Petitioners' Case Brief at Appx083097-083203.  In sum, Ellwood's new argument that "rather than finding a way to comply with its statutory obligations, Commerce instead chose to rely on unverified information" is an about face from the position it took before the agency.  *Compare* Ellwood Br. at 18 *with* Petitioners' Case Brief at Appx083195.

Ellwood also contends that Commerce's decision not to issue a verification report is contrary to law.  Ellwood Br. at 21-22.  Although the SAA, and the regulations, require Commerce to "report the methods, procedures, and results of a verification," *see* SAA at 868; *see also* 19 C.F.R. § 351.307(c), the record of the investigation shows Commerce met this obligation.  Ellwood did not argue before Commerce that this requirement was not met.  As discussed above, the verification questionnaires and responses, the issues and decision memorandum, and the final determination all explain the methods, procedures, and results of the off-site verification Commerce conducted.  *See* Commerce Letter to Metalcam, Appx082927-082928; Commerce Letter to Lucchini, Appx082922-082923; *see also* Metalcam's Response to Verification Questionnaire, Appx083327-084018; Lucchini's Response to Verification Questionnaire, Appx082932-083096.  As recounted above, Ellwood approvingly discussed Commerce's verification methods and procedures used here during the course of the investigation.

Moreover, to the extent the regulation would require Commerce to issue a separate "report", the Federal Circuit held in *PAM S.p.A. v. United States*, that the agency can relax or modify regulatory requirements if there is no substantial prejudice to any party.  463 F.3d at 1348.  Here, in the midst of a global pandemic, Commerce exercised its discretion and modified certain regulatory requirements to ensure that verification was conducted in a safe and timely manner.  Because the verification methods, procedures, and results in this investigation were placed on the record and Ellwood had the opportunity to discuss Commerce's verification methods during the course of the investigation, there is no substantial prejudice to any party and Ellwood has not claimed as such.

For all of these reasons, Commerce did verify the information on which it relied in making its final determination, in a manner consistent with law.

**IV.    Commerce's Final Determination Is Supported By Substantial Evidence And In Accordance With Law**

Ellwood argues that Commerce "ignored major issues" within the responses received to the verification questionnaires, and that Commerce should have determined that "both Metalcam and Lucchini failed to provide requested information in the form and manner requested by Commerce." Ellwood Br. at 28-39. Ellwood alleges that Commerce erected barriers to avoid engaging with record evidence and ignored applicable law. *Id.* at 39-41. Hence, in Ellwood's view, there was no other reasonable outcome than application of facts available with adverse inferences (adverse facts available). *Id.* at 41-44.

Ellwood's arguments are not persuasive, however, because Commerce lawfully relied on, and engaged with, the record evidence in making its final determination, including addressing each of the arguments raised in Ellwood's administrative case briefs. *See generally* IDM at Appx083282-083314. Further, Commerce reasonably determined that all the necessary information is available on the record of the investigation and therefore application of facts available, let alone application of adverse facts available, was not warranted. IDM at Appx083287, Appx083306. Because Commerce addressed Ellwood's timely raised concerns and based its final determination on substantial record evidence, this Court should reject Ellwood's arguments.

**A.    Commerce Addressed Material Arguments Raised During The Investigation In Making Its Final Determination**

Section 1677f(i)(3)(A) of Title 19 requires that Commerce in antidumping and countervailing duty proceedings address "relevant arguments." Specifically, The statute states that Commerce shall:

> include in a final determination described in paragraph (1) an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review (as the case may be), concerning the establishment of dumping or a countervailable subsidy, or the suspension of the investigation, with respect to which the determination is made.

19 U.S.C. §1677f(i)(3)(A). The SAA further clarifies that this section is not intended to alter existing law regarding public notice and explanation of antidumping and countervailing duty determinations, and that existing law "does not require that an agency make an explicit response to every argument made by a party." SAA at 892 (explaining that existing law "instead requires that issues material to the agency's determination be discussed so that the 'path of the agency may reasonably be discerned'") (citations omitted).

Early in the proceeding, Commerce determined that respondents did not have a viable home market or third-country market. PDM at Appx082852. Therefore, pursuant to 19 U.S.C. § 1677(a)(4), Commerce based respondents' normal value on constructed value. Id. Constructed value is essentially the cost of production plus profit. See Uttam Galva Steels Ltd., v. United States, 997 F.3d 1192, 1194 (Fed. Cir. 2021); 19 U.S.C. § 1677b(e). Ellwood did not and does not now challenge Commerce's methodology for calculating normal value based on constructed value. Rather, Ellwood only argues the data submitted by Metalcam and Lucchini and used by Commerce in its calculations are "unverifiable and irreconcilable." Ellwood Br. at 15, 28-39. Essentially, Ellwood takes issue with aspects of Commerce's use and evaluation of (1) Metalcam's cost data; (2) Metalcam's sales data; and (3) Lucchini's verification questionnaire answer. However, as discussed below, Commerce adequately addressed parties' concerns about the reliability and use of the data, and its determinations are supported by substantial evidence in the record.

24

### 1.   Commerce's Use Of Metalcam's Costs Data Was Reasonable

Ellwood argues that Metalcam's costs and "product family standard costs," and Metalcam's audited financial statements, trial balance, and "internal operating report" do not reconcile.  Ellwood Br. at 30.  Hence, in Ellwood's view, "no document" ties Metalcam's reported costs used in the dumping calculation to Metalcam's audited financial statements. Ellwood Br. at 31.  Ellwood supports this contention through misleading quotations from the issues and decision memorandum.  Ellwood Br. at 29.

However, the record evidence demonstrates that Metalcam's reported costs do reconcile to its financial statement costs, as Commerce described in the issues and decision memorandum. IDM at Appx083288.  As Commerce explained, section 1677b(f)(1)(A) mandates that costs will normally be calculated based on the records of the producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles (GAAP) of the exporting country and reasonably reflect the costs associated with the production and sale of the merchandise.  *Id*.  Metalcam reported its costs according to its normal books and records which, in accordance with Italian GAAP, follow the International Financial Reporting Standards (IFRS). *Id.* (citing Metalcam's Section D Questionnaire Response (Apr. 6, 2020), Appx082394).  In the normal course of business, Metalcam's cost accounting system, a component of its enterprise resource planning (ERP) system, accounts for the total cost of manufacturing at the job order level.  *Id.*; *see also id.* at Appx082397.  This, in turn, formed the basis for the reported manufacturing costs to Commerce*.*  Moreover, the costs in the job orders are based on standard costs and Metalcam calculated a variance at the steel plant and forging mill level that is applied to the standard costs to derive the actual cost.  IDM at Appx083288; *see also* Metalcam's Section D Questionnaire Response at Appx082400.  Metalcam identified the physical characteristics, as

defined by Commerce, for each order and then weight-averaged, using production quantities, the actual costs of each fluid end block specific product within a product control number (CONNUM) to determine the reported costs.  IDM at Appx083288.

      As an initial matter, Ellwood's claim that Commerce recognized that the internal operating report and the product family level standard costs do not reconcile relies on a misunderstanding of what Commerce actually said in its final determination.  In support of this misconception, Ellwood repeatedly cherry-picks quotes from the issues and decision memorandum, *see, e.g.,* Ellwood Br. at 29-30, which address the fact that, taken alone, certain aspects of the financial reports do not match up on a line-by-line basis, because categories in the report and product family levels standard costs were not identical, *see* IDM at Appx083289 ("{T}he constituent cost elements in the product family level standard costs for, e.g., Steel Ingot, External Machining, etc., cannot be compared to the raw materials and external services costs in the trial balance or internal operating report which records costs on the basis of the nature of expenses" because "{t}he Steel Ingot field in the product family cost worksheet, therefore, not only includes the cost of materials (ingot) but also includes some processing costs like forging, heat treatment and external machining.").  What Ellwood fails to mention, however, is Commerce's explanation of how, *in total*, the report and product family level costs *were* reconcilable: "In our review of the trial balance and the internal operating report for the {period of investigation}, we find that they are in agreement.  While the trial balance and internal operating report may not reconcile to the product family level standard costs by constituent cost elements (e.g., steel ingot cost, external machining costs), they do reconcile in total (after applying the calculated cost variance)." *Id.*; *see also id.* ("{I}n total, the costs recorded in Metalcam's trial balance, internal operating report, and product family level standard costs,

adjusted by the variance, reconcile.").  Thus, contrary to Ellwood's characterization of the final

determination, Commerce did determine, based on the record, that the reports were reconcilable.

Ellwood also contends that a formula error made by Metalcam in preparing the

reconciliation of its cost of goods sold from its audited financial statements to its total reported

fluid end block costs rendered the record data unreliable, and that Commerce failed to provide an

adequate explanation for relying on Metalcam's data.  Ellwood Br. 31-32.  However, Commerce

recognized the formula error and explained that error did not affect the overall reliability of the

data.  IDM at Appx083288.  Specifically,

> We agree with the petitioners that the cost reconciliation worksheet
> contained a formula error in one of the reconciling items, where
> the appropriate amounts from the trial balance for a period outside
> the {period of investigation} (i.e., October to December 2019)
> were not properly summed.  However, after fully examining the
> record, as noted by Metalcam, we found the same formula error in
> the corresponding reconciling item where the appropriate amounts
> from the trial balance for a period within the {period of
> investigation} (i.e., October to December 2018) were not properly
> summed.  Because one of these reconciling items is a subtraction
> and the other error is an addition, the net result of these two errors
> continues to show that Metalcam's reported cost file reconciled to
> its financial statement costs.

*Id.*  Thus, Ellwood's argument that Commerce should disregard Metalcam's cost data because of

a minor mistake in arithmetic, even though the record contains the information necessary to

reconcile the reported cost file to the GAAP consistent financial statement costs, is unpersuasive.

Ellwood's concerns – and selective quotation of the issues and decision memorandum –

with regard to Metalcam's "minor input chart" similarly mischaracterize Commerce's

determination and reasoning.  Ellwood Br. at 32.  As Commerce explained, "we disagree that the

minor input chart is flawed as the information in the chart is merely a portion of the total

machining costs in the product family cost worksheet and the trial balance.  Specifically, the

reported rough machining costs in the minor input chart is a subset of the total external services

cost in the trial balance, it does not include the costs of machining services performed on the

non-subject merchandise and finish machining services for the subject merchandise, it only

includes rough machining costs for fluid end blocks." IDM at Appx083289.  Put another way,

Ellwood's concerns are based on an apples-to-oranges comparison: Metalcam's minor input

chart is a comparison of *rough* machining services provided *only* for fluid end blocks from

affiliated and unaffiliated suppliers, which naturally would not be identical to the *total* machining

costs in the product family cost worksheet and the trial balance, which also included costs related

finish machining services and even to non-subject products.  *Id*.  Ellwood's comparison, not the

information in the minor input chart, is flawed.

Ellwood's arguments regarding an anomaly in the material costs for certain *non-subject*

*merchandise* are likewise unpersuasive.  Ellwood Br. at 33.  In its final determination,

Commerce explained that in reviewing the record as a whole, it did appear that certain material

costs for non-subject merchandise are negative, however, Commerce determined that "the

anomaly impacts a very small number of job orders and any adjustment will likely result in an

increase in the cost of *non-subject merchandise*, possibly resulting in a reduction to the reported

costs of the subject merchandise."  IDM at Appx083290.  Moreover, contrary to Ellwood's

assertions, Commerce also explained the record basis for its conclusion: "This assertion is made

because earlier in the proceeding we noted a negative value for internal machining costs for

subject merchandise . . . .  Metalcam submitted a revised cost file after correcting the faulty query

that resulted in an increase to the cost of subject merchandise."  *Id.*  Consequently, "because the

anomaly is insignificant with respect to the total job orders reported, is related only to non-

subject merchandise, and record evidence does not show that this anomaly affects the reported

cost of subject merchandise, {Commerce found} no adjustment to Metalcam's reported cost is warranted." *Id.*  Notably, although Ellwood objects to Commerce's treatment of the anomaly, it does not explain how or why this anomaly would have any impact, let alone a significant one, on the results of the investigation or why an error affecting a small number of job orders throws the entirety of Metalcam's data into question.  Ellwood Br. at 33.  Also, Commerce, recognizing the statutory requirement that a party be afforded an opportunity to remedy a deficiency before facts available may be applied, acknowledged that the anomaly had not been discovered until the briefing stage after it had been on the record of the proceeding for months.  IDM at Appx083290; *see also* 19 U.S.C. §§ 1677e(a) and 1677m(d).  Hence Ellwood's argument that Commerce should have disregarded, or worse yet applied adverse facts available to, subject merchandise costs due to an "insignificant" anomaly in *non-subject* merchandise costs, again is unconvincing.

Ellwood also contends that Metalcam lowered its actual period of investigation costs for forged ingots that are held in semi-finished inventory waiting for a fluid end block order.  Specifically, Ellwood argues that Commerce "ignored {} distortions by allowing the costs of ingots that were produced, but not used during the period of investigation, to be buried in the company's overall cost of manufacture (thus allocating them away from subject FEBs)."  Ellwood Br. 33-34.  However, contrary to Ellwood's assertions, Commerce did not "sidestep" this concern; rather, Commerce determined that record evidence does not support a claim that the there is an understatement of the reported costs due to ingot costs being held in semi-finished inventory and that no such "distortion" existed.  IDM at Appx083290.  Commerce's review of the cost of sales in the trial balance for the period of investigation showed that the inventory changes in the value of semi-finished goods are appropriately included in the cost of sales, and

likewise appropriately included in the reported cost of manufacture as demonstrated in the overall cost reconciliation.  *Id.*

In sum, Commerce addressed each of Ellwood's concerns with regard to Metalcam's cost reporting and properly determined that Metalcam's reported costs are reasonable, product-specific, rely on their normal books and records, and reconcile to their Italian GAAP-consistent audited financials.  *Id.*  Therefore, Commerce used the complete, accurate, and verifiable cost data on the record in determining Metalcam's weighted-average dumping margin for purposes of the final determination.  *Id.*

### 2.      Commerce's Use Of Metalcam's Sales Data Was Reasonable

Ellwood's contentions regarding Commerce's use of Metalcam's sales data are likewise premised on a misunderstanding of Commerce's final determination.  Ellwood claims that Metalcam's sales reconciliation associated with the movement of certain revenue items between appropriate fiscal quarters constituted new factual information or substantive methodological changes first disclosed at verification should have formed the basis for adverse inferences. Ellwood Br. at 34.  Ellwood further argues that "Commerce recognized that Metalcam manually moved certain revenue items in its books and records, which was not disclosed until Metalcam's response to Commerce's questionnaire in lieu of {on-site} verification" and that Commerce's use of the sales data therefore could not be justified.  *Id.*  Ultimately, Ellwood alleges that "Commerce failed to reasonably explain how the aforementioned inconsistencies in Metalcam's submissions, including screen shots from Metalcam's source accounting program that undermined previously reported data, did not impugn the validity of the Metalcam's reporting *in toto*."  *Id.* at 35.

However, as an initial matter, the invoices in question did *not* deal with the merchandise under consideration in this investigation.  IDM at Appx083292 (noting that "the petitioners' argument to discredit the sales reconciliation centers on invoices that do not relate to {merchandise under consideration}").  And Commerce explained, in detail and with repeated reference to record evidence, why "the petitioners' assertion is misleading when arguing that Metalcam's manual movement of certain revenue items finds no basis in Metalcam's books and records, rendering the reconciliation unverifiable."  *Id.* at Appx083291.  For example, in some instances, when preparing its quarterly trial balances, Metalcam reclassified a certain limited number of invoices from one sales revenue general ledger account to the other, or the total invoice value for certain invoices booked at year end was appropriated to those fiscal quarters in which the respective revenue should have been recognized.  *Id.* at Appx083291; *see also* Metalcam's Response to Verification Questionnaire, Appx083334-083344.  Whenever this occurred, Metalcam identified how the invoices in question were recorded in its financial accounting system, provided all such invoices, and reconciled the values between financial accounting system and trial balance for all affected general ledger accounts in affected periods. IDM at Appx083291 (citing Metalcam's Response to Verification Questionnaire, Appx083334-083344, Appx083348-Appx083437).

Upon review of record evidence taken from Metalcam's accounting system, Commerce confirmed that the invoices in question were reflected in the financial accounting system and form an integral part of Metalcam's books and records.  IDM at Appx083291.  Moreover, as Commerce explained in the IDM, "the nature of the revenue activity described in affected invoices, when taken together with the names and structure of sales revenue general ledger accounts, support{ed} the narrative Metalcam provided on the record justifying certain

anticipated divergences between financial accounting and trial balance information, affecting

certain general ledger accounts." *Id.*  For invoices split between fiscal quarters, invoice

descriptions identify specific fiscal months or fiscal quarters for which certain management and

technical service charges are assessed to affiliates.  *Id.*; *see also* Metalcam's Response to

Verification Questionnaire, Appx083337-083344, Appx083413-083437.  This is also true for

invoices reclassified from one sales revenue general ledger account into the other – invoice

descriptions identify sales of certain plant equipment, originally booked in the sales revenue

account designate for a different revenue activity.  IDM at 10 (citing Metalcam's Response to

Verification Questionnaire, Appx083335, Appx083396-083409).

Commerce noted that record evidence supports Metalcam's assertion that none of the

invoices challenged by Ellwood related to sales of merchandise under consideration, and their

total value is insignificant in relation to Metalcam's total period of investigation revenue.  IDM

at Appx083292.  Moreover, record evidence showed that none of the invoices that were either

split between certain fiscal quarters or moved from one account into another, or crossed over

from one fiscal year to another.  *Id.*  Hence, Commerce concluded that there is no basis to doubt

the integrity of the reconciliation of reported U.S. sales provided by Metalcam on the record.  *Id.*

Metalcam provided all of the sales information requested, in the manner and form in which it

was requested, including screen shots from the financial accounting system.  *Id.* at Appx083290-

083292; *see also* Metalcam's Response to Verification Questionnaire, Appx083335,

Appx083348-083384.

Commerce explained that it had found no merit to the assertion that the limited practice

of appropriating certain invoices in certain general ledger accounts between appropriate fiscal

quarters for interim quarterly trial balance preparation purpose is "substantive," given that the

cumulative effects of the movement in question is immaterial to Metalcam's financial performance.  IDM at Appx083292.  Metalcam's reconciliation of reported U.S. sales began with reconciling the total revenue in audited 2018 fiscal year income statement to the period of investigation total value in the trial balance, and then directly to the quantity and values (all sales, all markets) in the ERP download.  *Id.* (citing to Metalcam's Supplemental Questionnaire Response at Exhibit SAC2-5 (June 29, 2020), Appx084379-084392.  However, Commerce's verification questionnaire was the first instance provided to Metalcam to reconcile, individually, all 16 sales revenue-related general ledger accounts in its financial accounting system to the trial balance for the period of investigation.  *Id.* at Appx083292.  As such its responses to Commerce's verification do not support a finding that adverse facts available is warranted.  *Id.* at Appx083293.

Finally, as they did in the underlying investigation, "while the petitioners' argument to discredit the sales reconciliation centers on invoices that do not relate to {merchandise under consideration}, {plaintiffs} ignore other portions of Commerce's inquiries concerning Metalcam's reported reconciliation of its U.S. sales."  *Id.* at Appx083292.  The information Commerce requested included: (1) a period of investigation general ledger detail for "Foreign Sales Revenues" general ledger account, identifying therein all {period of investigation} U.S. sales of fluid end blocks; (2) a reconciliation of the total value of {period of investigation} U.S. sales of fluid end blocks in this detail to the total value of reported U.S. sales (as shown in Metalcam's reconciliation); (3) a demonstration of how Metalcam queried its accounting system to extract all sales of all products made in all countries, invoiced during the period of investigation, and how the results of the query support the quantity and value thereof, as reflected in Metalcam's reconciliation; and (4) a demonstration, using information previously

provided in the record, of how the quantity and value for various categories of sales shown in

steps of Metalcam's reconciliation of U.S. sales are supported.  *Id*.  Metalcam provided

information responsive to all of Commerce's requests and no discrepancies were identified.  *Id*.

In light of all this further, internally consistent, record evidence regarding Metalcam's sales of

relevant merchandise during the period of investigation, it was reasonable for Commerce rely on

Metalcam's sales data.

Additionally, contrary to Ellwood's assertions, this case is not analogous to *Common*

*Alloy Aluminum Sheet from the Republic of Turkey*, 86 Fed. Reg. 13,315 (Dep't of Commerce

Mar. 8, 2021).  Ellwood Br. at 34 (arguing that Commerce's decisions in this investigation are

arbitrary when compared to Commerce's treatment of evidence in the countervailing duty

investigation of *Common Alloy Aluminum Sheet from the Republic of Turkey*).  As an initial

matter, each administrative proceeding is a separate exercise of Commerce's authority; each

administrative proceeding involves its own facts and record evidence, so Commerce necessarily

may reach different conclusions based on those different facts.  *See Jiaxing Bro. Fastener Co. v.*

*United States,* 822 F.3d 1289, 1299 (Fed. Cir. 2016).  The two investigations are also clearly

distinguishable: in *Aluminum Sheet from Turkey,* Commerce found that the respondent had failed

to provide requested necessary information, while as discussed above, Metalcam provided the

information Commerce requested.  Consequently, Commerce's reliance on Metalcam's data was

in accordance with law and supported by substantial evidence.

### 3.  Commerce Addressed Ellwood's Arguments Regarding Lucchini's Verification Response

Commerce also addressed Ellwood's arguments regarding Lucchini's verification

response and supported its determination with substantial record evidence.  Ellwood argues that

Lucchini concealed raw material scrap offsets that were disclosed for the first time in the

verification response.  Ellwood Br. at 36.  Ellwood further contends that Commerce "excused Lucchini's failings" on this issue by using information provided by Lucchini and not applying adverse facts available.  *Id.* at 36-39.  However, Commerce did not "excuse" Lucchini's failings; rather, relying on record evidence, Commerce appropriately adjusted Lucchini's reported costs to account for the cost of completed merchandise under consideration which was scrapped for quality reasons.  IDM at Appx083284, Appx083306.

Again, section 1677b(f)(1)(A) directs Commerce to normally calculate costs based on the records of the producer if such records are GAAP consistent and reasonably reflect the costs associated with the production and sale of the merchandise.  19 U.S.C. § 1677b(f)(1)(A).  However, should Commerce determine that such records do not reasonably reflect the costs associated with the production and sale of the merchandise, the statute allows Commerce to adjust a company's costs "in whatever manner the Department {thinks} advisable."  *LG Chem, Ltd. v. United States*, 2021 WL 3578970 at *8 (Ct. Int'l Trade Aug. 13, 2021).  Moreover, as previously discussed, the Federal Circuit has recognized that Commerce is the "master of antidumping law," and Commerce is entitled to substantial deference in its choice of accounting methodology.  *Avisma Corp.*, 688 F.3d at 764 (quoting *Daewoo Elec. Co. v. Int'l Union*, 6 F.3d 1511, 1516 (Fed. Cir. 1993)).  The courts instruct that Commerce should be guided by accuracy and fairness with the overriding purpose of calculating dumping margins as accurately as possible.  *Albemarle Corp. v. United States*, 821 F.3d 1345, 1354 (Fed. Cir. 2016); *Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333, 1344-45 (Fed. Cir. 2016); *see also SNR Roulements v. United States*, 402 F.3d 1358, 1363 (Fed. Cir. 2005).

To that end, as Commerce explained, its practice is to ensure fully yielded cost by allocating total input cost over the total of finished goods production.  IDM at Appx083306.  As

such, Commerce does not consider products scrapped for quality reasons to constitute finished

goods production.  *Id.*  Accordingly, because Lucchini provided information concerning the total

period of investigation cost of non-conforming products on a product-group specific basis,

Commerce allocated the cost of non-conforming products in the product group which contains

merchandise under consideration, over the production quantity of conforming finished goods.

*Id.* (citing to Lucchini's Section D Questionnaire Response (April 3, 2020), Appx082372).

Moreover, Commerce based its adjustment on record evidence that demonstrated that

Lucchini's scrap offset was limited to scrap cut away during the production process and that

items scrapped for quality reasons are not factored into the submitted pre-unit costs.  IDM at

Appx083306 (citing Lucchini's Supplemental D Questionnaire Response (June 29, 2020),

Appx084031).  Moreover, while it was appropriate to adjust Lucchini's reported costs to reflect

the costs of fluid end blocks which were scrapped due to quality defects, it is not appropriate to

do so for ingots scrapped for quality reasons; as Commerce explained, the cost of those ingots

are fully recovered.  IDM at Appx083306-083307.  Specifically, record evidence showed that,

through the use of credit notes from the ingot supplier to reflect the difference between the

ingot's purchase price and the proceeds from the sale of the defective ingot as scrap, Lucchini

fully recovers any costs associated with the ingots scrapped for quality reasons, and there are no

costs to be allocated to finished goods.  IDM at Appx083307 (citing to Lucchini's D

Questionnaire Response at Appx082283-082285; Lucchini's 2nd Supplemental D Questionnaire

Response at Exhibit S2D-7(a) (June 29, 2020), Appx084095-084179; and Lucchini's

Verification Questionnaire Response at Appx082946).  Thus, Commerce's adjustment to

Lucchini's reported costs to account for the cost of completed merchandise under consideration

which was scrapped for quality reasons is supported by substantial evidence and in accordance

with law.  Therefore, in light of the "tremendous deference" to the expertise of Commerce in matters of accounting methodology, the Court should sustain Commerce's adjustment of Lucchini's costs to account for scrapped subject merchandise and reject Ellwood's arguments to the contrary.  *Avisma Corp.*, 688 F.3d at 765.

As recounted above, Commerce did not avoid engaging with the record evidence or formulate excuses for not addressing Ellwood's arguments in the final determination.  To the contrary, Commerce explained its rationale in detail, and each finding is supported by substantial record evidence.

## B.    Commerce's Decision Not To Apply Adverse Facts Available Was Supported By Substantial Evidence And In Accordance With Law

Commerce reasonably determined that application of adverse facts available was not warranted against either Metalcam or Lucchini.  However, Ellwood asks the Court to ignore Commerce's well-reasoned and well-supported determination by arguing that Commerce acted arbitrarily by not applying adverse facts available.  Ellwood Br. at 41-44.  In doing so, Ellwood disregards the substantial amount of record evidence provided by respondents in response to multiple of Commerce's questionnaires, including the responses to Commerce's verification questionnaires.  Ellwood's preference for a different result cannot negate Commerce's thorough analysis or the substantial record evidence underlying it, and so the Court should reject Ellwood's arguments.  *See Maverick Tube*, 857 F.3d at 1359 ("A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding.") (citing *Consol. Edison Co.*, 305 U.S. at 229).

Commerce may only apply adverse facts available when necessary information is not available on the record, or when a respondent (1) withholds information that has been requested by Commerce, (2) fails to provide such information by Commerce's deadlines for submission of

the information or in the form and manner requested, (3) significantly impedes an antidumping proceeding, or (4) provides information that cannot be verified.  19 U.S.C. § 1677e.  "This subsection thus provides Commerce with a methodology to fill informational gaps when necessary or requested information is missing from the administrative record."  *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1356 (Ct. Int'l Trade 2018) (citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003)).  Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b)(1)(A).  A respondent cooperates to the "best of its ability" when it puts forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation.  *Nippon Steel*, 337 F.3d at 1382.  However, the standard does not require perfection and recognizes that mistakes sometimes occur. *Id.*  Commerce enjoys broad discretion when considering whether to apply adverse facts available.  *See e.g., PAM, S.p.A v. United States*, 582 F.3d 1336, 1339-40 (Fed. Cir. 2009); *see also Appvion, Inc. v. United States*, 100 F. Supp. 3d 1374, 1382 (Ct. Int'l Trade 2015). Moreover, Commerce is not required to affirmatively show that a party cooperated to the best of its ability every time it determines that adverse facts available should not be applied.  *See Appvion, Inc.*, 100 F. Supp. 3d at 1382; *see also Cerro Flow Prod., LLC v. United States*, 2014 WL 3539386, at *7 (Ct. Int'l Trade 2014) (explaining that neither the statute's plain language nor it legislative history obligated the ITC or Commerce to make adverse inferences in any situation) (internal citation omitted).

As an initial matter, Commerce did not need to resort to adverse facts available to fill gaps in the record because, as detailed above, sufficient, verifiable record information existed for

Commerce to make its decision.  *See* IDM at Appx083287 ("{W}e find that all necessary information is available on the record of this investigation."); *id.* at Appx083306-083307 (describing use of record information to address Lucchini's costs and that "Commerce found Lucchini's response to our supplemental questionnaire sufficient"); *see also Dillinger France*, 350 F. Supp. 3d at 1364 (holding that Commerce should not apply adverse facts available when there is "no informational gap in the sale prices for Commerce to fill").

Furthermore, when determining whether application of adverse facts available is warranted, Commerce examines the respondent's actions and assesses the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information.  *Nippon Steel,* 337 F.3d at 1382.  Here Commerce did just that and found that both Metalcam and Lucchini cooperated and responded to requests for information throughout the investigation. IDM at Appx083287-083288 ("Metalcam has not withheld information, failed to provide information within established time limits, significantly impeded this proceeding, or provided information that cannot be verified.  We find that, throughout the course of this investigation, Metalcam has cooperated with Commerce's requests for information, and it has answered each request for information to the best of its ability."); *id.* at Appx083292 (detailing Metalcam's provision of information and responsiveness to Commerce's requests); *id.* at Appx083306 ("{B}ecause Lucchini responded to Commerce's requests for information throughout this proceeding and disclosed the potential for fluid end blocks being scrapped after the completion of production due to quality defects and reported purchase adjustments in its original section D questionnaire response, we disagree that Lucchini failed to act to the best of its ability.  Lucchini disclosed these issues in a timely manner so the application of partial adverse facts available pursuant to section 776(b) of the Act is not warranted.").

Finally, Ellwood argues that Commerce's decision not to apply adverse facts available is arbitrary because it has done so in "situations where the failing was much less severe than in this case." Ellwood Br. at 43-44. As an initial matter, as discussed above, each administrative proceeding is a separate exercise of Commerce's authority; each administrative proceeding involves its own facts and record evidence, so Commerce necessarily may reach different conclusions based on those different facts. *See Jiaxing Bro.,* 822 F.3d at 1299. And the cases Ellwood cites are distinguishable: in *Deacero*, for instance, the respondent untimely submitted an essentially new dataset without any explanation or evidence to demonstrate the reliability of the data and failed to timely notify Commerce of nature and import of dataset errors. *Deacero S.A.P.I. de C.V. v. United States*, 353 F. Supp. 3d 1303, 1309-1310 (Ct. Int'l Trade 2018), *aff'd*, 996 F.3d 1283 (Fed. Cir. 2021). In contrast here, as discussed above, Metalcam and Lucchini provided data that were internally consistent and reconcilable and, where necessary, timely provided explanations of minor issues and additional documentation to Commerce.

In sum, Ellwood simply disagrees with Commerce's weighing of the evidence regarding its final determination as it applies to Lucchini and Metalcam. However, as the Court has held, this is not a valid basis to overturn Commerce's determination. *See Nucor Corp.*, 286 F. Supp. 3d at 1380 (where it is apparent Commerce has weighed the evidence, the Court declined to reweigh it); *Viet I–Mei Frozen Foods Co.*, 839 F.3d at 1106 ("An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence.") (citing *Consolo*, 383 U.S. at 620). Therefore, the Court should find that Commerce's determination not to apply adverse facts available to Metalcam and Lucchini is supported by substantial evidence and in accordance with law.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny Ellwood's motion for judgment on the agency record, sustain Commerce's final determination in all respects, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

/s/ Sarah E. Kramer
SARAH E. KRAMER
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 353-0537
Email: sarah.e.kramer@usdoj.gov

Of Counsel
HENDRICKS VALENZUELA
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement & Compliance
1401 Constitution Ave., NW
Washington, D.C. 20230

October 8, 2021                              *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 11,918 words, including text, footnotes, and headings.

/s/ Sarah E. Kramer

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE CO., *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>UNITED STATES,<br><br>　　　　　Defendant,<br><br>　　　　　and<br><br>METALCAM, S.P.A.,<br><br>　　　　　Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Court No. 21-00073<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **ORDER**

Upon consideration of plaintiffs' motion for judgment on the agency record, defendant's and defendant-intervenor's responses thereto, plaintiffs' reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____                           _____

New York, New York                                                        Judge