## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

|  |  |
|---|---|
| ELLWOOD CITY FORGE COMPANY,<br>ELLWOOD NATIONAL STEEL COMPANY,<br>ELLWOOD QUALITY STEELS COMPANY, and<br>A. FINKL & SONS,<br><br>                              Plaintiffs,<br><br>          v.<br><br>UNITED STATES,<br><br>                              Defendant,<br><br>          and<br><br>METALCAM, S.P.A.,<br><br>                         Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Court No. 21-00073<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## REPLY BRIEF OF ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS

Thomas M. Beline
Jack A. Levy
Myles S. Getlan
Jeffery B. Denning
James E. Ransdell
Nicole Brunda
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W., Ste 400
Washington, D.C. 20006
(202) 567-2316
(202) 567-2301
*tbeline@cassidylevy.com*

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

Dated:  November 5, 2021

# **Table of Contents**

Page

ARGUMENT ....................................................................................................................... 5

I.  Plaintiffs Challenged Commerce's So-Called "Verification Procedures" and Thus
    Exhausted Their Administrative Remedies; in Any Event, the Futility and Pure
    Question of Law Exceptions Apply ........................................................................... 5

    A.  Plaintiffs Reasonably Exhausted Their Administrative Remedies ................................ 6

    B.  The Futility and Pure Question of Law Exceptions to the Exhaustion Doctrine
        Apply     ........................................................................................................ 8

II. Commerce Lacked Discretion to Deviate from Verification Procedures Prescribed in
    the Statute and Regulations; Even Assuming *Chevron* Step Two Applies,
    Interpretation of "Verification" to Mean Issuance of a Single Additional
    Questionnaire With No Verification Report is Not Entitled to Deference ......................... 13

III. Defendant Fails to Justify Commerce's Reliance on Metalcam's Flawed Data;
    Consistent with Past Practice, Adverse Inferences Should Have Been Applied ................. 17

    A.  Commerce Does Not Dispute that Metalcam's Records Failed to Reconcile ............. 18

    B.  Metalcam's "Verification Response" Did Not Support Its Previously Reported
        Data, Rendering these Data Unreliable ........................................................... 21

    C.  By Not Rebutting the Use of Flawed Raw Material Steel Ingot Costs,
        Commerce Admits Error .......................................................................... 23

    D.  Commerce's Reliance on Metalcam's Sales Data Was Unreasonable ....................... 24

IV. Defendant Does Not Dispute Lucchini Failed to Timely Report Its Yield Losses;
    Commerce's Unexplained Departure from Past Practice is Not Entitled to Deference........ 25

V.  Conclusion ...................................................................................................... 27

## <u>Table of Authorities</u>

<u>Page(s)</u>

<u>Statutes</u>

19 U.S.C. § 1675(a)(4)..................................................................................................10

19 U.S.C. § 1677b(a)(4) ..............................................................................................18

19 U.S.C. § 1677e(b) ...................................................................................................16

19 U.S.C. § 3512(d) .....................................................................................................14

28 U.S.C. § 2637(d) .......................................................................................................8

<u>Regulations</u>

19 C.F.R. § 351.307(c).................................................................................................15

19 C.F.R. § 351.307(d) ...........................................................................................14, 24

19 C.F.R. § 351.309 .....................................................................................................11

<u>Court Decisions</u>

*Agro Dutch Indus., Ltd. v. United States*, 508 F. 3d 1024 (Fed. Cir. 2007) ..................10

*Bomont Industries v. United States*, 733 F. Supp. 1507 (1990) .............................12, 24

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d
1306 (Ct. Int'l Trade 2015) ..........................................................................................24

*Brown v Gardner*, 513 U.S. 115 (1993)........................................................................15

*Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292 (Ct. Int'l Trade
2019) ...............................................................................................................................7

*Carr v. Saul*, 141 S. Ct. 1352 (2021) .........................................................................8-9

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984).................................................................................................11, 13

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)....................8, 11

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ...........................8, 11

*Fuijian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F.
Supp. 2d 1314 (Ct. Int'l Trade 2001) ...........................................................................13

*Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021) ...........................................22

*Guizhou Tyre Co. v. United States,* 469 F. Supp. 3d 1338 (Ct. Int'l Trade 2020) ........................15

*Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ................. 23-24

*Huvis Corp. v. United States*, 525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007) .................................26

*Hyundai Elec. & Energy Sys. Co. v. United States*, CAFC Ct. No. 2021-1009, 2021 U.S. App. LEXIS 29810 (Fed. Cir. 2021) ...................................................................................20

*INS v. Yang*, 519 U.S. 26 (1996) .....................................................................................................26

*Itochu Bldg. Prods. v. United States*, 733 F.3d 1140 (Fed. Cir. 2013) ....................................8, 11

*Ipsco, Inc. v. United States*, 899 F.2d 1192 (Fed. Cir. 1990) ........................................................17

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986) ........................................ 13-14

*Kirkendall v. Dep't of the Army,* 479 F.3d 830 (Fed. Cir. 2007) ..................................................15

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ........................................................................................13

*Micron Tech. v. United States*, 117 F. 3d 1390 (Fed. Cir. 1997) ........................................ *passim*

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................................................................................................................17

*Mukand, Ltd. v. United States*, 767 F.3d 1300 (Fed. Cir. 2014) ...................................................20

*Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338 (Ct. Int'l Trade 1999) ....................................................................................................................17

*Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294 (Ct. Int'l Trade 2004) ....................................................................................................................18

*Torrington Co. v. United States*, 68 F.3d 1347 (Fed. Cir. 1995) ........................................... 15-16

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) .................................................15

*Trust Chem Co. v. United States*, 791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011)) ..........................7

*United States Steel Corp. v. United States*, 179 F. Supp. 3d 1114 (Ct. Int'l Trade 2016) ....................................................................................................................26

*Wheatland Tube Corp. v. United States*, 841 F. Supp. 1227 (Ct. Int'l Trade 1993) ....................................................................................................................17

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ..............................................................................................................9

*Zhejiang Zhaofeng Mech. & Elec. Co., Ltd. v. United States*, 416 F. Supp. 3d 1395 (Ct. Int'l Trade 2019)...........................................................................25

<u>Administrative Determinations</u>

*Common Alloy Aluminum Sheet From the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 86 Fed. Reg. 13,315 (Mar. 8, 2021) .................................... 24-25

*Forged Steel Fluid End Blocks from Italy: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020) ...................................................... *passim*

*Forged Steel Fluid End Blocks From Italy: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 44,500 (Jul 23, 2020) .................................................................. 6, 9-10

*Notice of Final Determination of Sales at Less Than Fair Value, and Negative Determination of Critical Circumstances: Certain Lined Paper Products from India*, 71 Fed. Reg. 45,012 (Aug. 8, 2006) ....................................................................................... 18-19

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

|  |  |
|---|---|
| ELLWOOD CITY FORGE COMPANY,<br>ELLWOOD NATIONAL STEEL COMPANY,<br>ELLWOOD QUALITY STEELS COMPANY, and<br>A. FINKL & SONS,<br><br>                       Plaintiffs,<br><br>          v.<br><br>UNITED STATES,<br><br>                     Defendant,<br>         and<br><br>METALCAM, S.P.A.,<br><br>            Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Court No. 21-00073<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' REPLY BRIEF**

Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons (collectively, "Plaintiffs") reply to the briefs filed on October 8, 2021, by Defendant, the United States ("Def. Br."), and Defendant-Intervenor, Metalcam, S.P.A. ("Metalcam Br.") concerning Plaintiffs' challenge to Commerce's final less-than-fair-value determination that relied on errors and misrepresentations in the factual record due to Commerce's "decision to short-circuit verification."[1]

---

[1] *Ellwood City Forge Company et al. v. United States*, Court No. 21-00007, ECF No. 28 at 5 (ordering remand to Commerce to "allow Commerce, at its discretion, to perform onsite verification, which would moot all procedural issues created by the agency's decision to short-circuit verification."). Plaintiffs note that the Court further suggested that "Commerce may wish to consider seeking voluntary remand in similar cases to comply with its verification obligations." *Id.* In the event Defendant seeks a similar voluntary remand as that at issue in that appeal and for which the Court granted remand, Plaintiffs would consent.

None of the responses overcome the challenges raised.  *First*, the Court should not apply the exhaustion doctrine and refuse to consider Plaintiffs' challenges to Commerce's unlawful "questionnaire in lieu of verification" procedures because whether and how Commerce conducted verification was at issue administratively or exceptions to the doctrine exist.  *Second*, Commerce fails to establish that the statute, its legislative history, or its regulations permitted it to short-circuit verification, not issue a verification report, rely upon unverified information, and abrogate its standard verification procedures.  *Third*, Commerce admits that flaws existed in Metalcam's data, which as established if true, called into question Metalcam's allocated costs to the production of fluid end blocks.  *Finally*, Commerce acted arbitrarily and contrary to its judicially-affirmed practice by accepting Lucchini's shifting narratives concerning its steel ingot costs.  Remand is warranted and should be ordered.

## ARGUMENT

I.   **Plaintiffs Challenged Commerce's So-Called "Verification Procedures" and Thus Exhausted Their Administrative Remedies; in Any Event, the Futility and Pure Question of Law Exceptions Apply**

Defendant argues this Court should deny Plaintiffs any relief from Commerce's inadequate "verification" procedures because Plaintiffs allegedly (1) failed to exhaust administrative remedies, (2) failed to raise the argument in their administrative case brief, and (3) present here an "opposite position" to the one Plaintiffs presented to Commerce.  *See* Def. Br. at 11-17.  Such arguments ignore the record.  Plaintiffs repeatedly emphasized the importance of robust verification procedures and, up to the release of the *Final Determination*,[2] were unaware

---

[2] *Forged Steel Fluid End Blocks from Italy: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020) ("*Final Determination*") (Appx083315-083318), and accompanying Issues and Decision Memorandum ("Final IDM") (Appx083282-083314).  The record is cited using Bates references, in accordance with Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden (Rev'd Feb. 17, 2021).

of the degree to which Commerce's "questionnaire in lieu of verification," a then-novelty with which Plaintiffs had no prior experience, would ultimately diverge substantially from Commerce's established verification procedures and the law governing verification.  As discussed below, the Court should not apply the exhaustion doctrine because the need for verification was addressed administratively and, in the event the Court applies the exhaustion doctrine the well-established exceptions of futility and "pure question of law" apply.

### A.   Plaintiffs Reasonably Exhausted Their Administrative Remedies

Defendant claims Plaintiffs failed to exhaust their administrative remedies because they "did not challenge verification procedures before Commerce."  Def. Br. at 12.  The administrative record, however, demonstrates both before and after Commerce's *Preliminary Determination*,[3] Plaintiffs emphasized their concerns about respondents' incomplete responses and stressed the need for "rigorous verifications."  *See* "Petitioner's Pre-Preliminary Comments Concerning Lucchini" (July 2, 2020) at 41 (Appx082824); *see also* "Petitioner's Pre-Preliminary Comments Concerning Metalcam" (July 2, 2020) at 21 n.55 (expressing concern Metalcam was not supplying documentation because it suspected verification would not occur) (Appx082760); "Petitioner's Post-Preliminary Comments" (Aug. 4, 2020) at 38 (Appx082917) (noting "with Commerce's ability to conduct a traditional verification in doubt, the integrity of these proceedings is in jeopardy").

As detailed in Plaintiffs' opening brief, *see* Plaintiffs' Br. at 17-27, and summarized again in section II, *infra*, the term "verification" has a specific meaning under the statute and

---

[3] *See Forged Steel Fluid End Blocks From Italy: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 44,500 (July 23, 2020) ("*Preliminary Determination*") (Appx082871-082874), and accompanying Issues and Decision Memorandum (Appx082837-082854).

Commerce's regulations.  In black-and-white, Plaintiffs requested "verification."  "The determinative question {regarding administrative exhaustion} is whether Commerce was put on notice of the issue."  *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292, 1305 n.14 (Ct. Int'l Trade 2019) (quoting *Trust Chem Co. v. United States*, 791 F. Supp. 2d 1257, 1268 n.27 (Ct. Int'l Trade 2011)).  Here, Commerce was notified that Plaintiffs desired a verification, which heretofore had followed the statutory requirement even under conditions that required slight modification.  The exhaustion requirement does not mandate that Plaintiffs predict Commerce will suddenly adopt a novel, non-compliant methodology, as occurred here.

After Commerce issued its "questionnaire in lieu of verification," Plaintiffs further availed themselves of all meaningful opportunities to exhort Commerce to hew as closely to traditional verification as the questionnaire format allowed.  For example, in response to extension requests filed by both respondents, Plaintiffs noted that "insofar as Commerce intended the supplemental questionnaire to operate 'in-lieu of' on-the-ground verification procedures," requests for extension of time were procedurally inappropriate.  "Petitioner's Objection to LMA's Request for an Extension of Time to Respond to Commerce's Verification Questionnaire" (Sept. 8, 2020) at 1-2 (Appx084516-084517); "Petitioner's Objection to Metalcam's Request for an Extension of Time to Respond to Commerce's Verification Questionnaire" (Sept. 8, 2020) at 1-2 (Appx084523-084524).  Plaintiffs furthermore emphasized the "myriad differences in scope between the questionnaire and an on-site verification," in arguing for stricter administration of the former.  *See* "Petitioners' Reply to Metalcam's Renewed Request for an Extension of Time to Respond to Commerce's Verification Questionnaire" (Sept. 9, 2020) at 3 (Appx084531).  Commerce nevertheless granted extensions, which departed meaningfully from established practice.

Plaintiffs thus exhausted their administrative remedies.  Plaintiffs requested verification and when Commerce nevertheless adopted alternative procedures, Plaintiffs requested Commerce administer those procedures as strictly as it would in an actual verification. Commerce declined to do either.

### B.  The Futility and Pure Question of Law Exceptions to the Exhaustion Doctrine Apply

The exhaustion doctrine is discretionary and only required "where appropriate," *see* 28 U.S.C. § 2637(d), meaning it must "serve some practical purpose where applied."  *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013).  There would be no practical purpose to applying an exhaustion bar here.

"{A} party often is permitted to bypass an available avenue of administrative challenge if pursuing that route would clearly be futile, *i.e.* where it is clear that additional filings with the agency would be ineffectual."  *Itochu*, 773 F.3d at 1145 (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1378-79 (Fed. Cir. 2007)).  The Federal Circuit has additionally recognized a "pure question of law" exception to the statutory exhaustion requirement, which applies when statutory construction alone suffices to resolve the case.  *See generally Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003).  Both exceptions apply here, though only one is needed to overcome the exhaustion bar.

*First*, contrary to Defendant's claims, *see* Def. Br. at 16, it would have been inutile for Plaintiffs to argue during case briefing that Commerce was statutorily required to conduct on-site verification.  As the Supreme Court has made clear, "{i}t makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested.  Such a vain exercise will rarely protect administrative agency authority or promote judicial efficiency."  *See Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021) (internal citations omitted); *see also Corus Staal BV*

*v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (internal citations omitted) (The futility exception applies where "enforcing the exhaustion requirement would mean that parties would be required to go through obviously useless motions in order to preserve their rights"); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013) (recognizing an exception "where exhaustion would be 'a useless formality'"). Here, even if Commerce had fully agreed with such arguments, and it was doubtful it had since it designed otherwise weak procedures instead and applied those, it was powerless to conduct such a verification prior to the statutorily determined deadline for the final determination.

Defendant's contention that such an exercise may have been fruitful because "Commerce took additional steps during these unprecedented pandemic times to conduct verification," Def. Br. at 15, misses the point and is belied by Commerce's actions. The question is not whether arguing about Commerce's verification procedures at any point in the proceeding would have been futile; indeed, as detailed above, Plaintiffs repeatedly requested "verification" early in the proceeding and thereafter voiced concerns about Commerce's "verification procedures" during the questionnaire period. Instead, the question, per Defendant, is whether arguing about Commerce's verification procedures in the administrative case brief and subsequent hearing would have been futile. *See generally* Def. Br. at 12.

The answer is yes, it would have been futile. At the briefing and hearing stage, reverification was a temporal impossibility. Defendant has not suggested otherwise, nor could it credibly do so. Commerce would have had *less than one month*[4] to (1) consider case and rebuttal

---

[4] After Commerce extended the deadlines, briefing concluded on November 2, 2020. *See* Letter from Commerce (Oct. 23, 2020) (Appx084536). A hearing on the briefs was held on November 13, 2020. *See* Hearing Transcript (Nov. 13, 2020) (Appx083204-083281). Commerce was required to complete its final determination by December 7, 2020. *See Preliminary*

*(footnote continued on next page)*

brief arguments concerning the legal adequacy of its "questionnaires in lieu of verification," (2) devise a new, compliant verification methodology, (3) communicate and implement that methodology, (4) compile and issue a verification report, (5) solicit revised case and rebuttal briefs incorporating the findings of the verification report, and (6) reach a final determination based on verified facts. Given the looming statutory deadline, whatever alternative verification methods Plaintiff may have advocated during the briefing phase would have been a useless formality with no potential to alter the "verification" procedures already implemented by Commerce. Nor would any argument that Commerce should create the required verification report have had practical effect. Even if Commerce had done so post-briefing, the parties would have had no opportunity to comment upon the report such that Commerce could meaningfully consider those comments in preparing its final determination.

*Second*, Plaintiffs' arguments are excepted from the statutory exhaustion requirement because they pose a pure question of law, *see Agro Dutch Indus., Ltd. v. United States*, 508 F. 3d 1024, 1029 (Fed. Cir. 2007) (concluding that "the proper interpretation of {19 U.S.C.} § 1675(a)(4) presents a 'pure question of law' that can be addressed on appeal despite Agro's failure to raise such an argument in the proceeding before Commerce"), *viz.*, whether Commerce acted unlawfully by failing to verify respondents' sales and cost data used in the dumping calculation. *See* Plaintiffs' Br. at 17. Indeed, Plaintiffs observed that Commerce, by acknowledging it was "unable to conduct onsite verification of the information relied upon in making its final determination in this investigation as provided for in section 782(i)," had

---

*Determination* at 44,503 (Appx082874) ("no later than 135 days after the date of publication of this preliminary determination").

admitted to violating the statute.  Plaintiffs' Br. at 18 (quoting *Final Determination* at 79,997 (Appx083316)).

Defendant claims Plaintiffs "misconstrued" this statement as an admission Commerce did not conduct a verification, *see* Def. Br. at 18, but Commerce's words speak for themselves.  If—as Commerce acknowledged—an on-site verification is "provided for" in the statute, then it is required for a "verification."  Under *Chevron* step one, this is the "the end of the matter." *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). Yet, Commerce admitted to not doing so.  Therefore, and contrary to Defendant's assertions, *see* Def. Br. at 17-18, whether Commerce satisfied statutory mandates concerning verification does not require developing a factual record of Commerce's past practice or reasoning beyond that which is already on the record.  Unlike *Consol. Bearings* and other cases cited by Defendant, *see* Def. Br. at 16-17, questions of statutory construction resolve this issue.

Defendant additionally claims Plaintiffs' failure to include certain verification arguments in its administrative case brief violates 19 C.F.R. § 351.309, and that the Federal Circuit made compliance with this regulation an absolute prerequisite to judicial review in *Corus Staal*.  *See* Def. Br. at 14 (citing *Corus Staal*, 502 F.3d at 1379).  But Defendant overreads *Corus Staal*. Commerce has no power to limit this Court's jurisdiction or the scope of review by regulation, only Congress could do so.  Indeed, several years after *Corus Staal* the Federal Circuit recognized that in circumstances where, as here, there is no new factual or legal argument Plaintiff could have made in the case brief that "might have affected Commerce's position, aided judicial review, or given {Plaintiff} the relief it sought" it is inappropriate to consider 19 C.F.R. § 351.309 an absolute requirement.  *See Itochu*, 733 F.3d at 1147.  Put differently, the "futility"

and "pure question of law" exceptions to the exhaustion doctrine apply equally to situations in which a party failed to include an argument in its administrative case brief.

Finally, contrary to Defendant's assertions, Plaintiffs do not here assert an "opposite position of that presented to the agency" and Plaintiffs' claims are not precluded by estoppel principles.  *See* Def. Br. at 14-15.  Context matters.  Well prior to Plaintiffs' statements Commerce had already claimed in-person verification was not possible, hence the questionnaires "in lieu of performing an on-site verification."  *See, e.g.*, Letter from Commerce to Metalcam (Sept. 2, 2020) at 1 (Appx082927).  Being "glad" or "grateful" that Commerce at least did *something* and utilized an "alternative tool" to gather information, *see* "Petitioners' Case Brief" (Oct. 20, 2020) at 85 (Appx083195); Hearing Transcript at 36 (Appx083239), is perfectly consistent with wishing Commerce had done *more*.

To be clear, Plaintiffs *never* stated that Commerce's "alternative tool" constituted a "verification" that complied with the statute and regulations.  Moreover, at the time of Plaintiffs' statements, Plaintiffs knew only Commerce had *obtained* information, but could not know just how far Commerce's treatment of that information would deviate from statutorily required verification practices.  Plaintiffs reasonably believed Commerce would follow the statute, and its past practice, and treat verification "like an audit, the purpose of which is to test information provided by a party for accuracy and completeness."  *Bomont Industries v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990).  As discussed further in Section III, *infra*, Commerce did no such thing, major gaps in the "verification" responses of both respondents persisted, and, contrary to its established practice in similar situations, Commerce failed to apply adverse inferences to the respondents' clear failure to fill these holes.

**II.** **Commerce Lacked Discretion to Deviate from Verification Procedures Prescribed in the Statute and Regulations; Even Assuming *Chevron* Step Two Applies, Interpretation of "Verification" to Mean Issuance of a Single Additional Questionnaire With No Verification Report is Not Entitled to Deference**

Commerce's concession that it failed to conduct an on-site verification, which it acknowledges is "provided for in section 782(i) of the Tariff Act of 1930, as amended" *Final Determination* at 79,997 (Appx083316), renders Commerce's actions *ipso facto* unlawful.  By itself, this establishes the necessity of remand.  However, even absent such clear acknowledgement, Commerce's procedures constituted an abuse of discretion because they failed to comply with the statutory mandates for a verification, as explained in the Statement of Administrative Action ("SAA"),[5] and with Commerce's own regulations and past practice.  *See generally Micron Tech*, 117 F. 3d at 1395-96 (noting that courts review Commerce's verification procedures for "abuse of discretion"); *see also Fuijian Mach.*, 178 F. Supp. 2d at 1314 (clarifying that in this context the "abuse of discretion" standard is "another guise of the statutorily-mandated substantial evidence/in-accordance-with-law-test").

Defendant asserts that neither the statute nor Commerce's regulations require Commerce to conduct an on-site verification, and that Commerce has unfettered discretion to use whatever verification procedures it pleases.  *See* Def. Br. at 19.  This is incorrect.  Although the statutory provision does not itself define "verification," this is not the end of the inquiry under *Chevron*. Deference is not owed absent "genuine ambiguity," and "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (citing *Chevron*, 467 U.S. at 843); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 240 (1986) (citing *Chevron*, 467 U.S. at 842-843)

---

[5] Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040.

(agency's construction of statute it administers is only valid where it neither contradicts the express language of the statute, nor frustrates otherwise manifest congressional intent). In interpreting the Trade Act of 1930, those "traditional tools" include the SAA, which Congress expressly designated as the "authoritative expression by the United States concerning the interpretation and application of…{the} Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d). The SAA makes clear that verification must, at a minimum, be "in a foreign country" and must include a verification report describing "the methods, procedures, and results of the verification <u>prior to</u> {a} final determination in an investigation." SAA at 868 (emphasis added).

Here, Commerce acted unlawfully by failing to conform its verification procedures to either requirement. Defendant's claim that it met its obligations to "report the methods, procedures, and results of a verification," Def. Br. at 22, lack merit because the SAA requires Commerce to issue a verification report "prior to" its final determination. Discussion of such methods, procedures, and results *in the Final Determination* and its accompanying IDM, violate this temporal requirement.

Commerce's regulations are consistent with the SAA's directives, and thus Commerce's conduct violated its own regulations as well. For example, Commerce's regulations state that during verification Commerce employees "***will visit***" relevant entities in the affected country "in order to verify the accuracy and completeness of submitted factual information." 19 C.F.R. § 351.307(d). Rather than address this when claiming Commerce's regulations do not require an on-site verification, Defendant instead omits this subsection, entitled "Procedures for verification," through a strategically placed ellipsis. *See* Def. Br. at 19 & n.3.

14

Commerce's regulations also require it to "report the methods, procedures, and results of a verification under this section prior to making a final determination in an investigation."  19 C.F.R. § 351.307(c) (emphasis added); *see also* SAA at 868.  By not satisfying this requirement, as noted above, Commerce thus failed to follow its own regulations, which prejudiced Plaintiffs insofar as Plaintiffs were precluded from commenting on Commerce's verification findings.  *See Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) ("Commerce, like other agencies, must follow its own regulations"); *Guizhou Tyre Co. v. United States*, 469 F. Supp. 3d 1338, 1358 (Ct. Int'l Trade 2020) ("An agency must act consistently with its regulations where failure to do so would cause prejudice to an interested party").

In the past, whenever circumstances have arisen that prevent Commerce from traveling abroad to conduct verification, Commerce has employed alternative "in person" procedures.  *See generally* Plaintiffs' Br. at 22-23.  Defendant is wrong that Commerce here "hewed as closely to its on-site verification procedures as feasible."  Def. Br. 19.  Commerce's supplemental questionnaire resembles neither its traditional verification practice nor past instances where it conducted quasi-verification in person.  And there is no explanation for Commerce's failure to issue a timely verification report.  In any event, even if prior instances of off-site verification could be cited to support what Commerce did here (and for reasons discussed in our opening brief, *see generally* Plaintiffs' Br. at 22-23, they cannot), Commerce's "consistent misapplication of the law can neither be used to defend its practice; nor to justify what Congress did not intend." *Kirkendall v. Dep't of the Army*, 479 F.3d 830, 844 (Fed. Cir. 2007) (citing *Brown v Gardner*, 513 U.S. 115, 120-21 (1993)).

Defendant's reliance on *Torrington* for the proposition that alternative verification procedures are acceptable is likewise misplaced.  *See* Def. Br. at 20 (citing *Torrington Co. v.*

15

*United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995)).  *Torrington* involved the first administrative

review of an antidumping duty order where, unlike in the investigation at issue here,

"verification was not required unless there was a showing of 'good cause for verification' within

the meaning of {19 U.S.C. § 1677e(b)}."  *Torrington*, 68 F.3d at 1350.  The Federal Circuit

concluded that in determining whether there is "good cause for verification," Commerce may

lawfully "weigh the need for verification in a particular case against the burden that verification

would impose on agency resources," including ongoing travel restrictions.  *Id.* at 1351.  Because

the Court found "it was not improper for Commerce to cancel the verifications" in the

circumstances presented, it did not address what type of "compromise option," if any, would

have been a lawful substitute to on-site verification.  *Id.* at 1352.  Thus, *Torrington* was, in

essence, a review of a "good cause" determination irrelevant to investigations, and not a review

of verification procedures.

Finally, and contrary to assertions by both Defendant and Defendant-Intervenor,

Commerce's single questionnaire "in lieu of verification" was not a lawful substitute for an on-

site verification.  As explained above and in Plaintiffs' opening brief, no such substitute exists.

*See* Plaintiffs' Br. at 19-26.  Moreover, the questionnaire in no way "approximated the

experience of an on-site verification."  *See* Metalcam Br. at 6; *see also* Def. Br. at 12 (claiming

that the "questionnaires {in lieu of verification} fulfill the function of on-site verification").

Indeed, Commerce itself acknowledge the questionnaire it issued represented only "a subset of

what it typically requested in a verification outline," did not involve the types of "impromptu

questions that Commerce verifiers ask during the course of verification," and, unlike a true on-

site verification, "pertain{ed} {only} to information {the respondent} already provided on the

record."  *See* Letter from Commerce to Lucchini (Sept. 9, 2020) (Appx083325-083326); Letter from Commerce to Metalcam (Sept. 9, 2020) (Appx083323-083324).

Thus, even if Commerce's questionnaire could theoretically substitute for a verification, Commerce abused its administrative discretion by developing and applying a procedural framework that contravened the statute's objectives.  *See Ipsco, Inc. v. United States*, 899 F.2d 1192, 1195 (Fed. Cir. 1990) (quoting *Motor Vehicle Mut. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 48 (1983) (further citations omitted)) ("{W}e cannot sustain {Commerce's} exercise of administrative discretion if it contravenes statutory objectives…{as} 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion'"); *Wheatland Tube Corp. v. United States*, 841 F. Supp. 1227, 1235 (Ct. Int'l Trade 1993*)* ("This Court has noted that it will not allow the agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute."); *Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 1999) ("When {Commerce's} actions compromise the accuracy of dumping margins, then it has abused its discretion.").

**III.**     **Defendant Fails to Justify Commerce's Reliance on Metalcam's Flawed Data; Consistent with Past Practice, Adverse Inferences Should Have Been Applied**

In addition to being based on insufficient and invalid procedures, Commerce's reliance on Metalcam's data is unsupported by substantial evidence.  *See generally Micron Tech*., 117 F. 3d. at 1397.  In particular, the responses to Commerce's "questionnaire{s} in lieu of on-site verification" failed to validate its previously reported cost and sales information.  *See* Plaintiffs' Br. at 28-44 (detailing shortcomings).  Such significant gaps and inconsistencies would warrant application of adverse facts available ("AFA") under normal verification procedures because

Commerce does not normally accept new factual information at verification. *See Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1304 (Ct. Int'l Trade 2004).

A. **Commerce Does Not Dispute that Metalcam's Records Failed to Reconcile**

Metalcam failed to reconcile its product-specific costs of raw materials, internal machining, and external machining, as reported in its cost database, to its audited financial statements. *See* Plaintiffs' Br. at 29-30. Both Defendant and Defendant-Intervenor ultimately concur with these basic facts. *See, e.g.*, Def. Br. at 26 (acknowledging that "the financial reports do not match up on a line-by-line basis" to the product family standard costs); Metalcam Br. at 10 (confirming that "discrete elements of the product family level standard costs do not tie directly to Metalcam's trial balance and internal operating report").

The context of this failure illustrates its severity. Because Metalcam had insufficient home or third-country market sales to use as a comparison, Commerce calculated Metalcam's normal value for each product control number ("CONNUM") based on constructed value ("CV"), *i.e.* the sum of costs, expenses, and profit. *See generally* 19 U.S.C. §§ 1677b(a)(4), (e). When, as here, Commerce relies on respondent's cost records in creating CV, it becomes vital that Commerce ensure the respondent has appropriately allocated its costs among various CONNUMs. This is particularly true where a respondent uses the same equipment to produce both subject and non-subject merchandise, as does Metalcam. This overlap provides respondent an opening to manipulate the dumping margin by improperly allocating such mixed costs among and within these categories. Commerce thus requires respondents to demonstrate that their cost allocations, and thus their CONNUM-specific costs, are reasonable and accurate. Specifically, Commerce requires respondents to reconcile their CONNUM-specific costs, as reported in the cost database, to their audited financial records, which "undergo detailed testing and certification by independent auditors and {thus} serve as a reliable benchmark." *Certain Lined Paper*

18

*Products from India*, 71 Fed. Reg. 45,012 (Aug. 8, 2006) (AD Inv. Final), IDM at Comment 14. Metalcam failed this exercise.

Defendant, however, claims Metalcam satisfied this requirement by demonstrating that "*in total*, the report and product family level costs were reconcilable," albeit only "after applying the calculated cost variance." Def. Br. at 26 (quoting Final IDM at 8 (Appx083289)). Metalcam similarly claims that Commerce reasonably verified its cost reporting because its *aggregate* costs reconciled. *See* Metalcam Br. at 10-11. But such arguments miss the point, as merely reconciling total cost figures says nothing about the allocation of components of total cost among subject and non-subject merchandise, which has been Plaintiffs' significant, and consistent, concern both administratively and before this Court. *See* Plaintiffs Br. at 28-29 (citing Petitioners' Initial Sec. D Deficiency Comments at 3-4 (Appx082571-082572) and Petitioners' Post-Prelim Comments at 6-14 (Appx082885-082893)). As Commerce acknowledged, "the issue at hand is whether Metalcam's reported product control (CONNUM)-specific costs reasonably reflect the costs associated with the production of forged steel fluid end blocks." Final IDM at 7 (Appx083288) (emphasis added). The reconciliation of total costs is only the start of this analysis; Commerce erred in treating it as the end.

Defendant and Defendant-Intervenor both claim Metalcam's acknowledged failure to reconcile the constituent cost elements in its product family level standard costs (which Metalcam developed solely for the purposes of CONNUM-specific cost reporting in this investigation) was justified given Metalcam's accounting practices. *See* Def. Br. at 26 (noting that "certain aspects of the financial reports do not match up on a line-by-line basis, because categories in the {financial} report and product family levels standard costs were not identical"); Metalcam Br. at 11-12 (quoting Final IDM at 8 (Appx083289)) (claiming that failure to

reconcile at the constituent cost level was justified because "product family level standard costs {are} a characteristically different report compared to the two other documents from Metalcam's accounting systems"). But claimed accounting system deficiencies are no excuse for a failure to provide a complete cost reconciliation. In fact, the Federal Circuit recently rejected such an argument, explaining:

> {Respondent} Hyundai also contends that it could not have been more forthcoming in providing Commerce with product-specific cost tracing given the nature of its accounting. We are not persuaded. To the extent that the shortcomings of Hyundai's responses are attributable to its record keeping, that alone does not avoid an adverse inference.

*Hyundai Elec. & Energy Sys. Co. v. United States*, CAFC Ct. No. 2021-1009, 2021 U.S. App. LEXIS 29810 at *28 (Fed. Cir. 2021) (internal citations omitted) (precedential opinion not yet published in the Federal Reporter). This is because such product-specific cost tracing is "foundational to Commerce's ability to perform the antidumping duty calculations in a sound manner." *Id.* at *28-*29 (citing *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307 (Fed. Cir. 2014) ("Product-specific information is a necessary element in the dumping analysis, and it is standard procedure for Commerce to request product-specific data in antidumping investigations. It was thus reasonable for Commerce to expect from {respondent} more accurate and responsive answers to the questionnaire.")).

Defendant-Intervenor's claim that the Federal Circuit's decision in *Micron Tech.* justified its failure to provide a complete cost reconciliation is similarly without merit. *See* Metalcam Br. at 12 (citing *Micron Tech.*, 117 F.3d at 1400). As an initial matter, in the determination at issue in *Micron Tech.* Commerce unambiguously issued a verification report and, after completing the verification process, held public hearings to address various verification issues. *See Micron Tech.*, 117 F.3d at 1390. As discussed in Section II, *supra*, Commerce did no such thing here.

Furthermore, and as Defendant-Intervenor admits, in *Micron Tech.* "the Federal Circuit was ultimately able to be {sic} reconcile the documents with additional steps."  *See* Metalcam Br. at 12 (citing *Micron Tech.,* 117 F.3d at 1390).  In major part due to the absence of a verification report in Metalcam's case, such "additional steps," and thus the ability to reasonably discern the path of Commerce's decision-making, are not possible.

In response to Plaintiffs' arguments about the still unreconciled costs reported in Metalcam's minor input chart, Defendant and Defendant-Intervenor ignore the issue.  They argue that by attempting to reconcile the minor input chart (which only includes rough machining services provided for FEBs) to the product family cost worksheet and trial balance (which include costs related to finished machining services for both subject and non-subject merchandise), Plaintiffs undertook an erroneous "apples-to-oranges comparison."  Def. Br. at 28; *see also* Metalcam Br. at 14-15 (claiming that in making such arguments "Plaintiffs merely misunderstood the record").  But this is Plaintiffs' entire point; namely, Metalcam's minor input chart failed to provide a complete picture of total costs, and thus there is no way of verifying the validity of Metalcam's initial cost allocation.  *See* Plaintiffs' Br. at 32-33.  Put another way, the issue is not the discrepancy in the apples-to-oranges comparison *per se*, but rather the fact that Metalcam only provided apples and oranges, which made it impossible for Plaintiffs (and thus Commerce) to conduct an apples-to-apples reconciliation analysis.  Commerce erred in relying on a minor input chart that it could not reconcile to Metalcam's audited financial records.

### B.   Metalcam's "Verification Response" Did Not Support Its Previously Reported Data, Rendering these Data Unreliable

Commerce additionally erred in relying on Metalcam's cost reconciliation because source documentation it submitted in response to Commerce's "questionnaire in lieu of verification" did not support Metalcam's prior questionnaire responses.  *See* Plaintiffs' Br. at 32.  In their response

briefs, Defendant and Defendant-Intervenor both sidestep Plaintiffs' argument, essentially claiming that because the same formula error is present in two locations the discrepancies cancel each other out and do not affect the reliability of Metalcam's data.  *See* Def. Br. at 27; Metalcam Br. at 13-14.  Such logic misses the mark and contravenes Commerce's practice and case law.

Verification represents a "point of no return," the purpose of which is to "'to test information provided by a party for accuracy and completeness.'"  *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) (quoting *Micron Tech.*, 117 F.3d at 1396).  Here, Metalcam was asked to provide source documentation to verify the accuracy of its previously submitted data and, insofar as that source documentation does not match its submission, Metalcam failed verification.  Indeed, by addressing the error in purely mathematical terms, Commerce elevated form over substance and entirely failed to address the fact that the calculations Metalcam provided at "verification" actively contradicted the record evidence it previously submitted.  This failure to verify *ipso facto* renders Metalcam's submitted cost data unreliable, and Commerce's reliance thereon unsupported by substantial evidence.

Commerce's use of Metalcam's unverifiable cost data was all the more unreasonable because Metalcam's final product family cost worksheet contained *negative* costs for certain materials.  *See* Plaintiffs' Br. at 33.  Defendant and Defendant-Intervenor claim this admitted "anomaly," which Metalcam conceded continued to exist at verification, is immaterial because Metalcam only allocated these negative costs to non-subject merchandise.  *See* Def. Br. at 28-29; Metalcam Br. at 15-16.  Again, such assertions ignore the gravamen of the issue, which is that the *mere existence* of such negative costs (a clear mathematical impossibility) call into question the reliability of Metalcam's allocation of costs between subject and non-subject merchandise and thus the entirety of its cost database.  Put simply, the very fact that the product family cost

worksheet contains negative costs means that it is neither correct nor verifiable and renders Commerce's decision to rely on Metalcam's cost database (which is based on this clearly erroneous product family cost worksheet) unsupported by substantial evidence.

### C.   By Not Rebutting the Use of Flawed Raw Material Steel Ingot Costs, Commerce Admits Error

Plaintiffs further argued that Metalcam's reported costs for forged steel ingots were flawed insofar as they did not include costs of ingots produced during the POR, but placed in semi-finished goods inventory. *See* Plaintiffs Br. at 33. This resulted in an aberrant situation in which FEBs with similar chemical and physical properties had significantly different steel ingot costs. *See generally* "Forged Steel Fluid End Blocks from Italy: Petitioner's Pre-Preliminary Comments Concerning Metalcam" (July 2, 2020) at 14-18 (Appx082753-082757). As Commerce did in its *Final Determination*, both Defendant and Defendant-Intervenor ignore this issue in their response briefs. Instead, both merely parrot Commerce's assertion that no distortion existed without explaining why Metalcam's methodology of not apportioning consistent costs to specific products was reasonable and valid. *See* Def. Br. at 29-30 (citing Final IDM at 9 (Appx083290)); Metalcam Br. at 17-18 (same).

It is not surprising that Commerce failed to respond, as this information was fundamentally unverifiable. As Defendant-Intervenor acknowledges, *see* Metalcam Br. at 17, Metalcam only revealed its practice when attempting to validate its job order costing in response to Commerce's "questionnaire in lieu of verification," at which point Commerce's unlawful substitute "verification" procedures permitted no time for further inquiry or validation. Reliance on Metalcam's unverified, and unverifiable, cost-build up and methodology rendered Commerce's *Final Determination* unsupported by substantial evidence. *See generally Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1349-50 (Ct. Int'l Trade 2021) (affirming

Commerce's rejection of information provided at verification as having been "precluded…from fully investigating and verifying," and noting that "verification is not a forum for respondents to provide or for Commerce to accept or collect new factual information") (citing *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1349 (Ct. Int'l Trade 2015)).

### D.   Commerce's Reliance on Metalcam's Sales Data Was Unreasonable

Commerce's reliance on Metalcam's sales data was unsupported by substantial evidence because Metalcam was unable to provide the requested source documentation necessary to verify its sales reconciliation.  *See* Plaintiffs' Br. at 35.  In response, Defendant admits there are errors but claims that the identified failures are immaterial because the items in question involved "insignificant" amounts and did not relate to the sale of merchandise under consideration.  *See* Def. Br. at 31; *see also* Metalcam Br. at 18-20 (largely echoing these arguments).

But such claims are beside the point.  As in an audit, the purpose of a verification is to "verify the accuracy and completeness of {previously} submitted factual information."  19 C.F.R. § 351.307(d); *see also Bomont Industries*, 733 F. Supp. at 1508.  Thus where, as here, the respondent is unable to provide the requested primary source information (*i.e.* screenshots from its financial accounting system) validating the information previously provided, this renders the previously submitted data unverifiable and thus necessarily inaccurate or incomplete.  Indeed, Commerce has recently applied AFA in response to a similar failure to validate submitted sales reporting.  *See* Plaintiffs' Br. at 34-35 (citing *Common Alloy Aluminum Sheet From the Republic of Turkey*, 86 Fed. Reg. 13,315 (Mar. 8, 2021) (CVD Final) ("*Aluminum from Turkey*"), IDM at 6).

Contrary to the claims of Defendant and Defendant-Intervenor, that the verification failures identified in this instance did not relate to Metalcam's U.S. sales is immaterial.  Instead,

the inconsistencies in and of themselves render Metalcam's sales reconciliation data suspect and, at the very least, require further inquiry to ensure their accuracy. Such additional source validation was impossible here, however, in part because Commerce's "verification" consisted of but one post-preliminary questionnaire rather than the fulsome inquiry contemplated under the statute and Commerce's regulations. Commerce's modified (and unlawful) verification procedures do not give it carte blanche to simply accept Metalcam's entirely new, and thus unverifiable, explanations. The purpose of verification is to confirm the accuracy of the information already submitted. *See Borusan*, 61 F. Supp. at 1349. Here, consistent with Commerce's court-approved practice, Metalcam's inability to provide screen shots validating its sales reconciliation *ipso facto* warranted the application of adverse facts available because Metalcam's sales data cannot be reasonably relied upon. *See Aluminum from Turkey*, IDM at 6; *see generally Zhejiang Zhaofeng Mech. & Elec. Co., Ltd. v. United States*, 416 F. Supp. 3d 1395, 1401 (Ct. Int'l Trade 2019) (upholding Commerce's application of AFA where Commerce identified discrepancies in the sales reconciliation because such discrepancies reasonably supported an inference that the respondent's sales database was not credible).

### IV.   Defendant Does Not Dispute Lucchini Failed to Timely Report Its Yield Losses; Commerce's Unexplained Departure from Past Practice is Not Entitled to Deference

With respect to mandatory respondent Lucchini Mamé Forge S.p.A ("Lucchini"), Plaintiffs argued that, consistent with Commerce practice and Court precedent, Lucchini's failure to timely report its yield losses in the form and manner requested by Commerce justified the application of adverse inferences because the delay prevented Commerce from meaningfully verifying the reasonableness of Lucchini's reported yield loss this information. *See* Plaintiffs' Br. at 37-38. In response, Defendant argues Commerce has discretion to make adjustments to a respondent's costs and then engages in a defense of Commerce's adjustment to Lucchini's

reported costs to account for this error. *See* Def. Br. at 34-37. But this fails to address Plaintiffs'

argument; namely, to "the extent Commerce contends that the questionnaire in lieu of

verification was in fact a verification, Commerce's approach to Lucchini's flagrant disregard for

Commerce's instructions contravenes its practice, demonstrating its arbitrariness in this case."

Plaintiffs' Br. at 37.

Although Plaintiffs disagree with Commerce's specific adjustment to Lucchini's reported

costs, *see* Plaintiffs' Br. at 37, the more important point is that Commerce has previously applied

adverse inferences for the precise failings Lucchini is guilty of in this case. *See id.* at 37-38.

Defendant fails to recognize that, "{t}hough the agency's discretion is unfettered at the outset, if

it announces and follows—by rule or by settled course of adjudication—a general policy by

which its exercise of discretion will be governed, an irrational departure from that policy (as

opposed to an avowed alteration of it) could constitute action that must be overturned as

'arbitrary, capricious, {or} an abuse of discretion….'" *Huvis Corp. v. United States*, 525 F.

Supp. 2d 1370, 1377 (Ct. Int'l Trade 2007) (quoting *INS v. Yang*, 519 U.S. 26, 32 (1996)). This

Court has held that Commerce is not permitted to "merely accept{} {respondent}'s reported

yield losses without comparing costs" across products. *United States Steel Corp. v. United

States*, 179 F. Supp. 3d 1114, 1132-35 (Ct. Int'l Trade 2016).

Because Lucchini failed to report its yield losses accurately in its initial questionnaire as

instructed, Commerce was forced to accept Lucchini's modifications late in the proceeding

without conducting a full analysis, as it would during a normal verification. Commerce has

applied adverse inferences under this exact fact pattern in prior cases, and its refusal to follow

that practice here renders its *Final Determination* arbitrary, unsupported by substantial evidence,

and otherwise not in accordance with law.

26

V.      <u>**Conclusion**</u>

Commerce's actions in this proceeding render its *Final Determination* both unlawful and unsupported by substantial evidence.  Despite their best efforts to confuse, obfuscate, or bypass the fundamental issues, the arguments of Defendant and Defendant-Intervenor cannot change (and largely do not challenge) the basic facts outlined above.  Accordingly, this Court should remand the determination with instructions that Commerce verify the responses of Lucchini and Metalcam and thereby properly address the factual issues raised during the proceeding.

Respectfully submitted,

/s/ Thomas M. Beline
Thomas M. Beline
Jack A. Levy
Myles S. Getlan
Jeffery B. Denning
James E. Ransdell
Nicole Brunda
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300
(202) 567-2301
tbeline@cassidylevy.com

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

## <u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 6,814 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.


By:     <u>/s/ Thomas M. Beline</u>
          Thomas M. Beline