## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>METALCAM S.P.A.,<br><br>*Defendant-Intervenor.* | Before: Stephen Alexander Vaden, Judge<br><br>Court No. 1:21-00073 |

## <u>OPINION</u>

[Denying Plaintiffs' Motion for Judgment on the Agency Record and sustaining Commerce's determination.]

Dated: June 14, 2022

*Thomas M. Beline*, Cassidy Levy Kent LLP, of Washington, D.C., for Plaintiffs. With him on the brief were *Jack A. Levy*, *Myles S. Getlan*, *Jeffery B. Denning*, *James E. Ransdell*, and *Nicole Brunda*.

*Sarah E. Kramer*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, Commercial Litigation Branch, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, and *Hendricks Valenzuela*, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Douglas J. Heffner*, Faegre Drinker Biddle & Reath, LLP, of Washington, D.C., for Defendant-Intervenor. With him on the brief was *Richard P. Ferrin*.

**Vaden, Judge:** Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl and Sons (collectively Ellwood City and Plaintiffs) filed this case under Section 516A of the Tariff Act of 1930, as amended. Plaintiffs challenge certain aspects of the final determination in the less-than-fair-value investigation of forged steel fluid end blocks from Italy issued by the U.S. Department of Commerce (Commerce). Specifically, Plaintiffs challenge Commerce's decision to issue verification questionnaires in lieu of conducting on-site verification and Commerce's subsequent determination of a 7.33% dumping margin for Lucchini and a *de minimis* dumping margin for Metalcam S.p.A., both Italian producers of FEBs and mandatory respondents in this investigation. *See* Compl., ECF No. 6. Before the Court is the Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record. Pls.' Mot. J. Agency R. (Pls.' Mot.), ECF No. 21. For the reasons set forth below, the Court finds that Ellwood City failed to exhaust its administrative remedies with regard to its verification claim and that substantial evidence otherwise supports the agency's determination. Plaintiffs' Motion is **DENIED**.

## FACTUAL BACKGROUND

The products at issue in this case are forged steel fluid end blocks (FEBs) produced in Italy for import into the United States. The International Trade Commission described the types of FEBs included in the scope of its corresponding material injury investigation:

The products covered by this investigation are forged steel fluid end blocks (fluid end blocks), whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps.

The term "forged" is an industry term used to describe the grain texture of steel resulting from the application of localized compressive force. Illustrative forging standards include, but are not limited to, American Society for Testing and Materials (ASTM) specifications A668 and A788. . . .

The products covered by this investigation are: (1) Cut-to-length fluid end blocks with an actual height (measured from its highest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), an actual width (measured from its widest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), and an actual length (measured from its longest point) of 11 inches (279.4 mm) to 75 inches (1,905.0 mm); and (2) strings of fluid end blocks with an actual height (measured from its highest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), an actual width (measured from its widest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), and an actual length (measured from its longest point) up to 360 inches (9,144.0 mm). . . .

A fluid end block may be imported in finished condition (i.e., ready for incorporation into a pump fluid end assembly without further finishing operations) or unfinished condition (i.e., forged but still requiring one or more finishing operations before it is ready for incorporation into a pump fluid end assembly). Such finishing operations may include: (1) Heat treating; (2) milling one or more flat surfaces; (3) contour machining to custom shapes or dimensions; (4) drilling or boring holes; (5) threading holes; and/or (6) painting, varnishing, or coating.

*Forged Steel Fluid End Blocks from Italy:  Final Affirmative Determination of Sales*

*at Less Than Fair Value*, 85 Fed. Reg. 79,998, Appendix I (Dec. 11, 2020) (Final

Determination), J.A. at 83,315, ECF No. 29 (describing the particular characteristics

of FEBs included in this investigation).

## I. The Antidumping Investigation

The investigation at issue began on December 19, 2019, when Plaintiffs filed a

petition alleging that FEBs from Italy were being sold at less than fair market value

in the United States. *Forged Steel Fluid End Blocks from the Federal Republic of*

*Germany, India, and Italy: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed.

Reg. 2,394 (Jan. 15, 2020). Commerce initiated an investigation on January 15, 2020,

and published its Respondent Selection Memorandum that identified Lucchini Mamé

Forge S.p.A. (Lucchini) and Metalcam S.p.A. (Metalcam) as mandatory respondents

on February 4, 2020. Decision Memorandum for the Preliminary Affirmative

Determination in the Less-Than-Fair-Value Investigation of Forged Steel Fluid End

Blocks from Italy (PDM) at 2, J.A. at 82,838, ECF No. 29. Commerce sent Lucchini

and Metalcam a standard initial questionnaire on February 6, 2020, requesting

information about the Italian producers' sales in the United States and costs of

production. J.A. at 80,012, 80,165, ECF No. 29. Between March 3, 2020, and April

6, 2020, Metalcam and Lucchini submitted responses to each section of the initial

questionnaire. J.A. at 80,318, 81,180, 81,838, 81,873, 82,081, 82,215, 82,377, ECF

No. 29.

During the period that Metalcam and Lucchini submitted their questionnaire

responses, the World Health Organization officially classified COVID-19 as a

pandemic. *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, WORLD HEALTH ORGANIZATION (Mar. 11, 2020) https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020. On March 15, 2020, the Department of Commerce issued an agency-wide memo prohibiting all travel not "mission-critical and pre-approved by senior bureau leadership." DEP'T OF COMMERCE, *All Hands: Coronavirus Update (3-16-20)* https://bit.ly/commercecoronavirus. The CDC issued a Level 4 travel advisory, urging all U.S. citizens to avoid international travel on March 31, 2020. CENTERS FOR DISEASE CONTROL AND PREVENTION, Global Level 4 Health Advisory: Do Not Travel (Mar. 31, 2020).

On March 26, 2020, Commerce postponed the preliminary determination in the investigation by fifty days to July 16, 2020. *Forged Steel Fluid End Blocks from the Federal Republic of Germany, India and Italy: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 17,042 (March 26, 2020). Commerce continued its investigation of Italian FEBs during that period, issuing supplemental questionnaires to Metalcam and Lucchini between April 9, 2020, and June 17, 2020. PDM at 4, J.A. at 82,840, ECF No. 29. Metalcam and Lucchini responded to those questionnaires between April 29, 2020, and June 29, 2020. *Id.* Based on the initial information gathered from Metalcam and Lucchini, Commerce issued a Preliminary Affirmative Determination of Sales at Less Than

Fair Value (SLTFV), with preliminary results of a zero percent dumping margin for

Metalcam and 4.84% for Lucchini. *Forged Steel Fluid End Blocks from Italy:*

*Preliminary Affirmative Determination of Sales at Less Than Fair Value,*

*Postponement of Final Determination, and Extension of Provisional Measures*

(Prelim. Determination), 85 Fed. Reg. 44,500–01 (July 23, 2020), J.A. at 82,872, ECF

No. 29.

The parties submitted multiple comments after Commerce issued its

Preliminary Determination and before Commerce explained its intended verification

method. In Ellwood City's August 4, 2020 comments, it directly addressed concerns

about the verification procedures Commerce would undertake and gave specific

suggestions. Ellwood City argued: "Insofar as Commerce conducts verification or

issues a verification outline for prompt response from the respondents, Commerce

should instruct that the respondents must provide source accounting records and not

Excel worksheets as part of an answer and, in so doing, must not change any reported

data . . . ." J.A. at 82,911, ECF No. 29. Ellwood City continued:

> As discussed, the reported costs are incomplete, distorted, and
> unreliable. And with Commerce's ability to conduct a traditional
> verification in doubt, the integrity of these proceedings is in jeopardy . .
> . . [I]f Commerce determines that further verification is warranted, we
> urge Commerce not to give respondents authorization to once again
> correct erroneous sales and cost submissions. To that end, Commerce
> should ask respondents to finally support the record that they have
> provided. To date, gaps exist and reported costs have not been supported
> with anything other than respondents' say so. A decision to do otherwise
> would only invite further abuse of process by the respondents,
> particularly when they know that COVID-19 will likely prevent

> Commerce from conducting a robust on-site verification, as contemplated under the statute.

J.A. at 82,917–18, ECF No. 29.

On September 2, 2020, Commerce determined that "the global COVID-19 pandemic had made conducting on-site verification impossible" and thus issued questionnaires "in lieu of performing an on-site verification." Def.'s Resp. Opp'n Mot. J. Agency R. (Def.'s Resp.) at 5, ECF No. 23; Letter to Metalcam, J.A. at 3,027, ECF No. 30. Commerce explained that the purpose of the questionnaire was "to probe information . . . already submitted – not to obtain new information." Commerce Questionnaire in Lieu of Verification to Lucchini, J.A. at 82,922, ECF No. 29; Commerce Questionnaire in Lieu of Verification to Metalcam, J.A. at 82,927, ECF No. 29. As such, "the questions are similar to those that [Commerce] would normally ask during an on-site verification." *Id.* Metalcam and Lucchini requested extensions of ten and eight days, respectively, beyond the one-week time period Commerce allowed for their responses. Case A-475-840: Antidumping Duty Investigation of Forged Steel Fluid End Blocks from Italy: Lucchini Mamé Forge S.p.A. Extension Req. for Post-Prelim Questionnaire Resp. (Sept. 8, 2020), bar code 4023491-01, PR 338; Antidumping Duty Investigation of Forged Steel Fluid End Blocks from Italy: Extension Req. of Metalcam S.p.A. for Post-Prelim Questionnaire Resp. (Sept. 8, 2020), bar code 4023284-01, PR 337. Commerce explained, however, that granting such an extension would be inconsistent with Commerce's general verification procedures:

> Normally, Commerce provides respondents a verification outline one week in advance and expects the respondent to have prepared the documentation for each section of the verification outline during this time. Here, Metalcam has already been provided the equivalent of one week to prepare and submit information that amounts to a subset of what is typically requested in a verification outline. Further, unlike the impromptu questions that Commerce verifiers ask during the course of verification, Metalcam had one week to prepare answers to Commerce's specific requests for information. Moreover, Commerce's requests for information pertain to information Metalcam already provided on the record.

Commerce Response Partially Granting Extension, Doc. No. 4024158-01 (Sept. 9, 2020). Commerce ultimately granted the respondents a one-day extension, and Metalcam and Lucchini submitted responses on September 11, 2020. J.A. at 82,932, ECF No. 29.

Commerce issued the administrative briefing schedule on October 2, 2020; Metalcam and Ellwood City submitted administrative case briefs on October 20, 2020. Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Forged Steel Fluid End Blocks from Italy at 2, J.A. at 83,283, ECF No. 29 (IDM). Ellwood City's submission repeatedly evinced acceptance of Commerce's verification questionnaires and indicated that the questionnaires fulfilled the purposes of verification. It observed that "[t]he factual record is meaningfully and substantively different than the factual record that existed at the time the U.S. Department of Commerce issued its *Preliminary Determination*, primarily as a result of Commerce's remote verification." Ellwood City Admin. Case Br. at 1, J.A. at 83,111, ECF No. 35. It elaborated:

> Given that the COVID-19 global pandemic occurred in parallel with the conduct of this investigation, we firmly believe that respondents made a calculated judgment that verification would not occur in this investigation as required by law. Accordingly, respondents hid facts, obfuscated in responding to questionnaires, and withheld requested information that would shine light on their dumping. But they did not count on Commerce issuing the Verification Questionnaires in lieu of on-site, in-person verification. Insofar as they could not wiggle out of the requests within the Verification Questionnaires to support their reported costs by a specific and un-extended deadline, the Preliminary Determination, as is, can no longer stand and continue to be supported by substantial evidence.

*Id.* Positive references to "verification" abound throughout Ellwood City's brief. *See, e.g.*, *id.* at 2 ("But for Commerce's verification questionnaire, these issues may have gone undetected. . . . Commerce's verification has now revealed that . . . ."); *id.* at 3 ("Commerce's Verification Questionnaire instruct[ed] Lucchini to reconcile . . . ."); *id.* at 6 ("Th[e] verification exercise has definitively established that Metalcam's reported costs do not reconcile . . . ."); *id.* at 7 ("[V]erification has established that Metalcam supplied unexplained, unsupported, untranslated, and previously undisclosed [information] . . . . verification also undermined Metalcam's previously reported individual cost elements . . . . These failures, which only came to light in verifying Metalcam's responses, are substantial."); *id.* at 48 ("As a result of the information obtained in the Verification Questionnaire, Commerce should apply partial adverse facts available . . . ."); *id.* at 66–67 ("Commerce obtained additional information for these commissions in the Verification Response . . . ."); *id.* at 85 ("We are grateful for Commerce's Verification Questionnaires."). Metalcam and Lucchini returned

rebuttal case briefs on November 2, 2020, and Ellwood City submitted its rebuttal case brief on November 10, 2020.  J.A. at 83,283, ECF No. 29.

On November 13, Commerce held a virtual public hearing at the parties' request.  At this hearing, counsel for Ellwood City repeatedly referred to "verification" and "verification questionnaires" without expressing any opposition to Commerce's chosen verification procedures.  *See* Tr. Hearing, J.A. at 83,204, ECF No. 29.  Instead, Ellwood City only questioned whether Metalcam and Lucchini had submitted verifiable information and argued that discrepancies in their responses prevented Commerce from being able to rely on the submitted information.  *See id.* at 36:4–12.  Ellwood City even went so far as to compliment Commerce for taking an "extraordinary step in these times of the coronavirus to issue a verification questionnaire," and Ellwood City was "glad [Commerce] did."  *Id.* at 36:5–7.

On December 8, 2020, Commerce issued its Final Issues and Decision Memorandum (IDM), explaining in detail its decision to assign a dumping margin of zero to Metalcam and 7.33% to Lucchini.  *See* IDM, J.A. at 83,282, ECF No. 29.  Lucchini's rate was an increase from Commerce's preliminary determination of 4.84%.  *Cf.* Prelim. Determination, 85 Fed. Reg. at 44,501, J.A. at 82,872, ECF No. 29.  Commerce published the Final Affirmative Determination of Sales at Less than Fair Value on December 11, 2020.  Final Determination, 85 Fed. Reg. 79,996, J.A. at 83,315, ECF No. 29.

## II. The Present Dispute

In February 2021, Plaintiffs sued Commerce, challenging its final determination with regard to Metalcam and Lucchini.  Compl., ECF No. 6.  Metalcam moved to intervene as Defendant-Intervenor on March 19, 2021.  Consent Mot. Intervene, ECF No. 10.  Plaintiffs ask this Court to reverse Commerce's final determination on the bases that (1) Commerce's failure to conduct on-site verification was contrary to law; (2) its overall determination is unsupported by substantial evidence; and (3) Commerce acted arbitrarily by failing to apply facts available with an adverse inference.  Pls.' Mot. at 14–16, ECF No. 21.

Commerce filed its response on October 8, 2021, asserting that (1) Plaintiffs waived their verification argument by failing to raise it during the administrative proceeding; (2) Commerce's verification procedures were consistent with statutory requirements and necessary given the worldwide pandemic; (3) Metalcam and Lucchini's responses were consistent; and (4) Commerce's reliance on them was supported by substantial evidence.  Def.'s Resp. at 7, ECF No. 23.  Defendant-Intervenor Metalcam's[1] October 8, 2021, response similarly argued that (1) Commerce's verification procedures were within its discretion and fulfilled the statutory requirements and (2) Commerce's verification questionnaire elicited sufficient information such that Commerce's reliance on Metalcam's data was

---

[1] Lucchini did not move to intervene in these proceedings.

supported by substantial evidence.  Def.-Intervenor's Resp. Pls.' Mot. at 1–2, ECF No. 22.  Plaintiffs filed a reply brief on November 5, 2021.  Pls.' Reply, ECF No. 26.

The Court held oral argument on February 17, 2022.  Oral Argument Transcript (Tr.), ECF No. 41.  Despite multiple invitations, Plaintiffs' counsel could not direct the Court to any specific page in the administrative record where Plaintiffs raised the statutory on-site verification arguments they now vigorously propound.  Tr. 7:2 ("[W]hat I'm looking for is a page number[.]"); Tr. 12:21–25 (Judge Vaden: "Give me the page number where you told them you wanted it in person."  Plaintiffs: "So, Your Honor, we said at the July 2nd pre-preliminary comments, the need for rigorous verifications."); Tr. 110:16–17 (inviting parties to tell the Court "[h]ere's the page number you should go look at to prove I preserved this[.]").  Rather, Plaintiffs returned to the theme that Commerce did not treat the information it gathered in the way that Plaintiffs expected.  Tr. 21:8–10 ("We didn't know their procedures were inadequate until they issued a decision memo when Commerce did not engage.").  Commerce confirmed that, if Plaintiffs had raised the issue in the administrative case brief, it would have addressed the issue in the record.  Tr. 46:24–25, 47:6–13.[2]

To give Plaintiffs a final chance to cite to the Court an instance in which they preserved their statutory verification argument, the Court allowed the parties to file

---

[2] When asked by the Court, "[I]f they had raised the objection at that point, you could have done something, couldn't you?," Commerce responded: "Absolutely, Your Honor. At the very least, it would have created a record for judicial review. It would have promoted administrative regularity. In terms of the verification report, it would have been possible perhaps to issue a verification report in that amount of time . . . . [S]o it is possible that Commerce could have done things, or at the very least address the concerns to create a record for judicial review." Tr. 46:24–25, 47:6–13.

an optional ten-page supplemental brief citing any additional evidence the Court

should consider in its opinion.   *See* Minute Order, ECF No. 37.   Plaintiffs and

Metalcam took advantage of the opportunity and filed their supplemental briefs on

February 28, 2022.   Pls.' Br. Summarizing Arguments, ECF No. 42; Letter Br. Def.-

Intervenors, ECF No. 40.   In their submission, Plaintiffs cited the three-paragraph

"Conclusion" section of their post-preliminary determination comments.   They

worried about "the integrity of the proceedings" and therefore requested that:

> Commerce should ask respondents to finally support the record that
> they have provided.  To date, gaps exist and reported costs have not been
> supported with anything other than respondents' say so.  A decision to
> do otherwise would only invite further abuse of process by the
> respondents, particularly when they know that COVID-19 will likely
> prevent Commerce from conducting a robust on-site verification, as
> contemplated under the statute.

J.A. at 82,918, ECF No. 29 (selectively quoted by Plaintiffs in Pls.' Suppl. Br. at 2,

ECF No. 42).   *Cf*. Pls.' Suppl. Br. at 2 (asserting that Plaintiffs "consistently and

repeatedly stressed" their argument that on-site verification is legally mandatory).

Even then, Plaintiffs did not object or suggest an alternative procedure for Commerce

to employ.   Plaintiffs instead confirmed their understanding that Commerce would

not engage in its traditional "on-site verification."

## JURISDICTION AND STANDARD OF REVIEW

This Court has exclusive jurisdiction over Ellwood City's challenge to

Commerce's Final Determination under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. §

1581(c), which grant the Court authority to review actions contesting final

affirmative determinations, including any negative part of such determinations, in an antidumping order. The Court must sustain Commerce's "determination, finding, or conclusion" unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). If the determinations are either unsupported by substantial evidence or not in accordance with the law, the Court must "hold unlawful any determination, finding, or conclusion found." *Id.* This standard requires that Commerce thoroughly examine the record and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted); *accord Tianjin Magnesium Int'l Co. v. United States*, 722 F.Supp.2d 1322, 1328 (CIT 2010). "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *See New Am. Keg v. United States*, No. 20-0008, 2021 WL 1206153, at *6 (CIT Mar. 23, 2021). "It is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992).

Reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006);

*see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit has described "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## DISCUSSION

### I. Summary

The "major issue" presented by Plaintiffs' Motion for Judgment on the Agency Record is whether Commerce's verification methodology in the underlying investigation was consistent with statutory mandates. Pls.' Mot. at 14, ECF No. 21. Commerce argues that Plaintiffs waived the verification argument by failing to address it during the administrative proceeding. Def.'s Resp. at 11, ECF No. 23. After reviewing the administrative record and the arguments in this case, the Court finds that Plaintiffs failed to exhaust their administrative remedies. Ellwood City did not challenge Commerce's failure to perform an on-site verification during the pendency of the administrative proceeding, much less include the argument in its final brief before the agency as required by regulation. Instead, it complimented the agency for its verification procedures — until those procedures resulted in a final determination not to Ellwood City's liking.

Furthermore, neither of the potentially relevant exhaustion exceptions allow the verification claim to proceed. The Court finds that submitting Plaintiffs' verification argument would not have been futile. Indeed, the agency could have modified its procedures or addressed Plaintiffs' concerns on the record had Plaintiffs raised their objection first before the agency. Plaintiffs' own explanation of their legal claim relies on past agency practice, indicating that the inquiry is one that will require, in part, a factual record. It therefore cannot qualify for the pure-question-of-law exception.

In addition to the "major issue" of verification procedure, Plaintiffs make a number of secondary claims that they *did* address to the agency during the underlying investigation. Plaintiffs dispute Commerce's evaluation of Metalcam's records reconciliation, its perceived data discrepancies, its costs and sales data, and Lucchini's steel ingot yield losses. Pls.' Mot. at 28–38, ECF No. 21. However, after examining the record, the Court finds that these objections lack merit. They ask the Court to "reweigh the evidence," which is impermissible under the substantial evidence standard. That standard applied to the record evidence supports Commerce's final determination with respect to Plaintiffs' preserved objections. *Trent Tube Div.,* 975 F.2d at 815. Because Ellwood City failed to properly raise its verification argument during the administrative proceedings and because substantial evidence supports Commerce's remaining findings, Ellwood City's Motion is **DENIED**.

## II. Administrative Exhaustion

Ellwood City waived its verification argument when it failed to object to Commerce's verification methodology during the antidumping investigation. The CIT requires the exhaustion of administrative remedies "where appropriate," a requirement it interprets strictly. 28 U.S.C. § 2637(d); *Corus Staal BV v. U.S.*, 502 F.3d 1370, 1379 (Fed. Cir. 2007). In evaluating this requirement, the determinative question is whether Commerce was "put on notice" of the argument, not whether the argument was raised in exactly the same words before the agency. *Trust Chem Co. v. U.S.*, 791 F.Supp.2d 1257, 1268 n.27 (CIT 2011). Here, Commerce was not put on notice of Ellwood City's argument because Ellwood City never objected to Commerce's "questionnaire in lieu of on-site verification" during the investigation. Though Ellwood City claims two exhaustion exceptions save it from its failure to raise the issue, its argument was neither futile nor a pure question of law.

The Supreme Court has long "acknowledged the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts. . . . Exhaustion is required because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992). "[D]eference to Congress' delegation of authority" means that "agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer." *Id.* This is especially the case when "the action under review involves exercise of the agency's

discretionary power or when the agency proceedings in question allow the agency to apply its special expertise." *Id.*

Consequently, the doctrine of administrative exhaustion recognizes that "an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Id.* Exhaustion thereby promotes judicial efficiency because it requires parties to make arguments first before the agency that the agency may then moot before they reach court. When administrative exhaustion does not resolve an issue before it reaches a courtroom, exhaustion still "produce[s] a useful record for subsequent judicial consideration, especially in a complex or technical factual context." *Id.*

Statutory law mandates that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies" in an antidumping order review. 28 U.S.C. § 2637(d). Department of Commerce regulations are even more explicit. In an antidumping investigation, parties must submit a case brief that presents "all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results." 19 C.F.R. § 351.309(c)(2). In other words, Commerce's regulation provides that parties must state all relevant arguments in their final brief to the agency or forever hold their peace. *See id.* Although "applying exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade"

because the "statutory injunction is not absolute," Commerce's regulation gives the exhaustion requirement extra weight. *Corus Staal*, 502 F.3d at 1379 (noting that the presence of the regulation means that exhaustion is not merely "a creature of court decision"); *see generally Hormel v. Helvering*, 312 U.S. 552, 556 (1941) (explaining the importance of exhausting arguments before administrative agencies). Consequently, "the Court of International Trade generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Corus Staal*, 502 F.3d at 1379. "[A] party's failure to raise an argument before Commerce constitutes a failure to exhaust its administrative remedies." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1388 (Fed. Cir. 2014).

In determining whether a party has exhausted its administrative remedies, "[t]he determinative question is whether Commerce was put on notice of the issue, not whether Plaintiff's exact wording below is used in the subsequent litigation." *Trust Chem Co.*, 791 F.Supp.2d at 1268 n.27. The Court strikes a balance here. Although a plaintiff "cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue without raising a particular argument," the Court will also find "plaintiff's brief statement of the argument is sufficient *if* it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it." *Luoyang Bearing Corp. v. United States*, 347 F.Supp.2d 1326, 1352 (CIT 2004) (emphasis added).

The Court agrees with Commerce that Plaintiffs failed to exhaust their administrative remedies with regard to the verification argument because Ellwood City "did not raise any of the arguments it now makes regarding Commerce's verification procedures to the agency . . . ." Def.'s Resp. at 11–12, ECF No. 23. Absent from the entire investigation — let alone from the case brief — are any arguments about the validity of Commerce's verification procedures. Ellwood City's voluminous, 106-page post-preliminary administrative case brief of October 20, 2020, is devoid of any assertion of illegality regarding Commerce's use of a verification questionnaire. Rather, Ellwood City repeatedly indicates its approval of and confidence in Commerce's questionnaires "in lieu of performing on-site verification." Questionnaire, J.A. at 3,027, ECF No. 30. Ellwood City refers to Commerce's "remote verification" and regularly lauds the effectiveness of the verification procedure in highlighting purported discrepancies in Metalcam and Lucchini's data: "But for Commerce's verification questionnaire, these issues may have gone undetected . . . . Commerce's verification has now revealed that . . . ." Ellwood City Admin. Case Br. at 2, J.A. at 83,112, ECF No. 29. Ellwood City's approval is further underscored by comments it made during the virtual hearing that took place after the administrative briefing, during which Ellwood City complimented Commerce for taking the "extraordinary step" of requiring a mid-pandemic "verification questionnaire" in the first place, a measure that "glad[dened]" Plaintiffs at the time. Hearing Tr. at 36:5–7, J.A. at 83,204, ECF No. 29.

Commerce's regulations require that, in antidumping investigation proceedings before the issuance of a final determination, parties must submit a case brief that presents "all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results." 19 C.F.R. § 351.309(c)(2) (2018). Even if parties have referenced certain arguments in earlier comments, they must present the arguments again in the post-preliminary case brief to exhaust their administrative remedies and avoid waiving those arguments. *See id.* Plaintiffs rightly acknowledge that Section 351.309 applies to the administrative review at the heart of Ellwood City's case. Tr. 62:25, 63:1–2 ("You are in [an] antidumping case, so (b)(1) applies to you, correct?" Answer: "Yes, Your Honor.").

Although Ellwood City noted in the concluding paragraphs of its post-preliminary comments that "COVID-19 will likely prevent Commerce from conducting a robust on-site verification, as contemplated under the statute" and that Commerce would not be able to conduct a "traditional verification," Ellwood City did not object to Commerce's questionnaire, suggest an alternative procedure, or express the strong position it now embraces that nothing short of an on-site verification is legal. *See* J.A. at 82,917–18. ECF No. 29. Indeed, following the conclusion of verification, when multiple further opportunities to challenge the questionnaire method arose, Ellwood City instead declared it was "grateful for Commerce's

Verification Questionnaires."  Ellwood City Admin. Case Br. at 85, J.A. at 83,195,

ECF No. 29.

Compliments and observations are not objections, and parties to a proceeding

generally are not "glad" if they believe an agency is acting illegally.  Although Ellwood

City's brief to this Court accuses Commerce of "ignor[ing] the law completely" and

suggests that Commerce could have conducted verification "via videoconference," its

submissions to Commerce do not hint at such arguments or alternatives.  *Compare*

Pls.' Mot. at 24 (containing the prior quoted language), *with* Ellwood City Admin.

Case Br. at 85, J.A. at 83,195, ECF No. 29 ("Here, in-person verification was

impossible given the COVD-19 global pandemic, but Commerce developed an

alternative tool of a verification questionnaire to obtain the type of information it

would during an on-site verification. We are grateful for Commerce's Verification

Questionnaires.").  Commerce was thus not on notice of a challenge to its use of a

verification questionnaire.  *Trust Chem Co.*, 791 F.Supp.2d at 1268 n.27 (noting that

a party's burden is merely to put Commerce "on notice" of its objection).  Because

Ellwood City failed to raise its now strident objections to Commerce's use of a

verification questionnaire during the pendency of the proceeding before the agency,

it has failed to exhaust its administrative remedies.  *See* 28 U.S.C. § 2637(d).

The Court may still reach the substance of Ellwood City's argument if Ellwood

City satisfies the requirements of an exception to the administrative exhaustion

doctrine.  *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003)

("In the Court of International Trade, a plaintiff must . . . show that it exhausted its administrative remedies, or that it qualifies for an exception to the exhaustion doctrine.").  In response to its failure to exhaust, Ellwood City invokes two exceptions — futility and pure question of law.  Pls.' Reply at 8–12, ECF No. 26.  The Court considers each in turn.

### 1.      Futility

The Federal Circuit has explained, "a party often is permitted to bypass an available avenue of administrative challenge if pursuing that route would clearly be futile, *i.e.*, where it is clear that additional filings with the agency would be ineffectual." *Itochu Bldg. Prod. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013) (internal quotation marks omitted).  Two Federal Circuit precedents guide the Court's analysis of the narrow futility exception.

In *Corus Staal*, a Dutch manufacturer of hot-rolled steel challenged Commerce's finding that "Corus absorbed the antidumping duties on its U.S. sales rather than passing them on to its customers," arguing that Commerce "was not authorized to address the duty absorption issue."  502 F.3d at 1378.  Corus Staal set forth its position on the duty absorption issue briefly in a pre-preliminary response to Commerce's request for information, which Commerce rejected in its preliminary results.  *Id.*  Thereafter, Corus Staal submitted an administrative case brief but omitted the duty absorption argument.  *Id.*  The manufacturer acknowledged that it failed to raise the duty absorption issue in its case brief but argued that its failure

should be excused because raising the issue again would have been futile. *Id.* Corus Staal asserted that Commerce was already on notice of its position from its pre-preliminary submission and noted that Commerce rejected that position in the preliminary results. Commerce had further consistently taken a position contrary to Corus Staal's absorption argument in previous cases and "was therefore unlikely to accept those arguments if Corus pressed them in its case brief." *Id.*

The Federal Circuit was unpersuaded by Corus Staal's futility claim. Instead, it found that Corus Staal's "failure to raise its objections to the treatment of the duty absorption issue in the preliminary results . . . 'essentially precluded Commerce from the opportunity to make a final determination on the issue.'" *Id.* at 1380. The Federal Circuit explained that the futility exception "is a narrow one" and "[t]he mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies." *Id.* at 1379. Moreover, it was "not obvious that the presentation of [Corus Staal's] arguments to the agency would have been pointless," adding "even if it is likely that Commerce would have rejected Corus's legal and factual showings, it would still have been preferable, for purposes of administrative regularity and judicial efficiency, for Corus to make its arguments in its case brief and for Commerce to give its full and final administrative response in the final results." *Id.* at 1380. Commerce's initial response in the preliminary results was brief and expressly designated as preliminary. It was "not designed to be Commerce's last word on the matter"; and on

further consideration, the agency could have taken a different position in the final results. *Id.* Corus Staal's failure to raise the issue in its case brief to the agency, as required by Commerce's regulation, could not be excused by futility. *Id.* at 1379 (citing 19 C.F.R. § 351.309(b)(1)).

*Itochu* represents the flip side of the coin. There, a Chinese respondent was party to an administrative review of its American sales of steel nails that were subject to an antidumping-duty order. 733 F.3d at 1142. While the review was underway, one of the domestic manufacturers withdrew its petition with regard to "four types of steel nails" and asked Commerce to revoke the order as to those products. *Id.* Itochu submitted comments in support of the domestic manufacturer's withdrawal and also urged that the partial revocation extend back to the beginning of the administrative review period. Itochu "put its argument on the record before Commerce issued its preliminary results: it set forth its position in comments, met with eight department officials to discuss the issue, and submitted legal support for its position." *Id.* at 1146. However, when Commerce issued its preliminary determination, it rejected Itochu's position about the scope of the partial revocation of the order because it did "not find this to be consistent with [Commerce's] recent practice." *Id.* at 1143–44 (alteration in original) (quoting *Certain Steel Nails from the People's Republic of China, Initiation and Preliminary Results of Antidumping Duty Changed Circumstances Review*, 76 Fed. Reg. 22,369, 22,371 (Apr. 21, 2011)). Itochu did not submit comments after the preliminary determination; and in the final determination, Commerce once

again rejected Itochu's position and selected a date after the period of administrative review as the effective date for the revocation.

The Federal Circuit held that futility excused Itochu from presenting its argument one more time before the agency. *Id.* at 1148. Exhaustion applies when it serves a "practical purpose" — that of giving notice to the agency so that it may be the initial decision maker and create a record for subsequent judicial review. *Id.* at 1145. None of those purposes would have been served by requiring Itochu to submit the same argument an additional time. Commerce was on notice of Itochu's argument and indeed addressed it in Commerce's final decision. *Id.* at 1146 ("Commerce [did not] reject Itochu's effective-date position for a failure to exhaust or indicate that it thought Itochu had abandoned its position. To the contrary, Commerce referred to Itochu's position and again ruled on the effective-date issue on the merits."). Thus, Commerce had made the initial decision and created a record reflecting the agency's full reasoning to allow for judicial review. *Id.* Where a party had eight meetings with Commerce Department officials on the topic and submitted two separate written versions of its argument, it belied reason to believe that yet another submission to the agency would have made a difference or convinced the agency to change its mind. *Id.* Itochu was also "under no specific requirement to file a case brief" because Commerce's exhaustion regulation requiring parties to state "all arguments that continue in the submitter's view to be relevant to the Secretary's final determination" did not apply. *See* 19 C.F.R. § 351.309(b)(1) (excluding changed-circumstance reviews

from the proceedings where written briefs are required); *Itochu*, 733 F.3d at 1145 n.1 (noting the regulation's inapplicability).  Futility thus excused Itochu's failure to make the same argument to the agency for the eleventh time, and the courts could address the merits of its case.  *Id.* at 1148.

Ellwood City repeatedly referenced *Itochu* at oral argument and in its briefs, erroneously claiming that its facts are analogous.  *Itochu* stands for the proposition that, where a party has repeatedly informed Commerce of its objections, it may be excused from omitting the same objection in an optional brief to the agency, particularly if the agency actually responds to the objection in question.  *Itochu* does not permit a party to omit *any* clear mention of its objection and then blindside the agency with a new argument once the matter reaches court.  The issue is one of fundamental fairness; the Commerce Department in *Itochu* was repeatedly informed of the party's objection and responded to it both in the preliminary and final results.  Here, Commerce had no warning that Ellwood City would object and had no opportunity to respond before these proceedings.

Seeking to come within *Itochu*'s framework, Ellwood City asserts that "Commerce was aware of Plaintiffs' desire for on-site verification" because of comments it submitted after the preliminary determination.  Pls.' Supp. Br. at 2, ECF No. 42.  However, when given an opportunity by the Court to submit a supplemental brief listing each instance where it objected to Commerce's failure to conduct an on-site verification, Plaintiffs could only muster one citation.  That citation, to the

conclusion section of its brief to the agency, merely requested that Commerce "ask respondents to finally support the record that they have provided" because "COVID-19 will likely prevent Commerce from conducting a robust on-site verification, as contemplated under the statute." *See* J.A. at 82,917–18, ECF No. 29 (post-preliminary determination comments cited in Pls.' Supp. Br. at 2, ECF No. 42). Far from objecting to Commerce's actions, Plaintiffs endorsed them. *See, e.g.*, Admin. Case Br. at 2, J.A. at 83,112, ECF No. 29 ("But for Commerce's verification questionnaire, these issues may have gone undetected . . . . Commerce's verification has now revealed that . . . . "); *see also id.* at 3 ("Commerce's Verification Questionnaire instruct[ed] Lucchini to reconcile . . . ."); *id.* at 6 ("Th[e] verification exercise has definitively established that Metalcam's reported costs do not reconcile . . . ."); *id.* at 7 ("verification has established that Metalcam supplied unexplained [items] . . . . verification also undermined Metalcam's previously reported individual cost elements . . . . These failures, which only came to light in verifying Metalcam's responses, are substantial."); *id.* at 48 ("As a result of the information obtained in the Verification Questionnaire, Commerce should apply partial adverse facts available . . . ."); *id.* at 66–67 ("Commerce obtained additional information for these commissions in the Verification Response . . . ."); *id.* at 85 ("We are grateful for Commerce's Verification Questionnaires."). Plaintiffs' actions — literally complimenting Commerce on its chosen course of action and then excoriating them in court after an adverse determination — has the feeling of a strategic litigation decision that did not

go as planned. Plaintiffs may well have decided to work with the agency's chosen verification procedures in the hope that the new process would yield a positive result. Whatever Plaintiffs' reasoning for withholding its objection, Commerce cannot be expected to respond to an argument never made. And because Plaintiffs never objected, *Itochu* offers them no safe harbor. *See* 733 F.3d at 1146–48 (finding futility where a party raised an issue at least ten times before the agency and the agency responded to the argument in its final determination).

In a final effort to come within the exception, Ellwood City asserts futility because "[a]t the briefing and hearing stage, reverification was a temporal impossibility." Pls.' Reply at 9, ECF No. 26. It cites the Supreme Court's recent admonition that it "makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested." *Id.* (citing *Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021)). However, *Carr* is readily distinguishable. There, the Supreme Court addressed whether applicants for Social Security benefits should be required to raise constitutional objections before the agency's administrative law judges, who had no power to rule on constitutional claims. The Justices explained, "agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise." *Id.* at 1360. Therefore, "it is sometimes appropriate for courts to entertain constitutional challenges to statutes or other agency-wide policies even when those challenges were not raised in administrative proceedings." *Id.*

But Plaintiffs' claims here do not invoke the Constitution; they are instead about the proper agency procedures for verifying information submitted by the foreign exporters under investigation. Responding to procedural issues or methodological disputes in antidumping investigations is *precisely* Commerce's area of expertise. *Cf. McCarthy*, 503 U.S. at 145 (holding that exhaustion principles are at their strongest when the question requires the agency to apply "its special expertise"). Even if Commerce could not have further tolled the deadline for the final determination or established new verification procedures in the remaining time, "it would still have been preferable, for purposes of administrative regularity and judicial efficiency," for Ellwood City "to make its arguments in its case brief and for Commerce to give its full and final administrative response in the final results." *Corus Staal*, 502 F.3d at 1380. Commerce could then have acknowledged and responded to Ellwood City's objections on the record. And this is to say nothing of what procedural modifications Commerce could have made had Plaintiffs not remained silent but instead stated their objections early and often. *Cf. Itochu*, 733 F.3d at 1146 (noting that appellant stated its objections before eight separate departmental officials and submitted its legal rationale in writing *before* the optional final briefing stage).

Commerce could reasonably have concluded that it resolved Ellwood City's concerns by its use of questionnaires to test information, and Ellwood City never said otherwise despite having ample opportunity to do so. *See* Hearing Tr. at 36:5–7, J.A.

at 83,204, ECF No. 29 (praising Commerce for taking the "extraordinary step in these times of the coronavirus to issue a verification questionnaire. We're glad you did."). The futility exception "is a narrow one," and Ellwood City has not satisfied it.  *Corus Staal*, 502 F.3d at 1380.  By failing to object to Commerce's decision to issue a questionnaire in lieu of a traditional on-site verification, Ellwood City "essentially precluded Commerce from the opportunity to make a final determination on the issue" and place its reasons for its actions in the administrative record.  *Id.*  Because it is far from "obvious that the presentation of [Ellwood City's] arguments to the agency would have been pointless," Plaintiff has failed to demonstrate that its failure to raise the issue before the agency may be excused by futility.  *Id.*

### 2.      Pure Question of Law

Although Ellwood City's appeal to futility proved futile, it advances one further exception to preserve its argument:  pure questions of law.   "Requiring exhaustion may also be inappropriate where the issue for the court is a 'pure question of law' that can be addressed without further factual development or further agency exercise of discretion."  *Itochu*, 733 F.3d at 1146.  Even when it is undisputed that a respondent did not raise an argument in proceedings before Commerce, if the argument "implicates a pure question of law, it may be addressed" on appeal.  *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007).  That is only the case, however, where "[s]tatutory construction alone is sufficient to resolve the merits of the argument," and where no evidentiary issues remain.  *Id.*  Because Ellwood City's

argument implicates questions of past practice and Commerce's ability to comply with any statutory mandate — factual matters that would require the development of a record — the pure question of law exception does not apply.

The Federal Circuit has emphasized the exception's limited scope by holding it only applicable to cases where further factual development would be unnecessary. In *Consolidated Bearings*, an importer challenged Commerce's liquidation instructions. Because the importer did not participate in the underlying administrative review, it did not raise its challenge before the agency. *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003). When the agency asserted that Consolidated Bearings had failed to exhaust its administrative remedies and was barred from bringing the matter before the court, Consolidated argued that the case presented a "pure legal issue" that would only require examination of the statute governing liquidation of entries to determine who was correct. *Id.* The Federal Circuit did not find the inquiry to be so limited. Consolidated had "alleged that Commerce arbitrarily changed its well-established practice and contravened the reasonable expectations of importers" regarding the liquidation instructions Commerce gave to Customs at the conclusion of the administrative review. *Id.* Because those allegations "require[d] a factual record of Commerce's past practice and an assessment of Commerce's justifications for any departure from that past practice," the Federal Circuit held that "[s]tatutory construction alone" was not sufficient to resolve the case and the "pure question of law" exception did not apply. *Id.*

Ellwood City's argument falls into the same difficulties. Pointing to Commerce's acknowledgement that it was "unable to conduct onsite verification of the information relied upon in making its final determination in this investigation as provided for in section 782(i)," Pls.' Reply at 10–11, ECF No. 26; 85 Fed. Reg. 79,996–97, J.A. at 83,316, ECF No. 29, Plaintiffs claim Commerce admitted it violated the statute and that no further factual record is necessary. Pls.' Reply at 10–11, ECF No. 26. But Ellwood City's argument is not nearly so concise. To prove its case that past obstacles have not prevented a more fulsome verification, Ellwood City cites Commerce's previous actions verifying information from a Pakistani respondent in a Washington, D.C. hotel; tolling deadlines after 9/11 to allow for security concerns to pass; and conducting what Ellwood City admits was an "off-site verification at a Beijing hotel rather than on-site verification at the respondent's production facilities." Pls.' Mot. at 22–23, ECF No. 21. Ellwood City further suggests that "Commerce could have arranged a virtual 'on site' verification visit with Lucchini and Metalcam, given Commerce's extensive use of videoconferencing during the pandemic." *Id*. at 24. It also complains that Commerce failed to fully document in the record why it "believed the alternative procedures it undertook were adequate." *Id*. at 27. And finally it asserts in a bolded heading that **"Commerce Unreasonably Departed from Past Practice."** *Id*.

Ellwood City's argument therefore appears to be perfectly analogous to that in *Consolidated Bearings*. Like Ellwood City, Consolidated Bearings first alleged that

all a court need do is examine specific statutory provisions to rule on its claim. *Compare* Pls.' Mot. at 22 (citing 19 U.S.C. § 1677m(i); 19 C.F.R. § 351.307*), with Consol. Bearings Co.*, 348 F.3d at 1003 (citing 19 U.S.C. § 1675). However, this seemingly simple statutory claim quickly morphs into allegations that Commerce had deviated from "past practices." *Compare* Pls.' Mot. at 22–23 (citing past examples from Pakistan, Germany, France, the United Kingdom, Korea, and China), *with Consol. Bearings Co.*, 348 F.3d at 1003 (noting that Consolidated alleged Commerce violated its "well-established prior practice of applying the final results of administrative reviews to importers who did not participate in the review, but import the same merchandise from resellers"). Indeed, Ellwood City's acceptance of these past "off-site" practices as "verification" and suggestion of virtual alternatives confirm the factual rather than purely legal nature of the inquiry. *See* Pls.' Mot. at 22–23 (citing with approval these "alternative mechanisms of the type previously employed"). These are exactly the type of allegations that "require a factual record of Commerce's past practice and an assessment of Commerce's justifications for any departure from that past practice." *Consol. Bearings Co.*, 348 F.3d at 1003. No such record exists because Plaintiffs failed to raise their claim before the agency. As "[s]tatutory construction alone" is not sufficient to resolve Plaintiffs' claim, the pure question of law exception does not apply.[3] *Id.*

---

[3] To the extent Plaintiffs' argument regarding the lack of a verification report is separate from their larger verification questionnaire argument, the Court will accept their premise *arguendo* that Commerce failed to include the required materials in the record and that the pure question of law

### 3.    Failure to Exhaust

There could be few more "appropriate" cases to apply the administrative exhaustion requirement than this one.  *Cf.* 28 U.S.C. § 2637(d) ("requir[ing] the exhaustion of administrative remedies" wherever "appropriate").  Plaintiffs initially complimented the agency's verification questionnaire only to blindside the agency in court when they disagreed with the agency's final determination.  Exhaustion does not require that Ellwood City submit a dissertation on its legal arguments; it merely requires that the agency receive fair notice of them.  Although *Itochu* suggests that the Federal Circuit may allow a party to omit raising the same argument in every agency submission, it does not permit a party to fail to provide *any* notice of its objection.  *Cf. Itochu*, 733 F.3d at 1146 (holding that, because Commerce addressed the earlier-raised argument in its final decision, there was no unfairness to the agency in considering the argument on appeal).  Plaintiffs' haste in seeking an outcome, which may have influenced their strategy, does not excuse their failure to

---

exception applies.  Plaintiffs' claim still fails because they have not demonstrated substantial prejudice.  *See Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (stating the "general principle" that it is always within the discretion of "an administrative agency to relax or modify its procedural rules . . . when in a given case the ends of justice require it.  The action . . . is not reviewable except upon a showing of substantial prejudice to the complaining party."); *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1330 (Fed. Cir. 2013) ("the suspension in this case could be invalidated only if Great American showed that the agency's procedural error caused it substantial prejudice"); *PAM S.p.A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006) ("[A]gencies may relax or modify their procedural rules and . . . a subsequent agency action is only rescindable 'upon a showing of substantial prejudice.'")  Plaintiffs point to no argument they would have raised had Commerce earlier placed additional information on the record, *see* Pls.' Mot. at 21, ECF No. 21, and Plaintiffs had plenty of notice Commerce did not intend to conduct a traditional on-site verification.  Letter to Metalcam, J.A. at 3,027, ECF No. 30 (informing all parties of the "questionnaire in lieu of on-site verification" method Commerce planned to pursue).  Plaintiffs just chose not to object.  Indeed, the remaining substantive arguments Plaintiffs advance are the same ones they made — and preserved — before the agency.

comply with Commerce's regulation and to create an appealable record.  *See* Tr. 24: 17–23 ("To be perfectly blunt with you . . . . We need[ed] to get a final determination as soon as possible.").

The Federal Circuit has held that Congress intended that, "absent a strong contrary reason, the [trade] court should insist that parties exhaust their remedies before the pertinent administrative agencies."  *Corus Staal*, 502 F.2d at 1379.  Had Plaintiffs done so here, this Court would have had the benefit of the agency's reasoned judgment about both its interpretation of its legal authorities as well as its past practices.  Because Ellwood City chose not to assert the alleged illegality of Commerce's verification questionnaire, the administrative record is devoid of Commerce's explanation of both the law and the facts supporting its chosen methodology.  The Court may not now consider extra-record evidence about past practices to resolve Plaintiffs' claim.  19 U.S.C. § 1516a(b)(1)(B)(i) (limiting the Court to reviewing conclusions and evidence found "on the record").  Ellwood City has failed to identify a "strong contrary reason" not to apply the general rule that claims may not be raised for the first time in court.  *Corus Staal*, 502 F.3d at 1379.  The Court therefore may not consider the merits of Plaintiffs' claims because of their failure to exhaust their administrative remedies.  *See* 28 U.S.C. § 2637(d).

### III. Substantial Evidence

Although Ellwood City did not preserve what it now describes as its "major issue" on appeal, it did preserve five arguments regarding how Commerce analyzed

the evidence before it and responded to Ellwood City's comments regarding its calculations. In reviewing antidumping determinations, this Court is bound to adhere to the substantial evidence standard. The Court will sustain Commerce's determination if it "articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. When reviewing a determination for substantial evidence, the Court's role is not to "reweigh the evidence" or "reconsider questions of fact anew." *Crucible Materials Corp.*, 975 F.2d at 815. Rather, in "antidumping cases, we accord substantial deference to Commerce's statutory interpretation . . . ." *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995). An examination of the record demonstrates that Commerce has met its burden in each of Plaintiffs' preserved arguments, which are summarized below.

### 1.      Metalcam's Records Failed to Reconcile

In its briefing before the Court, Ellwood City asserts that "Metalcam failed to reconcile its product-specific costs of raw materials, internal machining, and external machining, as reported in its cost database, to its audited financial statements." Pls.' Reply at 18, ECF No. 26. Ellwood City adequately preserved this argument at length. It asserted in its administrative case brief before the agency that "Metalcam's reported direct material costs do not reconcile to the Income Statement," J.A. at 83,121, ECF No. 29; that "Metalcam's [e]xternal [m]achining [c]osts" also do not reconcile to Metalcam's financial reports or its financial statements, J.A. at 83,125,

ECF No. 29; and that "Metalcam's [r]eported [i]nternal [c]osts" do not reconcile to its

financial statements,  J.A. at 83,133, ECF No. 29.

Commerce responded to this argument on the record in detail.  Commerce

described its usual method for calculating costs and the statute from which its

methodology is derived.  Commerce also thoroughly described Metalcam's cost

accounting system, which "accounts for the total cost of manufacturing at the job

order level."  IDM at 7, J.A. at 83,288, ECF No. 29.  The job order level is the basis

for the manufacturing costs that Metalcam reports to Commerce, and Metalcam then

calculates a variance based on the steel plant and forging mill where the products are

manufactured to derive the actual costs.  *Id.*  Commerce acknowledged the specific

arguments raised by Ellwood City:  "The petitioners allege that costs as reported in

Metalcam's trial balance, the *Conto Economico* (internal operating report) and the

product family level standard costs do not reconcile."  IDM at 8, J.A. at 83,289, ECF

No. 29.  "We disagree. . . . While the trial balance and internal operating report may

not reconcile to the product family level standard costs by constituent cost elements

. . . they do reconcile in total."  *Id.*  Commerce explained that the discrepancy Ellwood

City noted occurred because the "product family level standard costs, at the

constituent cost level, cannot be reconciled to the trial balance or to the internal

operating report as it is a characteristically different report compared to the other

two documents from Metalcam's accounting systems."  *Id.*  Commerce concluded that

"in total, the costs recorded in Metalcam's trial balance, internal operating report,

and product family level standard costs, adjusted by the variance, reconcile." *Id.*

Thus, Commerce evaluated the same documents on the record cited by Plaintiffs,

explained its methodology, and its conclusions. Evaluating Ellwood City's arguments

and reviewing the record, the Court declines to reweigh the evidence, and finds that

substantial evidence supports Commerce's conclusions regarding Metalcam's cost

reconciliation.

### 2.   Metalcam's Verification Response Did Not Support Its Previously Reported Data, Rendering These Data Unreliable.

Ellwood City also argued that "Commerce additionally erred in relying on

Metalcam's cost reconciliation because source documentation it submitted in

response to Commerce's 'questionnaire in lieu of verification' did not support

Metalcam's prior questionnaire responses." Pls.' Reply at 21, ECF No. 26. One of the

specific errors Ellwood City identified was a formula error. Pls.' Mot. at 31, ECF No.

21. Ellwood City stated this objection in numerous ways in its administrative brief,

arguing that "[t]here are many differences between Exhibit CVE-3 and the

documents it purports to verify" and "[i]nsofar as Metalcam was asked to provide a

verification of its submitted data and the verification submission does not match its

revised submission in its supplemental questionnaire response, Metalcam has not

passed verification." J.A. at 83,124, ECF No. 29.

Commerce acknowledged Ellwood City's argument and explained its rationale

for disagreeing: "We agree with petitioners that the cost reconciliation worksheet

contained a formula error in one of the reconciling items . . . . However, after fully

examining the record, as noted by Metalcam, we found the same formula error in the corresponding reconciling item." IDM at 7, J.A. at 83,288, ECF No. 29. Commerce explained that "[b]ecause one of these reconciling items is a subtraction and the other error is an addition, the net result of the two errors continues to show that Metalcam's reported cost file reconciled to its financial statement costs." *Id.* Once again, Commerce acknowledged Plaintiffs' concern, evaluated the document at issue, and came to a different conclusion on the record regarding these two minor errors. Ellwood City's continued dissatisfaction with Commerce's response and alternate interpretation of the formula error's impact on the overall reliability of Metalcam's data does not change the fact that a reasonable mind evaluating the record could find that substantial evidence supports Commerce's conclusion. The Court finds that Commerce has adequately answered this challenge on the record, and substantial evidence supports Commerce's evaluation of the reliability of Metalcam's data.

3.      **By Not Rebutting the Use of Flawed Raw and Steel Ingot Costs, Commerce Admits Error**

Ellwood City alleges that Commerce erred in its treatment of its concerns about Metalcam's steel ingot costs. Pls.' Mot. at 33, ECF No. 21. Ellwood City preserved this argument in its administrative brief. *See* J.A. at 83,142, ECF No. 29. Commerce responded to this argument on the record, summarizing the issue: "The petitioners also allege that Metalcam lowered its actual POI[4] costs for forged ingots

---

[4] "POI" means "period of investigation."

that are held in semi-finished inventory waiting for a fluid end blocks order." IDM

at 9, J.A. at 83,290, ECF No. 29.

Commerce then explained that "[r]ecord evidence does not support a claim that

there is an understatement of the reported costs due to ingot costs being held in semi-

finished inventory." *Id.* Commerce ultimately concluded that "review of the cost of

sales in the trial balance for the POI shows that the inventory changes in the value

of semi-finished goods are appropriately included in the cost of sales, and likewise

appropriately included in the reported cost of manufacture as demonstrated in the

overall cost reconciliation." *Id.* Admittedly, Commerce is more conclusory and less

detailed in its response to this argument than it is to many of the others. But all that

Commerce needed to do was "articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made." *Motor*

*Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Commerce, reviewing Plaintiffs' complaint and

investigating the matter at issue, applied its expertise and decided that Metalcam's

allocation of steel ingot costs to semi-finished inventory was appropriate given the

circumstances. Both the evidence and the explanation of the record are sufficient to

support Commerce's conclusion, and the Court therefore finds that substantial

evidence supports Commerce's findings regarding steel ingot costs.

### 4. Commerce's Reliance on Metalcam's Sales Data Was Unreasonable

Plaintiffs object to Commerce's reliance on Metalcam's sales data: "Commerce

recognized that Metalcam manually moved certain revenue items in its books and

records, which was not disclosed until Metalcam's response to Commerce's questionnaire in lieu of verification." Pls.' Mot. at 34–35, ECF No. 21. Ellwood City asserts that "these types of belated disclosures and failures to verify without new factual information have been the basis for Commerce to apply adverse inferences [in the past]." *Id.* Plaintiffs preserved that argument during the administrative briefing, asserting that "Metalcam made undisclosed and unsupported adjustments to specific General Ledger accounts." J.A. at 83,149, ECF No. 29.

On the record, Commerce explained in detail what led to the adjustments to the ledger accounts and how they could be resolved: For certain general sales ledgers, when finalizing the books at the end of the 2018 and 2019 fiscal years, "a certain limited number of invoices was (*sic*) either reclassified from one sales revenue general ledger account to the other, or the total invoice value for certain invoices booked at year end was appropriated to those fiscal quarters in which the respective revenue should have been recognized." IDM at 10, J.A. at 83,291, ECF No. 29. According to Commerce, in each instance of an adjustment, Metalcam identified how the affected invoices were recorded in its accounting system, provided the invoices to Commerce, and reconciled the values for the general ledger accounts. *Id.* This evidence led Commerce to conclude that "the petitioners' assertion is misleading when arguing that Metalcam's manual movement of certain revenue items finds no basis in Metalcam's books and records" because "the nature of revenue activity described in affected invoices taken together with the names and structure of sales revenue

general ledger accounts, support the narrative Metalcam provided on the record justifying certain anticipated divergences between financial accounting and trial balance information, affecting certain general ledger accounts." *Id.* Commerce evaluated the books and records and did not find any conflict between the narrative Metalcam provided and the records on which the narrative was based, despite Plaintiffs' beliefs to the contrary. The Court is satisfied that Commerce has provided evidence on the record to support its reliance on Metalcam's sales data and finds that substantial evidence exists for Commerce's findings.

### 5.   **Lucchini Failed to Timely Report Its Yield Losses**

Finally, Plaintiffs also argue that "Lucchini's response to the 'questionnaire in lieu of verification' disclosed for the first time that Lucchini buried yield losses within its 'purchased price' for steel ingot and in so doing, prevented Commerce from examining the reasonableness of these yield losses." Pls.' Mot. at 36, ECF No. 21. Ellwood City believes that further examination might have revealed that the impact of this issue was more widespread. *Id.* Ellwood City raised this issue thoroughly in its administrative case brief: "Lucchini's Verification Response finally sheds light on Lucchini's steel ingot costs: Lucchini buried yield loss within its reported 'purchased price' for steel ingot and in so doing precluded Commerce from examining the reasonableness of the yield losses." J.A. at 83,158, ECF No. 29.

Commerce responded fulsomely on the record, explaining its methodology: "[W]e adjusted Lucchini's reported costs to account for the cost of completed MUC[5] which was scrapped for quality reasons. . . . Commerce's practice is to ensure a fully yielded cost by allocating total input cost over the total of finished goods production." IDM at 25, J.A. at 83,306, ECF No. 29. "[B]ecause Lucchini provided information concerning the total POI cost of non-conforming products on a product-group specific basis, we have allocated the cost of non-conforming products in the product group which contains MUC, over the production quantity of conforming finished goods." *Id.* On the record, Commerce explained its decision to adjust Lucchini's costs and further explained why, in its view, Lucchini's responses did not lead to any loss of credibility in those responses. In so doing, Commerce referred to its past practice and articulated a rational connection between the facts of the case and its choice to accept Lucchini's steel ingot costs with Commerce's adjustments. Commerce was specific in its explanation, and substantial evidence supports its conclusion.

**6.      Substantial Evidence Exists to Support Commerce's Determination**

In each of Plaintiffs' preceding arguments, the evidence appears to demonstrate good faith disagreement. Although Plaintiffs may dispute Commerce's conclusions and the weight given to various pieces of evidence, Commerce clearly acknowledged Plaintiffs' arguments and explained how it reached its ultimate

---

[5] "MUC" is "merchandise under consideration."

determination on each issue. Commerce relied on information on the record and reconciled it to its satisfaction in calculating the dumping margins for Metalcam and Lucchini. The Court must not "reweigh the evidence" and will not second-guess Commerce on individual line-item decisions that pertain to its particular area of expertise. *Crucible Materials Corp.*, 975 F.2d at 815. Because Commerce responded to each of Plaintiffs' arguments on the record, articulated a rational explanation for each decision, and the evidence on the record adequately supports Commerce's conclusions, the Court finds that substantial evidence supports each of Commerce's decisions in the remaining preserved arguments Plaintiffs raise.[6]

## CONCLUSION

The "major issue" in this case concerns the validity of the verification questionnaire Commerce employed in the underlying investigation. Pls.' Mot. at 14, ECF No. 21. Ellwood City had multiple opportunities to object to the verification methodology Commerce employed. Plaintiffs knew that Commerce's analysts would not be boarding planes to Italy to conduct an on-site verification in the summer of 2020. Yet, Plaintiffs were silent on that issue, including in their 106-page administrative case brief otherwise full of arguments and objections. Commerce had no opportunity to respond on the record to Plaintiffs' objection that its questionnaires

---

[6] Because the Court finds substantial evidence supports Commerce's rejection of Plaintiffs' arguments, it necessarily finds that substantial evidence also supports Commerce's refusal to use facts available with an adverse inference in light of the alleged deficiencies Plaintiffs identified. *See* Pls.' Mot. at 28–36, ECF No. 21.

did not satisfy the statutory requirements for verification. Nor did Commerce have a chance to evaluate the possibility of conducting a "virtual on-site verification" or any other of Plaintiffs' now-proposed alternatives. Pls.' Mot. at 24, ECF No. 21. Exhaustion would have served to "protect administrative agency authority and promote judicial efficiency." *Itochu*, 733 F.3d at 1145. Because Ellwood City failed to exhaust its administrative remedies, the Court cannot reach the merits of its verification challenge.

Plaintiffs' remaining arguments would require the Court to reweigh the evidence or substitute its judgment for that of Commerce. The substantial evidence standard prohibits the Court from taking that course. Plaintiffs' Motion for Judgment on the Agency Record is therefore **DENIED**; and Commerce's determination is **SUSTAINED**. Judgment will be entered accordingly.


                                        /s/      Stephen Alexander Vaden
                                        Stephen Alexander Vaden, Judge


Dated:    June 14, 2022
          New York, New York